**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

WEEMS INDUSTRIES, INC. d/b/a
LEGACY MANUFACTURING
COMPANY,

        Plaintiff,

vs.

TEKNOR APEX COMPANY,

        Defendant.

No.  C20-108-LTS

**MEMORANDUM
OPINION AND ORDER**

# TABLE OF CONTENTS

I. BACKGROUND ........................................................................... 3

II. PROCEDURAL HISTORY ........................................................... 3

III. FINDINGS OF FACT .................................................................. 5

    A. The Parties ............................................................................ 5
    B. Weems Develops the Flexzilla Color ...................................... 5
    C. Weems Uses the Pantone Color Matching System ................... 12
    D. Weems Starts Promoting the Safety Benefits of Flexzilla's
       Chartreuse Color ............................................................... 15
    E. Weems Applies to Register Its Color Mark for Air Hoses ........... 23
    F. Weems Stops Promoting the Safety Benefits of Flexzilla's Chartreuse Color .... 26
    G. Weems Responds to the June 15, 2009, Office Action ............... 31
    H. Weems Commences Enforcement Efforts ............................... 34
    I. Weems Changes Flexzilla's Color Again ................................ 37
    J. Weems Applies to Register its Color Mark for Compressed Air Hoses on the ......
       Principal Register ............................................................... 45
    K. Weems Undertakes Project 716 ............................................ 47
    L. Weems Applies to Register its Color Mark for Water Hoses on the Principal
       Register ............................................................................ 49
    M. The Use of Color in the Water and Garden Hose Industry ......... 52
    N. Teknor Develops the zero-G and zero-G Pro Hoses ................. 56

O. Teknor Develops the NexFlex Hose……………………………………………58

P. Weems Attempts to Prevent Teknor from Selling Yellow-Green Water Hoses .60

Q. Recognition of Flexzilla's "Chartreuse" Color as a Trademark ………………66

    1. Consumer Evidence……………………………………………………………66

    2. Flexzilla-Related Advertising Expenses …………………………………………66

    3. Form and Manner of Flexzilla-Related Advertising ………………………67

R. The Appearance of the Products in the Marketplace……………………………68

S. The Role of Color in Consumers' Purchasing Decisions …………………………70

T. The Lack of Actual Confusion…………………………………………………71

U. Expert Opinions and Testimony…………………………………………………72

    1.The Scope of Weems' Color Mark………………………………………72

    2. Functionality ……………………………………………………………77

    3. Likelihood of Confusion ………………………………………………79

IV. ANALYSIS ………………………………………………………………………89

A. Does Weems Own a Valid, Protectable Trademark in Chartreuse?……………91

    1. Functionality ……………………………………………………………93

    2. Distinctiveness …………………………………………………………112

B. Should the '921 Registration be Canceled? ………………………………… 119

V. CONCLUSION ………………………………………………………………… 121

2

# I.    BACKGROUND

This case involves the alleged infringement of a color trademark for water hoses that is registered on the Principal Register of the United States Patent and Trademark Office as Registration No. 5,293,921 (the '921 Registration).   A bench trial on the merits took place from August 28, 2023, through September 7, 2023.  Both before and during trial, the parties asserted an absurd and entirely-unnecessary number of evidentiary objections.[1]   I largely reserved ruling on those objections to permit a full and complete record to be made within a reasonable amount of time.  I also reserved ruling on the parties' various motions for judgment as a matter of law.

After receiving all of the evidence, I requested briefing on the still-pending evidentiary issues.  Doc. 240.  The parties then filed briefs (Docs. 252, 253) and responses (Docs. 254, 255).  On December 1, 2023, I filed an order resolving the evidentiary issues and establishing a schedule for briefing the merits of the various claims and defenses.  Doc. 262.  I also requested the submission of separate, proposed findings of fact.  *Id*.  The final brief – plaintiff's reply brief – was filed on April 4, 2024.  All issues are now fully submitted and ready for decision.  Based on the extent and quality of the parties' written arguments, I find that oral argument is not necessary.

# II.    PROCEDURAL HISTORY

Plaintiff Weems Industries, Inc. (Weems), filed its complaint (Doc. 1) on November 13, 2020, and filed an amended complaint (Doc. 21) on February 9, 2021.  The amended complaint includes the following counts:

---

[1] For example, defendant objected to over 130 of plaintiff's trial exhibits (roughly 60%).  Not to be outdone, plaintiff objected to over **700** of defendant's trial exhibits (roughly 85%).  Clearly no rational thought, or thought of any kind, went into the majority of the objections.  Many were boilerplate relevancy objections or, even worse, objections invoking Federal Rule of Evidence 403.  For a bench trial.  Really.

I.      trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1);

II.     common law trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a);

III.    unfair competition under the Lanham Act, 15 U.S.C. § 1125(a);

IV.     unfair competition under Iowa common law; and

V.      unjust enrichment.

Doc. 21. Defendant Teknor Apex Company (Teknor) filed an answer and counterclaim (Doc. 39) on June 1, 2021, asserting nine affirmative defenses and 11 counterclaims, with many of the counterclaims overlapping the affirmative defenses. Teknor's counterclaims seek declaratory relief as follows:

I.      Non-Infringement

II.     No Unfair Competition

III.    Cancellation of Registration (as not a source indicator)

IV.     Cancellation of Registration (as being functional)

V.      Cancellation of Registration (due to abandonment)

VI.     Cancellation of Registration (based on prior use or non-exclusion use)

VII.    Cancellation of Registration (based on lack of secondary meaning)

VIII.   Cancellation of Registration (based on registration obtained by fraud)

IX.     Cancellation of Registration (based on generic mark)

X.      Cancellation of Registration (based on phantom mark)

XI.     Rectification of Registration

Doc. 39.

After the court ruled on the parties' summary judgment motions, *see* Doc. 197, Teknor filed an unresisted motion (Doc. 213) to strike Weems' jury demand because Weems' only remaining remedies were equitable. The court granted that motion on June 2, 2023, confirming that the case would be tried to the court rather than to a jury. Doc. 215.

4

### III. FINDINGS OF FACT

#### A. The Parties

Weems is an Iowa corporation with its principal place of business in Marion, Iowa. Doc. 21 at ¶ 1; Doc. 42 at ¶ 23. Weems was founded in about 1975 and started as a manufacturers' representative for products sold primarily through agricultural channels and farm stores. Tr. 17:11-23; 18:20-22; 988:18-25. In the 1980s, Weems transitioned to a manufacturing company, as it became involved in the air hose assembly business, and in the 1990s Weems began marketing its own hose reels. Tr. 18:23-19:4; 19:15-18; 22:17-18; 23:8-13; 24:23-25:3; 982:7-983:3. Weems manufactured the housing of these reels itself, purchased air hoses from third parties and then spring-loaded the air hoses onto the hose reel. Tr. 20:17-21:11. These assemblies became a successful part of Weems' business. Tr. 21:14-15; 22:17-19.

Teknor is a Delaware corporation having its principal place of business in Pawtucket, Rhode Island. Doc. 39 at ¶¶ 3-4. Teknor began producing water hoses in the 1950s and has become one of the largest hose manufacturers in the United States. Tr. 452:5-19; 453:13-18.

#### B. Weems Develops the Flexzilla Color

Weems' President, Mark Weems, testified that at some point Weems decided to manufacture its own air hoses. Tr. 16:21-24; 21:20; 25:24-26:5. Weems' Vice President and Director of Marketing, Matthew Weems, testified that Weems' motivation for manufacturing its own air hoses came as a result of losing an account with Lowes for selling PVC air hose assemblies, causing Weems to realize that it needed to offer something that did not already exist in the air hose market. Tr. 985:2-3; 984:21-984:4; 986:6-987:13. In May 2005, Weems hired Richard Schindel to be its Director of Product Development due to his prior experience working for Gates Rubber Company (Gates), also known as Schrader-Bridgeport and Tomkins. Tr. 21:22-22:4;

114:18-25; 631:18-634:5; 637:2-4; 1065:13-22.  While at Gates, Schindel was a plant manager and was responsible for the development and manufacture of Amflo air hoses and their extrusion processes, along with a blended or hybrid PVC hose that Gates manufactured for Snap-On Tools.  Tr. 633:17-634:25; 637:2-4.

Gates made and sold Amflo hoses in a multitude of colors, including fluorescent, high-visibility colors.  Tr. 635:1-636:10; 636:5-12; 637:5-11; T0432 at 1-2, 7, 23.[2] Schindel had worked on these fluorescent, high visibility Amflo air hoses in the late 1990s and Gates still was selling them when Schindel left the company in 2002.  Tr. 635:8-16; 636:15-638:1; T0661 at 1, 65.  Gates referred to these fluorescent, high-visibility colors as "Day Glo," to denote that the colors were like those used for highlighter markers.  Tr. 637:21-638:18.  These colors included hi-vis green and hi-vis yellow.  Tr. 635:17-638:1; T0661 at 1, 65.  One reason for using fluorescent, high-visibility colors on air hoses was a safety concern – to prevent tripping by enhancing visibility of the hose.  Tr. 638:19-23; 643:1-6.

Weems sought to replicate Kuriyama's Tundra mint green air hose, which stood out due to its flexibility and functioning.  Tr. 27:4-7; 30:2-8; 34:-6; 640:17-641:3; 641:11-13; 694:18-25; 987:8-13.  Weems' air hose took approximately a year to develop and was first introduced, under the name "Flexzilla," at the Automotive Aftermarket Products Expo (AAPEX) trade show in November 2006.  Tr. 35:21-22; 36:14-16; 46:23-24; 138:2-5; 645:9-11.  On September 28, 2006, before introducing the Flexzilla air hose into the market, Weems filed an intent-to-use application to register the word "Flexzilla" as a trademark with the United States Patent and Trademark Office. (USPTO).  Tr. 117:16-19.  Weems began shipping its Flexzilla air hoses in May 2007.  T0200 at 1-2.  In its trademark applications, Weems asserted that

---

[2] Trial exhibits that begin with "T" are Teknor's exhibits while trial exhibits that begin with "W" are Weems' exhibits.

its first sale of these air hoses (i.e., the date of first use in commerce) was May 1, 2007. W209 at 2-3, 5, 20, 24, 178; T0034 at 3, 5, 10, 42.

Schindel was primarily responsible for the development of the Flexzilla air hose. Tr. 632:19-633:5; 694:10-13; 1283:7-9; 1284:1-5. In developing the color of the hose, Weems did not have a predetermined color in mind. Tr. 641:23-642:23. The color was not chosen before Weems hired Schindel, or before Flexzilla had been developed. Tr. 645:3-8. Weems was principally concerned with the characteristics of the hose, not the color. Tr. 642:16-25. However, Weems wanted a safety color that was highly visible to prevent tripping hazards associated with air hoses. Tr. 643:1-11. The use of high visibility colors, such as the safety green color used on road safety vests, was common at that time. Tr. 644:15-24.

Weems ultimately chose a bright yellow color, much like the "Day Glo Yellow" Amflo air hose Schindel had developed at Gates. Tr. 641:23-643:2; 643:7-11. As of November 27, 2006, Weems identified the color as "Highlighter Yellow" on its product specification sheets. Tr. 187:16-188:10; T0134 at 5-7. From at least February 6, 2007, through at least July 12, 2007, Weems' product specification sheets referenced the color of the Flexzilla hoses as "Highlighter Yellow Pantone 381C."[3] T0134; T0042 at 1-6; T0134 at 8-22. Weems' "SAP" system, which stored such information as inventory, product numbers and product descriptions, referenced the color of Flexzilla hoses as "yellow." Tr. 707:8-16; T0110 at 1, 3; T0111. Similarly, the product numbers Weems assigned to its Flexzilla products used the suffix "YW" to indicate the color as "yellow." Tr. 137:6-14; 701:11-15; T175 at 1.

In a 2007 advertising piece for a Sears catalog, Weems designated its Flexzilla hoses as "YW" (yellow) and referred to them as "Hi-Vis Air Hose(s)":

---

[3] As will be discussed further below, the Pantone Matching System is a standardized color matching system.

| Flexilla™ The Monster Air Hose | | | Catalog/Online EXCLUSIVE | | |
|---|---|---|---|---|---|
| Item | Catalog Number | Model Number | Description | Weight, lbs. | Price |
| V. | 009-18665 | HFZ14100YW2-CRA | Flexzilla™ 1/4 in. x 100 ft. Hi-Vis Air Hose | 7.13 | $49.99 |
| Also Available | | | | | |
| | 009-18666 | HFZ1450YW2-CRA | Flexzilla™ 1/4 in. x 50 ft. Hi-Vis Air Hose | 3.75 | 29.99 |
| | 009-18667 | HFZ12100YW3-CRA | Flexzilla™ 1/2 in. x 100 ft. Hi-Vis Air Hose | 12.63 | 99.99 |
| | 009-18668 | HFZ1250YW3-CRA | Flexzilla™ 1/2 in. x 50 ft. Hi-Vis Air Hose | 5.94 | 59.99 |
| | 009-18669 | HFZ1225YW3-CRA | Flexzilla™ 1/2 in. x 25 ft. Hi-Vis Air Hose | 3.50 | 39.99 |
| | 009-18670 | HFZ3850YW2-CRA | Flexzilla™ 3/8 in. x 50 ft. Hi-Vis Air Hose | 4.81 | 39.99 |
| | 009-18671 | HFZ3825YW2-CRA | Flexzilla™ 3/8 in. x 25 ft. Hi-Vis Air Hose | 2.63 | 24.99 |

Tr. 134:5-19; 699:24-702:8; T0065.  Nicholas Otte, a graphic designer in Weems' Marketing Department during the relevant time period, testified that when he began working for Weems in the fall of 2007, Flexzilla's color was yellow.  Tr. 692:25-694:3; 695:7-9.  Likewise, Steven Smith, a Quality Control Manager at Weems during the relevant time period, stated that when he began working at Weems in March 2007, Flexzilla's color was highlighter yellow Pantone 381C.  Tr. 1287:2-1288:5.

By February 2009, the color of the Flexzilla air hose had changed from yellow to yellow-green.  Tr. 648:5-6; 651:12-15; 1288:21-1291:16; T0193 at 1.  This change occurred after Weems discovered that Flexzilla's fluorescent, "hi-vis" yellow color would fade over time due to ultraviolet (UV) light exposure.  Tr. 643:23-644:9; 647:15-648:3; 695:10-20; 1288:5-1291:16.  Schindel addressed this problem by using a colorant that withstood UV light, thus changing the color of Flexzilla hoses from yellow to a yellow-green color.  Tr. 647:22-648:6; 695:21-696:7; 1288:21-1289:9.  This change is illustrated by photographs of Flexzilla air hoses manufactured in December 2008 and January 2009:



Tr. 1302:19-1303; T0134 at 3. Schindel had email communications with William Wu, an intermediary with Weems' Taiwanese manufacturer Jieh Ming (known as "Mr. Hose"), in which Schindel confirmed that Ming used "Fluorescent Yellow" in the past because Weems needed the color to be yellow, and then added Fluorescent Green together with Fluorescent Yellow. Tr. 650:5-651:15; 719:23-720:2; 1028:7-12; 1085:21-24; T0193 at 1.

By February 5, 2009, Weems' product specification sheets for Flexzilla hoses identified the outer color of the hoses as "Highlighter Yellow Pantone 389C." Tr. 1289:10-1291:16; T0039 at 1-4; T0134 at 23-27; T0729. Technical drawings denoted that the outer and inner colors of a Flexzilla hose as "Highlighter Yellow Pantone 389C" while acknowledging the previous color: "Pantone was 381C" on "10/2/2007." T0039 at 5. When Weems filed its first application to register the color of Flexzilla as a trademark in May 2009, it described its color mark as "chartreuse, namely, highlighter yellow pantone 389C." W209 at 2-5. When Weems expanded its Flexzilla line to include water hoses in 2009, the Flexzilla water hoses were the same yellow-green color as the Flexzilla air hoses. Tr. 40:20-21; 41:25-42:2; 647:8-14.

9

Mark Weems testified that he conceived of the color of the Flexzilla hose, stating that he wanted the color to be a trademark so it could not be copied and relating a story about how another company, Coilhose Pneumatics, lost market share after Chinese competitors copied the color of its hoses and sold low-cost, inferior hoses.  Tr. 28:11-29:15; 30:15-20; 31:4-11; 35:3-14; 60:17-61:7; 113:10-114:2; 116:9-117:6; 126:25-127:4.  Mark Weems testified that he conceived of the color prior to the development of Flexzilla and that Weems first used the chartreuse color with an ether-based polyurethane hose in 2004.  Tr. 30:21-24; 32:3-33:2; 112:12-16, 117:7-15.  The ether-based polyurethane hose was not successful, but Weems again used chartreuse when it developed what became the Flexzilla air hose.  Tr. 33:24-34:6.

Weems did not immediately refer to the color of its Flexzilla air hose as "chartreuse."  Tr. 37:7-15.  Instead, Weems referred to the color as a "fluorescent highlighter yellow," as a "placeholder, [] a reference for [its] suppliers so that they could kind of start on iterations on . . . what they could do on the color to get it close to what [Weems] wanted."  Tr. 36:16-22; 37:15; 113:20-114:2.  Weems went back and forth with iterations, arrived at a color it liked, was then "able to take it to the show."  Tr. 36:22-24.  Mark Weems testified that after a "drifting" of the original color of the air hose at the end of 2008, the color of Flexzilla air and water hoses has stayed the same ever since.  Tr. 127:14-128:4.

Mark Weems' testimony that Weems first used the chartreuse color in November 2004 is inconsistent with Weems' prior representations regarding its first use of the color.  In its Amended Complaint, Weems alleged that it "first adopted the color chartreuse as a trademark in early 2007, not 2004, when [it] used the color in association with air hoses"  Doc. 21 at ¶ 28.  Weems made the same representation to the USPTO in connection with its applications to register the color as a trademark.  Tr. 112:24:24-113:1; W209 at 2-3, 5-6, 20, 24; T0034 at 2-3, 5, 10.  This is consistent

with statements made by Weems in demand letters to its competitors. T0226; T0227; T0235; T0240.

There are other inconsistencies between the evidentiary record and Mark Weems' trial testimony. If Weems had already selected and used its specific "chartreuse" color on an air hose product in November 2004, there would have been no reason to use a "placeholder" of "highlighter yellow," "Pantone 381C," or "Pantone 389C," and then go back and forth with various iterations before Weems arrived at a color it liked. In addition, on March 12, 2007, Mark Weems sent an email message to Matthew Weems in which he stated that "Coilhose has [a trademark] on their Flexeel 'blue.'" W008. This contradicts Mark Weems' purported reason for selecting chartreuse as the color of Flexzilla (*i.e.*, that Chinese competitors were able to copy Coilhose Pneumatic's color because Coilhose Pneumatic did not have a trademark).

Regardless, it is clear that the color of the Flexzilla hoses did not remain constant over time. Instead, as noted above, the color changed from "highlighter yellow," to "highlighter yellow Pantone 381C," to "highlighter yellow Pantone 389C," to "Pantone 374C." *See also* Tr. 1303:22-1304:6. It is also clear that Weems did not initially select the color of the Flexzilla hose to be a trademark or source identifier. Weems did not promote the color as a trademark on any of its initial packaging or advertising. Tr. 46:25-47:6; 47:16-18; 48:19-21; 50:5-11; 51:12-18; 992:1-3; 997:3-5; 999:10-11; 1000:13-15; 1000:23-25; 1004:6-8; W019; W021B; W022; W023; W024; W025; T0065; T0066; T0067; T0072; T0099. Weems did not demarcate the color of Flexzilla hoses with a trademark notice on any advertising or packaging (as it did with the term "Flexzilla"), or otherwise state that "chartreuse" (or any other color) was a trademark, until Weems received a supplemental trademark registration in 2010. W026. Weems' initial promotional and advertising material did not reference the color of Flexzilla hoses. Tr. 109:19-25; 111:22-24; 992:1-6; 997:3-5; 999:10-11; 1000:13-15; 1000:23-25; 1004:6-8; W019; W021 at 55; W022; W23; W24; W25; T0066 at 9;

11

T0067 at 10; T068; T071; T0072. When Weems' initial advertising did mention color, it simply described the color "yellow." W209 at 30, 46; T098 at 2, 4, 7, 9, 11, 14, 15, 17, 18.

While Mark Weems testified that Weems used the color chartreuse as early as 2004, Weems did not seek to protect that color by filing an application with the USPTO until 2009. W209 at 2-5. During that time period, Weems was familiar with the air hose market and conducted due diligence of that market. Tr. 22:17-23; 118:16-19. Before Flexzilla was introduced, Weems knew that the marketplace comprised a variety of colors, including high visibility yellow and green colored air hoses. Tr. 124:24-125:15; T0655; T0660. For example, Weems knew that Amflo air hoses previously offered fluorescent "Day Glo" yellow and green colored air hoses (among other colors). Tr. 114:18-25; 118:20-122:12; T0204; T432 at 23; T0655 at 1; T0660 at 23. Harbor Freight Tools USA, Inc. (Harbor Freight), had marketed a bright green Amflo air hose since October 4, 2002. T0432 at 1-2, 7, 23. Weems also knew that other manufacturers, including Kuriyama and Snap-on Tools, had marketed high visibility air hoses. Tr. 23:5-12; 124:4-12; 126:17-24; T0648 at 249; T0649.

C. **Weems Uses the Pantone Color Matching System**

From at least March 2007 to July 2014, Weems referred to Flexzilla's color as a Pantone number, not as "chartreuse." Tr. 696:7-15; 1304:7-13. In terms of quality control and ensuring that the color of Flexzilla hoses met their specification, Weems checked Flexzilla hoses for color correctness by references to Pantone color chips. For example, from March 2007 through July 2014, Smith's job at Weems was to ensure the quality of Weems' products at Weems' manufacturing facilities in China and Taiwan and upon receipt in Iowa. Tr. 1281:13-1282:10. He reported to Schindel from 2007 to 2011. Tr. 1282:11-16. Smith regularly tested Flexzilla hoses as they were received, taking two hoses from each purchase order received. Tr. 1284:13-1285:3; 1286:2-4.

12

One hose would be burst tested, while the other would be subject to other tests and inspection, including checking the color of Flexzilla hoses for the correct Pantone color. Tr. 653:4-17; 1285:3-16; 1297:12-21.

Smith assessed color correctness by checking the hoses against a Pantone reference book that was maintained in his department. Tr. 1285:20-1286:1; 1298:12-24; *see also* T0161 at 1. He testified that Weems would always use Pantone as a reference to check the color of Flexzilla hoses for correctness. Tr. 1285:17-19; 1298:12-24; *see also* 648:17-649:8; T0043 at 1, 3; T0160 at 1; T0160 at 2-3; T0175 at 1. During his employment at Weems, Smith never referred to Flexzilla's color as "chartreuse," instead using Pantone numbers. Tr. 1304:7-13.

Weems also used Pantone numbers to specify the color of the text and graphics in its advertising materials. Tr. 716:19-717:7. Otte used Pantone 389C to specify the color for the Flexzilla logo in the below April 2009 Matco Tools ad:

Tr. 716:23-717:7; T0109. Weems' use of the Pantone system was consistent with Weems' enforcement efforts during the same time period. Weems specified Pantone 389C as the color of its trademark and identified other Pantone colors for competitors to avoid. T0206; T0209; T0212-T0217; T0222-T0224; T0226-T0227; T0228; T0229; T0237-T0238; T0243. Competitors similarly used Pantone designations to describe their accused products. T0204; T0208; T0219; T0234; T0241; T0245.

13

At trial, Mark Weems attempted to discount Weems' use and reliance on the Pantone system to specify Flexzilla's color. For example, in explaining why Weems used "Pantone 389C" to describe the color of its applied-for trademark in May 2009, he alleged that "at that time the trademark office required a Pantone to be stated. We had no choice." Tr. 53:18-23. Weems has failed to provide support for this claimed requirement.[4]

Mark Weems also testified that Weems used the Pantone system as a starting point orientation in its product development and marketing, meaning "start here and get close." Tr. 38:5-12. In terms of quality control, he alleged that the Pantone system was not used but, instead, inspectors in Taiwan and Iowa would use saved "golden samples" as a quality control reference, visually comparing the "golden sample" with incoming product. Tr. 38:15-39:8; 1461:15-1462:1. This attempt to minimize Weems' reliance on the Pantone system is contradicted by testimony and documentation to the contrary, including the record evidence cited above. *See also* 696:7-15; 716:19-717:7;

---

[4] Teknor points out that the USPTO's "Trademark Manual of Examining Procedure" (TMEP) does not now, and did not then, require that the PMS, or any other commercial color identification system, be used to identify an applied-for color mark, quoting the 2007 and 2023 versions of TMEP as follows:

> The color claim must include the generic name of the color claimed. The color claim may also include a reference to a commercial color identification system. The Office does not endorse or recommend any one commercial color identification system. TMEP § 807.07(a)(i) (5th ed. Sept. 2007) (emphasis added)

> The color claim must include the generic name of the color(s) claimed. It is usually not necessary to indicate shades of a color, but the examining attorney has the discretion to require that the applicant do so, if necessary to accurately describe the mark. The color claim may also include a reference to a commercial color identification system. The USPTO does not endorse or recommend any one commercial color identification system. TMEP § 807.07(a)(i) (TMEP Nov. 2023).

Doc. 271 at 32-33.

1284:16-1285:19; 1291:17-19; 1297:12-21; 1304:7-13; T0160-T0162; T0175. Nor does the record contain contemporaneous documentary evidence corroborating Mark Weems' allegations. I do not find his testimony concerning Weems' lack of reliance on the Pantone system to be credible.

### D. Weems Starts Promoting the Safety Benefits of Flexzilla's Chartreuse Color

When Weems began manufacturing air hoses, Coilhose Pneumatics was a leading manufacturer of air hoses in the construction and industrial supply chain market and one of Flexzilla's biggest competitors. Tr. 27:8-21; 651:22-652:7. Among other products, Coilhose Pneumatics sold a line of reinforced polyurethane air hoses called Flexeel. Tr. 27:2-13; T0101, T0102. Coilhose Pneumatics introduced Flexeel Max into the market before Weems launched its Flexzilla line. Tr. T0156; T0167. Flexeel Max was a high visibility green color that Coilhose Pneumatics called "Hi Viz Eel Green," designating that name as a trademark:



Tr. 140:3-11; T0142; T0167; T0479; T0480; T0580; T0581; T0662. Coilhose Pneumatics advertised this high visibility green color as being easier to see:

15



T0479; T0580; T0662.

Weems was aware of this advertising. T0142. Weems attended the 2006 Specialty Tools & Fasteners Distributors Association (STAFDA) trade show and knew Coilhose Pneumatics had displayed its Flexeel Max at that show. Tr. 138:24-139:2; 139:11-14. Mark Weems acknowledged that someone at Weems possessed the advertising for Flexeel Max, as shown in Exhibit T0662. Tr. 139:23-140:1; 143:19-23; 200:22-201:1.

By February 2009, Weems had hired Fred Mowczan from Coilhose Pneumatics as a sales manager. Mowczan disclosed Coilhose Pneumatics' pricing and technical information to Weems' management and sales department, with Mark Weems stating that he "want[ed] the coilhose price sheets converted to excel with the discounts from [Mowczan's] email below applied." T0166 at 1-2; T0688 at 1. With Flexzilla's shift from yellow to yellow-green, Weems began calling Flexzilla's color "Hi-Vis Green" and "Hi Vis Safety Green," much as Flexeel Max did with "Hi-Viz Eel Green." And much like Coilhose Pneumatics' advertising for Flexeel Max, Weems began emphasizing that Flexzilla's color was a safety feature that enhanced the hose's visibility and prevented tripping accidents. Tr. 134:20-135:3.

On March 9, 2009, Matthew Weems ordered Weems' marketing department to "make sure all Flexzilla hoses have the following listed as a [feature & benefit]: "Flexzilla Hi-Vis safety green makes hose more visible in the workplace," an order the marketing department followed and implemented. Tr. 135:4-15; 702:9-703:19; 1043:22-1045:8; T0107. Throughout the rest of 2009, Weems promoted and educated its distributors, retailers and end users that Flexzilla's color enhanced visibility and was

16

a safety feature of its hoses. For example, on March 30, 2009, Mowczan stressed that Weems' advertising for Flexzilla should underscore the fact that "[a]ll of the Zilla is a hi vis color making it easy to see at the job site. Making it a safe hose." T0194 at 1. In April 2009, sales managers circulated promotional fliers prepared by Weems' marketing department – and approved by Matthew Weems – to Weems' distributors and retailers, about the then-new Flexzilla water hose, which touted its color as a high visibility color that made the hose more visible:







Tr. 703:20-705:2; 716:5-10; 1033:21-1034:5; T0095; T0097; T0109 at 1-2.

On June 1, 2009, Weems published a "Full Line Catalog" that advertised the color of all Flexzilla products, including Flexzilla water hose products, as being a functional feature having high visibility that made the hose more visible. Tr. 136:20-137:5; 211:15-212:19; 705:3-707:4; 714:24-715:1; 715:22-716:4; 1077:4-1080:2; T0069 at 3, 7-13, 17, 35; T0070 at 3, 7-13, 17, 35; T0073. Weems distributed the 2009 Full Line Catalog at trade shows and to Weems' sales teams, distributors, and

17

retailers that marketed Weems' products. Tr. 707:5-7; 1077:14-22. On June 9, 2009, under Matthew Weems' directive, Weems changed the description of the color of its Flexzilla products in its internal system from "Yellow" to "Hi-Vis Safety Green," which meant that all packaging, slips, price sheets, and Weems' website would reference the color of Flexzilla as "Hi Vis Safety Green." Tr. 707:8-709:2; T0110, T0111, T0112. Weems promoted "Flexzilla Hi-Vis safety green" as a feature on its packaging:





T0049, T0053; *see also* T0052; T0054.

Similarly, in its fliers Weems advertised that the functional "features" of Flexzilla hoses included "Flexzilla® Hi-Vis safety green makes hose more visible in the workplace." T0038 at 1; T0093; T0125 at 3. NAPA, one of Weems' retailers, advertised that the "Features" of Flexzilla hoses included "Flexzilla® Hi-ViS safety green makes hose more visible in the workplace." Tr. 210:25-211:6; T0038 at 2; T0094; *see also* T0096. Weems also published ads for its Flexzilla Garden Hose, which listed "Flexzilla® Hi-Vis Safety Green" as a bullet point, functional feature:

19



Tr. 209:22-210:2; T0062.  The ad included a photograph of the hose in its packaging in the lower right-hand corner, which itself described the hose's color as a "Hi-Vis Safety Color" feature:



T0062.  Other Flexzilla advertising identified "Hi-Vis color for better visibility" as a product feature.  T0051.

In August 2009, Weems' marketing department instructed Blain's Farm and Fleet to include "Flexzilla® Hi-Vis Safety Green color makes hose more visible in the workplace" as a "bullet" on its website.  Tr. T0195 at 1-2.  In September 2009, Weems directed its sales representatives and marketing agencies to have retailers indicate Flexzilla's color as "Hi-Vis Safety Green," stating that it was "[e]xtremely important."  W009; T0116; T0117; T0195 at 1-2; Tr. 57:9-58:5.  In September 2009, Matthew Weems emphasized that the "Flexzilla Hi Vis safety green feature" should be accentuated on the packaging for Flexzilla air and water hoses.  Tr. 1047:24-1051:19; T0118, T0119; T0141.

In email messages dated September 25 and 29, 2009, entitled "Hi-vis" and "Task Update: Hi-vis," respectively, Matthew Weems instructed Otte to place a photograph entitled "HiVis Safty Green.jpg," along with copy from a Word document entitled "Flexzilla Hi Vis Safety Green.doc," into a "Bulletin" type flier layout. Tr. 709:17-711:20; T0120, T0121).  After several edits, on October 7, 2009, Matthew Weems presented "Marketing Bulletin No. 82" to Weems' sales, marketing and customer service departments.  Tr. 711:21-712:18; 1034:20-1035:17; 1039:10-1040:4; T0122-T0129; T0131-0133.  Matthew Weems stated that the Bulletin discussed Flexzilla's color, its "safety feature[]" and how the color "improves safety by increasing visual awareness thus increasing safety."  Tr. 160:17-162:6; 210:19-24; 1034:18-1036:5; T0133.  He also told Weems' sales, marketing and customer service departments that the marketing bulletin "provides the official wording for this feature as it should appear in all literature, catalogs and ads," and he instructed these departments to send the bulletin to "all reps and any customer that sells Flexzilla®:"

## Flexzilla® Hi-Vis Safety Green



Legacy's Flexzilla® trademark color is getting noticed in the retail store as well as on the shop floor. The Flexzilla® Hi-Vis Safety Green color is unique to the industry and helps increase visual awareness of the hose. This can help prevent accidents due to tripping.

Make sure that you discuss this unique color and its safety features whenever presenting the Flexzilla® line.

The official description of this feature is: "Flexzilla® Hi-Vis Safety Green."

Make sure all ads, catalogs & fliers include this copy.

Tr. 160:17-162:3; 210:19-24; 1034:18-1037:23; T0074; T0133. As instructed, Weems' employees distributed Marketing Bulletin No. 82, and "[made] sure all ads, catalogs, and flyers include[d] this copy." Tr. 162:4-6; 1037:25-1043:15; T0133 at 2.

In October 2009, Matthew Weems directed that the following description be included in a new product showcase for an upcoming trade show: "Unique Flexzilla® Hi-Vis safety green increases awareness, reducing accidents due to tripping." Tr. 1052:9-1055:4; T0136; T0731. Weems also created a "Hi Vis Safety Green" demonstration for its booth for the 2009 November AAPEX trade show, at which a Flexzilla hose would be placed on top of a carpet at the front of the booth to demonstrate the high visibility safety feature of Flexzilla's color, noting "[i]t will be a Flexzilla hi-vis safety green demo opportunity." Tr. 1053:17-1055:4; T0731. In October 2009, Schindel communicated to a manufacturer's representative that Flexzilla's "performance features" comprised its "Hi VIS Safety Green Color."

22

T0713.  Matthew Weems included the statement that "Hi-Vis safety green color helps prevent accidents due to tripping" in advertising copy for Flexzilla water hoses.  Tr. 1047:24-1050:4; T0141.

Weems sent these advertising materials to its customers and distributors.  Tr. 714:9-19; 990:1-4.  There were no situations in which a distributor, retailer or third-party ad featuring a Flexzilla product was not created or finally approved by Matthew Weems.  Tr. 699:12-16; 1033:21-1034:5.  Nor would such distributors, retailers or third parties modify the copy of any ad prepared by Weems.  Tr. 755:19-24.

### E.  Weems Applies to Register Its Color Mark for Air Hoses

On May 26, 2009, Weems filed Application Serial No. 77/744,591 (the '591 Application) to register the color "chartreuse, namely, highlighter yellow pantone 389C" as a trademark for "compressed air hoses."  Tr. 99:1-22; W209 at 1-8.  Matthew Weems signed and verified the '591 Application on behalf of Weems under 18 U.S.C. § 1001.  Tr. 1056:13-23; W209 at 4, 6.  As discussed above, throughout 2009 Matthew Weems directed Weems' efforts to tout the safety benefits of Flexzilla's high-visibility color.  Perhaps for this reason, he testified at trial that he "really wasn't involved in [the] process" of trying to obtain a trademark registration for the color and that he did not have any direct conversations with any of the attorneys that were assisting Weems with this application.  Tr. 1009:20-1010:10.

This testimony is not credible.  In addition to signing the trademark application on Weems' behalf, the privilege log Weems produced in the course of discovery shows that Matthew Weems was actively involved in the application process.  T0714 at 12-17.  Among other communications, he provided information to Weems' attorneys, Brian Laurenzo and Jason Hunt, concerning "[i]mages of 'Flexzilla' Color," the Pantone number describing the applied-for color, and other information pertaining to Weems' application.  T0714 at 16-17.

23

Mark Weems testified that while he was conferring with one of Weems' attorneys about how to describe the color, he "opened up a dictionary," "found chartreuse," and "decided that was the best word to describe the color that [Weems was] referring to earlier as kind of like a fluorescent highlighter yellow." Tr. 37:7-15. The description "highlighter yellow pantone 389C" mirrored Weems' then operative product specifications for Flexzilla hoses, which referenced the color as "highlighter yellow pantone 389C." T0039. Weems submitted the following drawing to depict the claimed color:



W209 at 7.

On June 15, 2009, the Examining Attorney issued an Examiner's Amendment, which confirmed an authorization granted by Laurenzo to amend the description of the color claimed to "chartreuse (Pantone 389C)" and to omit the phrase "highlighter yellow." W209 at 11. Laurenzo also authorized an amendment to state: "within the industry, the use of color as applied to, or appearing on, air hoses is not used to denote a functional or technical aspect or feature of the particular air hose." W209 at 11-12. Before granting these authorizations, Weems' attorneys communicated with Matthew Weems concerning the amendment on June 10 and 12, 2009. T0714 at 16.

Also on June 15, 2009, the Examining Attorney issued an Office Action refusing registration on the ground that the applied-for color mark was ornamental and lacked distinctiveness because consumers would perceive the color to be a design element of the goods, not an indicator of source for the goods. W209 at 12. The Examining

Attorney required Weems to provide certain information and documentation "[t]o permit proper examination of the applied-for color mark" and stated:

> . . . [Weems] must provide the following information and documentation:
>
> (1)     An explanation as to whether the identified color(s) serve(s) any purpose as used on the goods; [and] . . .
>
> (3)     Any available advertising, promotional or explanatory literature concerning the goods, particularly any material that relates specifically to the applied-for color mark;

W209 at 12.  The Examining Attorney explained that a color may be functional, and thus not protectable, if it yields a utilitarian or functional advantage, such as increasing the visibility of a product:

> Please note, that a color that is functional for specific goods is not registrable on the Principal Register under Trademark Act Section 2(f) or on the Supplemental Register, regardless of evidence of acquired distinctiveness.  TMEP §1202.05(b); see *Brunswick Corp. v. British Seagull Ltd.*, 35 F. 3d 1527, 1534, 32 USPQ2d 1120, 1125 (Fed. Cir. 1994).  A color is functional if it yields a utilitarian or functional advantage, *e.g.*, yellow or orange for safety signs make the signs more visible.  *See, e.g., Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994) (holding the color black functional for outboard motors because it provides competitive advantages in terms of being compatible with a wide variety of boat colors and making the engines appear smaller); *In re Ferris Corp.*, 59 USPQ2d 1587 (TTAB 2000) (holding the color pink functional for use on surgical wound dressings because the actual color of the goods closely resembles Caucasian human skin).  A color mark can also be functional if it provides competitive advantages such as being more economical to the manufacture or use of the goods.  See TMEP §§1202.02(a)(viii), 1202.05(b); *cf. Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10, 214 USPQ 1, 4 n.10 (1983).

W209 at 13.

*F.     Weems Stops Promoting the Safety Benefits of Flexzilla's Chartreuse Color*

At some point, Weems realized that promoting the safety benefits of Flexzilla's chartreuse color was in conflict with its effort to trademark that color.  According to Matthew Weems, touting the color's high-visibility properties became a mere "mistake that we made along the process."  Tr. 1029:3-4.  From January 26, 2010, to January 29, 2010, Matthew Weems, Mark Weems, and Laurenzo communicated with each other to address, among other things, Weems' "secondary registration," "color mark case studies," and the use of the term "ZillaGreen."  T0714 at 10, 12-13.  On February 2, 2010, Matthew Weems ordered Otte to remove "all references" to "Hi-Vis Safety green" and "[i]n its place [Weems] will refer to 'If it's not ZillaGreen™ it not Flexzilla®['.]"  W010; Tr. 162:7-15; 713:7-12; 1063:18-24.  Mark Weems testified as follows:

> Q.     And am I correct that following a conversation with Mr. Laurenzo on February 3 in 2010 Weems directed its employees that all reference to hi-vis safety green in making the hose more visible in the workplace need to be removed from all packaging, Weems' website, price sheets, catalogs, brochures, and marketing bulletins; correct?
>
> A.  Correct.

Tr. 162:7-15.  The references included, among other things, the packaging for Flexzilla air and water hoses, Weems' website, price sheets, catalogs, brochures and marketing bulletins.  W010.; *see also* 713:7-12; 1064:10-23; T0148; T0714 at 10, 12-13.

On February 3, 2010, Matthew Weems created a task for Otte entitled "Remove Hi-Vis Safety Green from all references," reiterating the undertakings with which he was charged in the February 2, 2010 email.  Tr. 713:23-714:8; 745:14-21; 1063:18-1064:23; W010; T0150.  When asked for his understanding as to why he had to remove any verbiage related to "hi-vis," Otte testified, "I know it was a legal matter and something about the function of the hi-vis."  Tr. 713:13-16).  Otte further testified that he did not recall that the reason for the removal of this verbiage was related to OSHA

or ANSI requirements.  Tr. 713:17-22.  In any event, Otte proceeded accordingly.  He directed others at Weems to remove "Hi-Vis safety green," stating that "ZillaGreen™" would be the term used to refer to Flexzilla's color on all marketing material, packaging, and product descriptions.  Tr. T0146; T0148; T0149; T0151; T0153.  By March 17, 2010, Otte had removed "Hi-Vis Safety Green" from the majority of Flexzilla's packaging proofs, which Cromer later approved at Matthew Weems' request.  T0153.

Weems' expungement of any mention of the high visibility feature of Flexzilla's color was a high priority for Weems.  Tr. 720:18-721:5; T0158 at 1, 6.  Matthew Weems admitted that "Weems thought it was so critical it went through a process of scrubbing anything about the hi-vis safety feature from all Flexzilla marketing materials" and "sanitizing all hi-vis references was a priority."  Tr. 1064:24-1067:15; 1068:3-7; 1080:3-15; T0154; T0158 at 1, 6; T0733.  In a February 18, 2010, email message concerning the status of a different project, Matthew Weems stated that the project was "on the stove, but other priorities [were] currently on the front burner," including "Sanitizing all Hi-Vis references."  Tr. 1080:16-1081:15; T0733.

As of April 2010, Weems was still in the process of scrubbing and sanitizing the "hi vis" language and safety language from all Flexzilla references.  Tr. 1067:20-23.  In an email message dated April 8, 2010, Matthew Weems warned Schindel, Mary Weems and Weems' sales department that Weems "cannot promote the feature highlighted below [Better visibility (Hi Vis Color)]" because Weems was "in the process of scrubbing it from all Flexzilla® references in exchange for the new tag line."  Tr. 1065:4-1067:15; T0154.  When Mary Weems responded by stating that the reference was merely "a point of comparison" for a webinar with sales representatives, Matthew Weems stated that Weems "cannot promote this as a feature regardless of if it is in advertising or if a salesman is pitching it."  T0154.

27

Weems' efforts to scrub all safety-related references continued over time. On January 12, 2011, Matthew Weems emailed Otte to report that while reviewing the website for Blain's Farm and Fleet, he found "a HUGE issue that [he] thought was handled. All Flexzilla® inventory ha[d] labels with 'Flexzilla® Hi-Vis safety green' referenced." Tr. 718:25-719:21;1082:14-1084:1; T0158 at 1. Matthew Weems wrote: "On 03/16/2010 or 04/16/2010 the corrected art (excluding the 'Flexzilla® Hi-Vis safety green' bullet point)" is archived on the packaging directory." Tr. 1084:3-12; T0158 at 1. However, Matthew Weems could not determine if or when the updated artwork was delivered to William Wu or Mr. Hose. T0158 at 1-2. He stated: "Sending the updated artwork to Mr. Hose was high priority 9 months ago and needs to happen right away. The 'Hi-Vis Safety Green' phrase will single handedly destroy our ability to register ZillaGreen™." Tr. 720:18-721:5; 750:17-20; 1084:13-1085:4; T0158 at 6.

Otte responded by stating that the most recent artwork for the product packaging possessed by William Wu still showed the "hi vis" language. Tr. 1085:11-24; T0158 at 1. Otte recalled working on removing all "hi vis" references from all Flexzilla packaging but could not recall if Weems ever completed review of the updated packaging or sent William Wu the same. T0158 at 1; Tr. 721:17-722:4; 1085:25-1086:12. Matthew Weems replied that Weems had completed the review and approval of the updated Flexzilla packaging artwork, but had never sent it to William Wu. Tr. 1086:13-15; T0158 at 1. Matthew Weems reiterated that the removal of the "Hi-Vis Safety Green" references and "calling out [Flexzilla's] color for the purpose of safety" was a "high priority." Tr. 1086:16-1087:8; T0158 at 1. He stated that if a competitor were to send the USPTO a label that called out the functionality of Flexzilla's color, the USPTO would invalidate Weems' trademark registration for its chartreuse color mark:

> This is not good as we lost almost one year in correcting our message to allow us to legitimately fight anyone claiming that we are calling out this color for the purpose of safety. US trademark attorney will take away our

> secondary registration on Zillagreen™ if our competition sends them one
> of our labels stating safety green.  Filing to attain a trade mark on color is
> like a hail mary pass, they are almost never successful.  The fact that we
> have one and then to loose [sic] it …

T0158 at 1; 722:8-723:9; 1087:9-14; 1088:10-1089:9; 1089:4-13.  Otte testified that he understood these statements by Matthew Weems to be the "legal" reasons for Weems' purging its use of the "hi-vis" verbiage and calling out the functional feature of the color of Flexzilla.  Tr. 721:6-14; 722:8-723:9.  Otte was not aware of any other reason.  Tr. 754:24-755:5.

At trial, however, Matthew Weems stated, "[m]y understanding was mistaken. I have never had any conversation with legal on the implications for having that copy in there."  Tr. 1082:8-13; *see also* 1087:2-7; 1087:19.  When asked to confirm his understanding at the time he wrote his January 12, 2011, email, Matthew Weems first answered that he was not sure what his specific understanding was at the time. Tr. 1087:15-1088:7.  He then admitted, "consistent with [his] understanding at the time," the reason why he and Weems were doing everything they could do to scrub and sanitize all marketing materials for the hi-vis feature was because the USPTO would cancel Weems' registration for its color mark.  Tr. 1088:10-1089:3.

Matthew Weems' testimony that Weems' use of "Hi-Vis", "high visibility" and/or "safety green" was merely a marketing "mistake" (Tr. 1028:22-1029:5) is not supported by the record.  In addition to the evidence described above, his April 24, 2019, email to Prime Wire & Cable confirms his understanding that Weems' promotion of Flexzilla's color as "High Visibility," and as a safety feature, created a risk that Flexzilla's color would be considered functional.  In that email, entitled "Flexzilla Marketing Copy - Prime Website," Matthew Weems provided feedback to Prime Wire & Cable's proposed advertising copy for a Flexzilla extension cord, in which Prime Wire & Cable described the color as "high visibility green."  He stated "High Visibility

29

or Hi-Vis is a function and is never used when referring to the Flexzilla® signature (Chartreuse / Zillagreen™) color." Tr. 1092:11-1094:18;1094:4-1095:6; T0189 at 4.

At trial, Weems attempted to downplay the rather-obvious connection between its 2009 trademark application and its abandonment of safety-feature terms such as "Hi-Vis Green" and "Hi Vis Safety Green." According to Weems, a sales manager, Erner, conceived of those terms and asked that Weems use them because he believed he could sell more hose into the automotive channel by including this language in Flexzilla's advertising. Tr. 1007:2-1008:2. Allegedly, Erner's impetus for these terms was a customer's use of high visibility-colored tools. Tr. 1007:19-25. Weems' Marketing Department then complied and adopted the terms. Tr. 56:12-14. Later, Mark Weems supposedly learned that the term "safety green" was a reference to an OSHA color, looked it up online, determined that the OSHA color did not describe Weems' color chartreuse, and instructed Matthew Weems to change the marketing. Tr. 56:14-57:8.

This concocted story is not credible. There is no independent evidence of (1) Erner conceiving the terms "Hi-Vis Green" and "Hi Vis Safety Green;" (2) Weems' internal consideration of, and acceptance of, Erner's purported idea; (3) whether an "OSHA Safety Green" exists; (4) Mark Weems' purported discovery of "OSHA Safety Green"; or (5) Mark Weems' purported instruction to change Weems' marketing was based on a determination that the OSHA color did not describe Weems' color. Moreover, there is no evidence of any OSHA regulations that precluded Weems from using the terms "hi-vis" or "high visibility," or from promoting the fact that its chartreuse color increased visual awareness of Flexzilla hoses or prevented accidents due to tripping. Tr. 163:4-14. I find that Weems made a conscious and deliberate decision, in late 2009 or early 2010, to stop promoting the high visibility and safety properties of the color of its Flexzilla hoses because it realized that promoting those properties was detrimental to its effort to register a trademark for that color.

30

*G.*     *Weems Responds to the June 15, 2009, Office Action*

On July 2, 2009, Laurenzo sent a letter with handwritten notes to Matthew
Weems concerning the June 15, 2009, Office Action.  T0714 at 15-16.  On July 7 and
9, 2009, Hunt and Matthew Weems communicated about Weems' response to the
Office Action.  Tr. 1056:25-17; T0714 at 15.  On July 7, 2009, Matthew Weems
emailed Weems' marketing department, stating:

> We are attempting to trademark the Flexzilla® hi-vis color and need to
> provide evidence of Flexzilla® in the market. One part of this would be to
> submit samples of customer fliers or adds [sic] promoting any Flexzilla®
> product. Please forward to me if you can get your hands on this material.

Tr. 208:3-12; 1058:2-1059:11; T0113.  Mark Weems responded, telling Matthew
Weems to set a deadline and to start an archive for all customers' and Weems' ads for
Weems' Flexzilla products.  Tr. 208:13-14;1059:16-1060:11; T0113, T0114.  From
August through September 2009, Matthew Weems continued to communicate with
Weems' attorneys about Weems' response to the June 15, 2009, Office Action.  T0714.

On October 5, 2009, Mark Weems sent an email to Matthew Weems about the
status of the "color trademark project."  Tr. 208:15-19; 1061:1-15; T0130.  Matthew
Weems responded that he had the "dollar figures on how much [Weems] has spent
promoting [Flexzilla]" and "a stack of examples of how [Weems has] packaged or
cataloged [Flexzilla]," which were to be submitted in response to the June 15, 2009
Office Action in the '591 Application.  Tr. 208:20-209:4; 1061:16-25; T0130.  Mark
Weems replied by directing Matthew Weems to send the advertising materials to
Weems' attorneys.  Tr. 1062:1-16; T0130.

Matthew Weems testified that he had no reason to believe that the "stack of
examples" of marketing materials he had collected was not sent to Weems' attorneys.
Tr. 1062:22-1063:8.  When asked whether he had any reason to believe that these
materials did not include Weems' then-current advertising materials, which specifically
promoted the color of Flexzilla hoses as enhancing visibility and preventing tripping

31

hazards, Matthew Weems testified that "[i]t's hard to speculate what was included." Tr. 1063:11-17.

On October 21, 2009, Weems' attorneys held "[i]ntrafirm conversations," which were followed by a series of communications between October 26, 2009, and November 13, 2009, among Weems' attorneys, Mark Weems and Matthew Weems concerning the "potential use of 'Flexzilla'." T0714. On November 17, 2009, Mowczan "did some digging" to determine when "Coilhose's Flexeel Max, with it's [sic] Hi-vis Eel Green Color was released." T0165. Mowczan stated that Flexeel Max™ "was released in September/October of 2006 for STAFDA," and its ads "stressed the hi-vis color." T0165; Tr. 141:25-142:15.

On December 15, 2009, Weems' attorneys filed a response to the June 15, 2009, Office Action. W209 at 16-17. This response included a declaration of Mark Weems and examples of advertising for Weems' chartreuse hoses. T0714 at 14; W209 at 16, 24-27. Despite the Examining Attorney's request for "advertising, promotional or explanatory literature . . . that relates specifically to the applied-for color mark," the prosecution history does not contain evidence that Weems provided copies of its then-current advertising that touted the "safety feature" of Flexzilla as having a high visibility color that makes the hose more visible. Tr. 211:10-14; W209 at 24-50. Instead, Weems submitted examples of three third-party catalogs from 2008 that referred to the color of Flexzilla air hoses as "yellow" and not as a trademark. Tr. 214:9-215:18; W209 at 30-47. Weems also submitted a printout of a computer screen display of a webpage from Weems' website displaying a list of Flexzilla "yellow air hoses." W209 at 48-50.

Weems told the Examining Attorney that Flexzilla's color had "been described in advertisements by more common yet consistent names, specifically yellow, yellow-green, and hi vis green," and stated, "no matter the term used to describe the color, [Weems] has been exclusively and continuously marketing and branding its compressed

32

air hoses with the applied for mark, the color 'chartreuse (pantone 389C)', since at least 2007." W209 at 20. This contradicts Weems' own technical documents which, as noted above, show that Flexzilla's color was Pantone 381C from November 2006 to just prior to February 2009. In responding to the Examining Attorney's request for an explanation as to whether the applied-for color served any purpose, Weems did not disclose that it selected Flexzilla's color to be highly visible and to help avoid accidents due to tripping. Instead, Weems stated:

> . . . [Weems] notes that the color 'chartreuse (pantone 389C)' is a bright or intense yellow-green. As a result, the color has the potential to be more visible than some other colors. However, any visibility attribute is purely incidental to the true purpose of the mark, namely to identify the source of Applicant's air hoses, which is certainly attained by the attention grabbing nature of the color.

W209 at 20.

As discussed above, Weems had used the terms "Hi-Vis Green" and "Hi Vis Safety Green" to refer to Flexzilla's color and touted that color as a high visibility, safety feature. *See also* Tr. 1034:6-16. I find that Weems' failure to provide the USPTO with copies of Weems' 2009 advertising reflects, at minimum, a deep concern by Weems that its trademark application would be denied on grounds that Flexzilla's chartreuse color is functional. This same conclusion flows from Matthew Weems' dissembling testimony on this issue. As noted above, his testimony about having little personal involvement in Weems' 2009 trademark application is contrary to the evidence. Moreover, he tried to minimize his months-long directive to promote the high visibility, safety feature of Flexzilla's color by stating that "[t]he hi-vis was a -- reference was a mistake that we made along the process." Tr. 1029:3-4. And while admitting at trial that Flexzilla's chartreuse color was a "bright" and "visible" color, "brighter than other colors," he refused to answer whether that color makes hoses easier for the user to see, instead saying he had no opinion. Tr. 1079:11-21.

33

On March 23, 2010, after Laurenzo authorized the Examining Attorney to withdraw Weems' alleged claim of acquired distinctiveness and to amend the '591 Application from the Principal Register to the Supplemental Register, the '591 Application issued as Supplemental Registration No. 3,765,628 (the '628 Supplemental Registration). W209 at 168-173, 178; Tr. 149:6-9. Weems then began to change its packaging and advertising to indicate that it possessed a registered trademark for the "color CHARTREUSE (PANTONE 389C)" for air hoses. Tr. 176:23-177:10; 177:17-21; W037; T0044. As noted above, before Weems received the '628 Supplemental Registration, its advertising and product packaging did not promote Flexzilla's color as a trademark or source indicator. Nor had Weems' advertising or product packaging ever used or called out the word "chartreuse." Tr. 712:23-713:1). Prior to February 2010, Otte had never heard the word "chartreuse" used in reference to Flexzilla hoses. Tr. 713:2-6.

**H.      Weems Commences Enforcement Efforts**

Once Weems received the '628 Supplemental Registration, it began sending cease and desist letters to competitors whose products allegedly fell within the scope of Weems' "chartreuse (Pantone 389C)" mark. This included competitors whose use of a challenged color predated Flexzilla. For example, on May 3, 2010, Weems sent a letter to Coilhose Pneumatics demanding that it cease and desist from marketing the Flexeel Max hose. T0203 at 1-4; Tr. 203:23-204:15. Weems alleged that Coilhose Pneumatics had copied Flexzilla's color and Flexeel Max's color was the "same," and that Coilhose Pneumatics' use of an "identical trade dress on identical goods and unauthorized use of [Weems'] distinctive color mark . . . . constitutes trademark infringement and unfair competition." T0203 at 1-2.

In November 2012, Weems again wrote to Coilhose Pneumatics and demanded that it "cease and desist from all further manufacture, use, and sale" of a chartreuse

colored hose that was displayed in Coilhose Pneumatics' booth at the 2012 AAPEX trade show, claiming that the hose infringed Weems' color mark. T0211 at 3. Coilhose Pneumatics replied as follows:

> As I am sure you also know, your client does not have the ability to prevent Coilhose Pneumatics or any other company from using every shade of chartreuse on hoses except the one you have registered with the USPTO. In fact, the registration you provided makes it clear that it is only a very narrow spectrum of that color which is protected and protectable. Green hoses have been around forever and I am sure your client is not claiming that it has the right to prevent any company from using the color green on a hose.
>
> Notwithstanding this fact, our client would certainly not copy Legacy Manufacturing's hoses since our client is the preeminent manufacturer of hoses and it would be foolish for the leading company to copy Legacy, a company of lesser market stature.

T0245 at 2.

On May 3, 2010, Weems sent a cease-and-desist letter to Tomkins, PLC (Tomkins), which at the time was the owner of Schrader-Bridgeport Int'l and the Amflo brand of air hoses. T0204 at 1. On May 21, 2010, Tomkins responded by stating that the accused Amflo hose was specified to be Pantone 375C, which was distinctly different than the "highlighter yellow" Flexzilla hoses identified as Pantone 389C in the '628 Supplemental Registration. T0205 at 1. Moreover, Tomkins reminded Weems that "green hoses have been sold under the AMFLO® trademark since at least 2002, including the neon yellow-green hose shown in the attached placard photo. This use clearly predates your clients use, beginning in 2007." T0205 at 1; *see also* T0432; Tr. 635:8-16; 636:15-638:1.

While Harbor Freight had sold yellow-green air hoses prior to Weems' introduction of Flexzilla (*see, e.g.*, T0432), Weems sent a demand letter to Harbor Freight on May 3, 2010, accusing it of using "the arbitrary non-functional color of [Flexzilla] air hoses in connection with identical goods." T0202 at 1-2. In 2012,

35

Weems again wrote to Harbor Freight, claiming that a Central Pneumatic air hose, Item #99915, which Harbor Freight had sold since 2008 (T0432 at 9, 63), violated the '628 Registration. T0207. In response, Harbor Freight responded by noting that its product was not Pantone 389C, but rather Pantone 367C. T0208.

On August 22, 2018, Weems sued Harbor Freight in this court. *Weems Industries, Inc. v. Harbor Freight Tools USA, Inc.*, No. 1:18-cv-00086-CJW-KEM.[5] Weems alleged that Harbor Freight sold a confusingly similar chartreuse-colored compressed air hose under the Diablo brand. On January 25, 2019, the parties entered into a settlement agreement that included a list of "Approved Colors" defined by various Pantone designations, including Pantone 376C. W053 at 6, 8; Tr. 74:6-21. Harbor Freight continues to sell bright green, yellow and yellow green air and water hoses. T0432. While Weems approved Pantone 376C for Harbor Freight's use, in a 2020 settlement agreement with Flexon Industries Corp., Pantone 376C was included in the "Prohibited Range" of colors. W054 at 8, 12-13.

In 2014, Wilmar Corporation (Wilmar) responded to Weems' claim of infringement of the '628 Supplemental Registration by stating that the color being used for its hose product was "PMS" (Pantone) 375, "which is clearly not chartreuse" and "is 14 pantones away from PMS 389." T0234. Wilmar also stated that the hoses are clearly marked differently in their unique retail packaging. T0234.

In March 2015, Plews, Inc. (Plews), responded to Weems' charge of infringement, noting that the "virtual identical charge of infringement was made" in May 2010. T0241. Plews identified the color of its comprised air hose as Pantone

---

[5] The court may, and hereby does, take judicial notice of the docket and filings in Weems' other trademark-related lawsuits in this court. *See, e.g., Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (court "may take judicial notice of judicial opinions and public records").

396U and noted its belief that Weems itself was no longer using the color covered by the '628 Supplemental Registration (Pantone 389C). T0241.

In 2015, Weems entered into a settlement agreement with Rolair in which Rolair agreed to phase out its inventory of "chartreuse-colored" air hoses. W055; Tr. 76:23-25. The record contains evidence of numerous other demand letters sent by Weems concerning alleged infringement of the '628 Supplemental Registration. T0209; T0212; T0216; T0217; T0222, T0224-T0233; T0243; T0246.

## I.    *Weems Changes Flexzilla's Color Again*

Between 2009 and 2013, Smith understood the color of Flexzilla hoses to be Pantone 389C. He also understood that Weems had a trademark registration for Flexzilla's color, which covered Pantone 389C. Tr. 1291:20-1292:10. Weems' competitors likewise understood Weems' color mark to be Pantone 389C. T0204; T0208; T0219; T0234; T0241; T0245. As noted above, in the course of policing its marks Weems often acknowledged that its color mark comprised Pantone 389C. T0206; T0209; T0212; T0213; T0214 – T0217; T0222 – T0224; T0226 and T0228 (identifying 18 Pantone colors to avoid); T0227; T0229; T0237; T0238; T0243.

At some point, however, Weems changed the color of its Flexzilla hoses again. Tr. 1303:22-1304:6. On October 13, 2013, Smith emailed Weems' Product Development and Purchasing departments, and copied Mark Weems, about the "Flexzilla Hose Color Change Process (389C)," stating:

Team,

Mr. Hose and William Wu have proposed that we phase in the "new" 389C Flexzilla color instead of making a rapid change which might confuse the customers. They want to phase it in over 3 or 4 slight changes. The question I have is how do we want to mark the hose with a date code when we do this. For October 2013 the date code is 1013. Assuming the first change is made in December 2013 do we just want them to move ahead to the next month (0114) or do we want them to

37

perhaps add an "A" or "B" to the end. For example, we could make the hose 1213A in December of this year to signify the first color change. This could get confusing so we'd like to come up with the proper way to make the hose when we make this 3 or 4 step color change. The goal here is to be able to always clearly identify which color is being made in the future. Your comments and suggestions would be greatly appreciated.

T0159. By January 2014, Weems officially identified the "new" color of Flexzilla hoses as Pantone 374C. On January 30, 2014, in an email directed to Matthew Weems and Allen Hudson (Hudson), of Weems' "Engineering" department, and entitled "Flexzilla Pantone Color Spec: Pantone 389C / Pantone 374C," Pieper wrote:

> Trademark reference: Pantone 389C
>
> Color of current hose: Pantone 374C
>
> As of 1/30/14, we will instruct all vendors that "ZillaGreen" is Pantone 374C. The trademark reference to 389C will remain the same on all packaging.

Tr. 1294:7-1295:8; T0160 at 2, 3; T0161; T0688 at 2. On January 31, 2014, Matthew Weems responded to Pieper's email, included Hudson (Engineering), Smith (Quality), Cromer (Product Development), and Mark Weems as recipients, and stated:

> Team, we have decided to not change Zillagreen™ to our registered 389C pantone. We have identified 374C as the pantone currently being produced and will attempt to register this in the near future.
>
> Quality: Make sure that Mr. Hose continues to produce hose to the color we have identified as Pantone 374C. In addition, Legal needs the date we stopped producing hose colored 389C and started producing them colored 374C. Please look through the archived production samples to find out this date.
>
> Marketing: Yes, the legal statement referencing 389C can stay on our packaging until further notice. Please source 374C color chips from pantone and provide to quality.

Tr. 1295:2-1297:21; T0160 at 3; T0161.

38

On February 1, 2014, Smith emailed Alan Li, Weems' Quality Control associate in Taiwan, stating:

> Please read and pay special attention to the email below from Legacy. It would appear a final decision has been made with regards to the color we want Flexzilla to be going forward. I guess no change needs to be made but we need to make sure all of our Flexzilla suppliers (especially Jieh Ming) is aware of this announcement from Legacy. Can you tell me if you have any 374C chips? If not I will be sure to send you some. Please be sure to follow up on this with Jieh Ming and William after CNY. Thanks!

Tr. 1299:12-13; T0160 at 1. Mr. Li responded by stating that he did not have the Pantone 374C chip, but currently had chips for Pantone 382C, 389C, 390C, 395C and 396C. T0160 at 1.

On February 6, 2014, Matthew Weems emailed Smith, with a copy to Mark Weems, asking him about the status of his request to look through archived production samples of Flexzilla to determine the date on which Weems had stopped producing hoses colored Pantone 389C and started producing hoses colored Pantone 374C. Tr. 1297:22-1298:3; T0160 at 3; T0161; T0162 at 1-2. Later the same day, Smith emailed Dave Harris to seek his assistance in determining the approximate date on which Weems changed from Pantone 389C to Pantone 374C, stating:

> Can you please try to randomly go through some old samples to see when we last made hose "close" to 389c Pantone. There is a Pantone book on the rack above where I sit. Please don't spend much time on this as I only need an approximation as to the date. The hardest part will be getting the hose back from storage but hopefully someone can help get it down. Thanks!!!

Tr. 1298:4-24; T0161 at 1. The following day, Smith asked Li to look through any samples or reports that he had to get an idea as to when Flexzilla's color changed from Pantone 389C to Pantone 374C. Tr. 1299:9-18; T0162 at 1.

39

By February 10, 2014, Weems had determined the approximate date on which Flexzilla's color had changed. Tr. 1299:21-1300:1. In an email entitled "Zillagreen 389C to 374C," Matthew Weems advised Mark Weems that the production samples pulled by Smith – photographs of which Matthew Weems attached – suggested the change from Pantone 389C to Pantone 374C occurred on July 11, 2011, and asked if he should forward this information to Laurenzo:





Matt Weems
Vice President
Legacy Manufacturing Company
Ph: 319-373-7305 Ext. 103
Fx: 319-373-7309
Cell: 319-361-7007
www.legacymfg.com
www.flexzilla.info

Tr. 1301:5-1302:15; 1321:22-25; T0163.  Smith confirmed that these photographs (the
only two photographs included in Matthew Weems' February 10, 2014, email) revealed
the change in Flexzilla's color from Pantone 389C to Pantone 374C in 2011, as
demonstrated by his review of Weems' archived production samples. Tr. 1301:15-
1302:15; 1321:16-21; T0163 at 1-2.  Smith also confirmed that the purchase order, the
type of hose and the date and type of testing performed on the archived production
samples (adhesion and burst testing) was denoted on the boxes containing the samples.
Tr. 1296:8-1297:6; 1301:5-22).

On February 10, 2014, Li responded to Smith's February 7, 2014, email, stating
that based in part on a conversation with Wu, his understanding was that there had been
no change to Flexzilla's color until Weems' January 30, 2014, formal announcement of
the change to Pantone 374C.  T0162 at 1.  Wu told Li "that the color was fixed since
2008 (not sure which month)."  *Id*.  Smith replied on February 11, 2014, stating that

Case 1:20-cv-00108-LTS-KEM     Document 275     Filed 11/20/24     Page 41 of 122

he was able to determine the date on which Weems changed from Pantone 389C to Pantone 374C.  *Id*.  Smith further stated:

> With regards to William saying the color has never changed since 2008 he couldn't be more wrong.  Back in 2008 the color was pretty much a yellow color and now it is predominantly green.

Tr. 1299:19-1301:4; T0162 at 1.  Smith testified that the "yellow color" to which he referred in his February 11, 2014 email was Pantone 381C, and the "predominantly green" was Pantone 374C.  Tr. 1300:10-16.  When Smith left Weems in July 2014, the color of Flexzilla hoses was Pantone 374C.  Tr. 1293:6-24.

Later documents confirm the change in Flexzilla's color from Pantone 389C to Pantone 374C, as well as Weems' continued reliance on the Pantone system to test color correctness.  An "Inspection Report" dated April 20, 2016, noted "Color P374C" as a particular product specification.  T0043 at 1, 3.  In November 2016, Weems' Product Development Department communicated with a supplier, Contitech, about a "1/4" Flexzilla hose and latest specification sheet."  T175 at 2-6.  After being advised that Contitech's dye supplier was using "Green 389 containing] Fluorescent pigments," Sam Kahudra, then Weems' Quality Assurance Manager, stated that "[a]s far as the color, [Weems] currently call[s] out Pantone 374C.  We noticed that you listed Green 389. Please explain."  T0175 at 2, 4; T0688 at 8.  In a follow-up, internal communication among the Product Development team, Marco Laubach (Laubach), then Weems' Director of Product Development, wrote:

> . . . I am a little puzzled why they say 389 for the color. The ContiTech hose is not the same as flexzilla color. Sam, can you please check the conti hose per the pantone book and advise.

T0175 at 1; T0688 at 8. Cromer, Schindel's "right-arm man while [he] was" at Weems, responded by stating:

> I think [Contitech] are a lot closer to 374C than 389C. 389C is what [Weems] originally started with and is noticeably more of a yellow-green

42

(hence the original "YW" in our Flexzilla part numbers) than what we get from Conti.

T0175 at 1; Tr. 646:17-18. Laubach replied that Weems "always communicated 374C… it's been on the specification sheet for a long time…" T0175 at 1.

Mark Weems' testimony on this issue was inconsistent with Weems' own documents. He testified that the above-referenced, January to February 2014 emails related to a one-time "slight color drift due to a manufacturing spec" that occurred in 2008 and emphasized that these were "Plews litigation e-mail[s]. [They] had nothing to do with the actual project that we were doing, testing the air hose. It was gathering information for a totally different lawsuit." Tr. 1460:16-24; 1462:2-12; 1462:13-1464:5; 1474:14-25. This testimony is undermined by the content and timing of the emails. Nothing about the contents suggests that they were related to Weems' lawsuit against Plews. That is understandable, as the emails were sent in early 2014 but Weems did not file suit against Plews until June 10, 2016. *See Weems Industries, Inc. v. Plews, Inc.*, No. 1:16-cv-00109-LRR-CJW (the Plews action). Mark Weems' claim that they were "Plews litigation e-mail[s]" is not credible.

Moreover, while Matthew Weems' February 10, 2014, email was entitled "Zillagreen 389C to 374C," Mark Weems claimed that the four photographs included in that email were not what Smith testified them to be (the results of his search of archived production samples as to when Weems "stopped producing hose colored 389C and started producing them colored 374C"). Tr. 1469:11-1470:3; T160 at 3; T0161 at 1; T0162 at 2. Mark Weems first claimed that the left box in the photographs showed untested, "deconstructed" hoses in their "normal Flexzilla color," but then stated that the hoses were tested. Tr. 1466:14-18; 1469:5-7. Mark Weems also stated that the right box showed hose covers that had been subjected to an oil test, wherein Schindel and Cromer "literally cooked or boiled" them in caustic, hydraulic oil, which in turn caused the color of the hoses to change "quite dramatically to a yellow." Tr. 1467:17-

43

20; 1469:18-21. The record contradicts Mark Weems' account. According to Smith, the tests to which the hoses were subjected were described on the box and no hoses were ever tested and placed in oil. Tr. 1296:13-1297:2; *see also* Tr. 1286:5-1287:1; 1286:15-23; 1302:15-22; 1316:5-21; T160 at 1; T0163 at 1-2. None of the above-referenced, January to February 2014 emails refer to or suggest the occurrence of any kind of oil testing. Tr. 1471:22-1472:11.

Smith also testified that the same tests were done on the hoses in both sample boxes and the photographs corroborate this testimony. T0163 at 1; Tr. 1316:5-14. Mark Weems claimed that "if you actually had a piece of the [oil] tested hose, you would see brown residue left over from the hydraulic oil bath." Tr. 1467:20-22. However, no such residue is readily apparent on either the hoses or the cardboard box containing them. Instead, the allegedly tested hoses in the left box appear extremely clean, with the Flexzilla print band unaffected by the purported "cooking" and "boiling" in a caustic, hydraulic fluid oil bath:



T163 at 2. Mark Weems' testimony concerning the change of Flexzilla's color from Pantone 389C to Pantone 374C is not credible.

**J.** ***Weems Applies to Register its Color Mark for Compressed Air Hoses on the Principal Register***

On April 14, 2015, Weems filed U.S. Trademark Application Serial No. 86/596,429 ('429 Application) for "the color chartreuse as applied to the entire hose body of the goods" for compressed air hoses. T0034 at 1-7. Weems identified the '628 Supplemental Registration as a prior registration of the same mark. T0034 at 3, 5. As with the '628 Supplemental Registration, Weems asserted May 1, 2007, as date of its first use of the claimed color mark. As noted above, however, in May 2007 Weems' technical documents specified the color as "Highlighter Yellow Pantone 381."

In addition, as also set forth above, by April 2015 Weems knew that Flexzilla's color had changed from Pantone 389C – Flexzilla's specified color in the '628 Supplemental Registration – and knew that Weems identified Pantone 374C as Flexzilla's color prior to filing the '429 Application. In order to conform these different colors but still claim May 1, 2007, as the date of Flexzilla's first sale, Weems omitted the specific "Pantone 389C" identification of its mark in the '429 Application, using only the descriptor "chartreuse," to describe the color of its mark. T0034 at 2, 5; Doc. 38 at 2, n. 2 ("The color 'chartreuse' . . . is defined as 'a variable color averaging a brilliant yellow green.' Merriam Webster Collegiate Dictionary at 193 (10th ed. 1993).")).

In support of its claim of acquired distinctiveness, Weems submitted a declaration of Mark Weems which, among other things, stated that the mark covered by the '429 Application was the "same mark chartreuse" that was covered by the '628 Supplemental Registration. T0034 at 11. However, Weems submitted a drawing depicting the claimed color of the '429 Application that was noticeably different than

45

the '628 Supplemental Registration's drawing, and instead, appears to reflect the change in Flexzilla's color from Pantone 389C to Pantone 374C:

Production Sample
Rec'd 06/30/2011



'628 Supplemental Registration    '429 Application

    

Production Sample
Rec'd 07/19/2011



W209 at 7; T0034 at 35; T0163 at 2.

Matthew Weems signed the '429 Application on behalf of Weems, declaring under 18 U.S.C. § 1001 that he:

46

believes that to the best of [his] knowledge and belief, no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive.

T0034 at 6. In further support of Weems' claim of acquired distinctiveness, Mark Weems declared:

Early after the adoption of the trademark chartreuse, namely from October 2007 through November 2009, Weems Industries spent approximately $79,281.00 on advertising and marketing materials to promote and educate compressed air hose product customers about the mark, the color chartreuse and its associated products, as related to and offered by Weems Industries.

T0034 at 10. However, Weems did not provide the USPTO with any such advertising. See T0034 at 9-35. Nor did Weems provide information relating to Weems' 2009 advertising materials, which, as noted above, educated consumers that Flexzilla's color was a safety feature in that it had high visibility that enhanced visibility of the hose and prevented tripping. T0034 at 9-35.

The USPTO ultimately allowed the '429 Application, which became Registration No. 4,827,169 (the '169 Registration) and which was registered on the Principal Register on October 6, 2015. T0034 at 1, 37-42.


## K. *Weems Undertakes Project 716*

When Weems sued Plews in 2016, it alleged that Plews infringed Weems' chartreuse color mark for air hoses. Tr. 129:1-6; 173:3-5. Plews' answer, filed October 11, 2016, included a request for cancellation of the '169 Registration on grounds that Weems' color mark was functional, and thus unenforceable, because the color served the function of preventing tripping hazards by being more easily visible. *See* Plews action, Doc. 9 at 36. Soon thereafter, Weems renewed its efforts to "scrub"

47

and "sanitize" all references to its chartreuse color as "Hi-Vis," realizing that its prior efforts to do so had not been completely successful. Tr. 1089:14-1091:13.

For example, on October 25, 2016, Matthew Weems found that numerous retailers, such as Walmart, were still using the term "Hi Vis" in connection with Flexzilla on their retail websites. Tr. 173:12-21; 1089:22-1090:8; T0170. Matthew Weems ordered Susie Weems to "have the guys" contact these retailers to remove such language, stating that the change was "mandatory" and Weems "can't advertise that Flexzilla is a Hi Vis Green." Tr. 1090:9-1091:13; T0170-T0173; T0176; T0178; T0179. Weems assigned a project number – 716 – to this renewed effort to sanitize its advertising and promotion of the high visibility feature of Flexzilla's color. Tr. 174:19-180:5. The following day, in an email entitled "Project 716 – Hi-Vis Green," Susie Weems directed Ryan Thomson to perform the requested task, noting that he should "start a spreadsheet," because the "list [of retailers using "Hi Vis"] is going to grow." T0172. Weems' Marketing Department then contacted Weems' salespeople and instructed them to have their accounts remove "Hi Vis" from their websites. T0173; T0176; T0178; T0179.

Nonetheless, Weems' distributors and retailers continued to tout the functionality of Flexzilla's chartreuse color with the marketing information Weems had previously instructed them to use. Tr. 186:7-187:9; T0050; T0080-T0091; T0431. As late as 2019, retailers advertised "High Visibility – easy to see in most workplaces" and "'Hi-Vis Safety Green' Visual awareness helps prevent accidents" as a feature of Flexzilla hoses. Tr. 184:21-186:6; W034 at 110, 131. In addition, several captures of Weems' retailers' websites, many copyrighted in 2022 and 2023, show that they still publicized "Flexzilla® Hi-Vis Safety Green color makes hose more visible in the workplace" as a feature and benefit. T0080-T0091; T0431. Even at the time of trial, Walmart's website, among others, was promoting "Flexzilla hi-vis safety green color makes the

48

hose more visible in the workplace" as a feature and benefit of Flexzilla air hoses. Tr. 175:6-176:22.

### L. *Weems Applies to Register its Color Mark for Water Hoses on the Principal Register.*

On May 17, 2016, Weems filed an application with the USPTO, Serial No. 87/040,353 (the '353 Application), to register "the color Chartreuse as applied to the hose body of the goods wherein the color Chartreuse appears on the surface of the body of the hose," for "[w]ater hoses, namely, garden hoses, watering hoses and pressure washer hoses. T0035 at 1-6. The application was signed by Matthew Weems. T0035 at 3. Weems cited its prior '169 Registration (which had claimed priority to the '628 Supplemental Registration) and also made a claim of acquired distinctiveness, asserting that it had made "substantially exclusive and continuous use" of the color mark "for at least the five years immediately before" the date of the application. T0035 at 4.

On September 14 and 21, 2016, Laurenzo spoke with the Examining Attorney regarding, among other things, the drawing submitted with Weems' application. T0035 at 13. Weems submitted the following drawing to depict the claimed color mark:



T0035 at 11, 13, 17. On October 3, 2016, Laurenzo spoke again with the Examining Attorney. T0035 at 76. On that same day, the Examining Attorney issued an Examiner's Amendment, which confirmed an authorization granted by Laurenzo to, among other things, amend the description of the color mark claimed to "the color

49

Chartreuse as applied to the exterior of the hose body of the goods wherein the color Chartreuse appears on the entire surface of the body of the hose." T0035 at 78.

The Examining Attorney also issued an Office Action refusing to register the color mark on grounds that the color used on the submitted specimen was ornamental and would be "perceived to be a design element or design feature *of* the goods, not an indicator of source *for* the goods." T0035 at 77 (emphasis in original). The Examining Attorney further refused registration on the grounds that Weems' claim of acquired distinctiveness was insufficient. T0035 at 77-78. The Examining Attorney wrote: "Given that color marks are never inherently distinctive" and "**the burden of proving that a color mark has acquired distinctiveness is *substantial*,**" Weems' "mere statement of **long use is not sufficient**" to demonstrate acquired distinctiveness. T0035 at 77 (emphasis in original)). Instead, Weems was required to "provide evidence demonstrating that the color mark has acquired source-indicating significance in the minds of consumers." T0035 at 77.

On April 3, 2017, Weems filed its response to the October 3, 2016, Office Action, which included a supporting declaration of Mark Weems. T035 at 21-75. Weems certified that the color of the mark covered by the '353 Application was the same color mark it had been using since 2007 in connection with air hoses and the same color mark that was the subject of Weems' prior registrations for compressed air hoses. T0035 at 26, 74. Weems provided exemplary advertising in which Weems stated that "CHARTREUSE (PANTONE 389C)" was its registered trademark. T0035 at 28, 32, 59, 60, 63, 66. Mark Weems verified that Weems had exclusively used and advertised the color chartreuse as a trademark for water hoses since at least as early as 2009. T0035 at 71-72.

Weems did not provide the USPTO with any of Weems' advertising from 2009. T0035 at 21-75. Thus, Weems did not provide examples of the advertising that "educated" Weems' representatives, buyers and consumers about the functionality of

50

the color of Flexzilla's air and water hoses as a high visibility color that prevented tripping accidents. Instead, Weems provided examples of its advertising and packaging that issued after Weems had undertaken to "scrub" and "sanitize" "Hi Vis" from Weems' records. T0035 at 28-70.

Weems also asserted that the chartreuse color mark for water hoses had acquired distinctiveness and, in support, claimed ownership of the '169 Registration. T0035 at 25-26. However, the color of the drawing for the mark of the '169 Registration differed from the colors of the drawings of the marks of the '628 Supplemental Registration and the '353 Application:

| '628 Registration<br>Air hoses | '169 Registration<br>Air hoses | '353 Application<br>Water hoses |
|:---:|:---:|:---:|



W209 at 7; T0034 at 35; T0035 at 17.

On April 12, 2017, Laurenzo spoke again with the Examining Attorney about the '353 Application. T0035 at 81, 88. The Examining Attorney requested evidence showing that it was common for companies to sell air, water and pressure washer hoses and indicated that if Weems could do so, then Weems could claim ownership of the '169 Registration as an active prior registration of the same mark to demonstrate acquired distinctiveness under 37 C.F.R. § 2.41(a)(1). T0035 at 81, 88. On April 21, 2017, Weems amended the '353 Application to reference its "ownership on the Principal Register for the same mark for sufficiently similar goods/services of active

U.S. Registration No(s). 4827169" as evidence of acquired distinctiveness.  T0035 at 81, 87-88.

The USPTO ultimately approved the '353 Application.  T0035 at 245-47.  On September 26, 2017, the '353 Application issued as the '921 Registration.  T0035 at 1.


**M.    *The Use of Color in the Water and Garden Hose Industry***

At the time Weems developed and introduced its Flexzilla water hoses in 2005 and 2006, Weems had not been involved in the lawn and garden hose market.  Tr. 40:21-41:3.  The evidence establishes that the use of a variety of colors, including various shades of yellow, green and yellow-green, has been widespread and long-established in the water hose industry.  *See, e.g.,* Tr. 326:8-22; 622:13-623:9; 803:13-19; *see also* various trial exhibits, including T0253 (Flexon's GreenChoice); T0256 (Maxaline Hybrid Polymer Hose); T0257 (Rainwave Prem-A-flex); T0258 (Garden Supreme Hybrid Polymer Hose); T0259 (Amflo Ultra H2O); T0260 (Boro); T0272 (LawnFlex);T0439 (Swan's Flexrite Pro).  Teknor itself has sold various colors of water hoses, including shades of yellow, green and yellow-green, since long before Weems introduced Flexzilla.  Tr. 683:5-9; 773:8-16; W157 at 2; T0301; T0283; T0294; T0296.

Cynthia Chatell, senior channel manager for Teknor's Consumer Products Division, testified that yellow, green, and yellow-green colored water hoses have been used in the lawn and garden industry for over 30 years and the water hose market is saturated with such colors.  Tr. 683:5-9.; 773:8-13; 775:24-776:2; T0375.  Chatell also testified that Teknor developed a bright yellow-green Neverkink hose in 2005 – prior to Flexzilla's existence – that she personally sold to Benny's, a New England based retail chain, in 2006.  Tr. 776:9-15; 815:25-816:16; T0282, T0285; T0296; T0368; T0369; 905:22-907:11.  Michele Izzo-Marchetti, Teknor's Marketing Specialist, similarly testified that green colors are universal, and that greens and yellows have been used for

as long as hoses have been manufactured. She also testified that there are only so many high visibility colors that sell well in the hose category. Marchetti Dep. 7:7-12, 9:5-13, 144:5-145:3, 145:22-146:10. I find Chatell's and Izzo-Marchetti's testimony on these points to be credible.

Even after Flexzilla's introduction, Teknor continued to manufacture and market bright green, yellow, and yellow-green colored water hoses, including Teknor's KinkControl Plus (T0254, T0283), Mainstays (T0273), Teknor Medium Duty hoses (T0273), Healthy Habitat (T0294 at 10-14), Room Essentials (T0294 at 18) and other medium and heavy duty green, yellow and yellow-green hoses (T0294). In addition, Teknor presented "store shop" evidence demonstrating the widespread availability and sale of yellow-green water hoses by Teknor and others, such as the "Pocket Hose" and the Swan Elements hose at national and regional retailers across the United States. *See, e.g.,* Tr. 659:18-690:16; T0385; T0386; T0390; T0397; T0398; T0399; T0400.

For the sake of (relative) brevity, I will not cite each and every exhibit or snippet of testimony presented by Teknor to establish the fact that yellow, green and yellow-green colored water hoses were widely marketed before Flexzilla and continue to be widely marketed today. Teknor has made this showing to an extreme degree. Teknor has also established, as a general matter, that color is not typically used in the water hose industry as trademark or source indicator. Mark Weems acknowledged that it is important for manufacturers to be able to offer water hoses in a variety of colors compatible with consumers' needs. Tr. 184:2-13. Color may be used ornamentally, so as to appeal to consumers' tastes and preferences. Tr. 763:19-764:3. Certain colors serve the function of allowing water hoses to blend into a variety of landscapes. For example, soaker and sprinkler hoses are usually black or brown to blend in with dirt and mulch. Tr. 764:12-14; 764:17-21; 774:23-775:3; T0301 at 13. Weems has offered such hoses. Tr. 72:15-23;183:12-184:1; W32 at 43. Colors are also used to

53

allow hoses to enhance landscape environments. T0301 at 330 ("Sunflow" hose promoting "Bright Color Enhances Landscape").

The color red is typically used to denote a hose designed to carry hot water. Tr. 465:12-13; 467:25-468:2; 765:8-9; Marchetti Dep. at 115:19-116:6. Marine/RV hoses, including those Weems has offered, are generally white, or white with blue stripes to denote safe drinking water. Tr. 182:19-183:6; 465:10-13; 764:11-12; 774:17-22; 804:6-11; 805:5-9; T0391 at 9; W20 at 11; W23 at 1, 8; W32 at 36; Marchetti Dep. at 115:25. Hoses with high visibility colors have been made and sold for the express purpose of increased safety. *See, e.g.*, T0502 at 1-2 ("Bright colored cover for easy visibility"); T0498 ("Ideal for jobsite applications and commercial uses where high visibility is important"); Tr. 764:14-17; Tr. 765:7-9; T0301 at 171 and T0281 ("Safety Bright" (Teknor) hose promoted as "Vibrant red color for high visibility in grass areas"; T0280 ("Safety Bright" (Teknor) yellow hose promoted as "You can't miss this one."); T0301 at 270 ("Yellow Jack" (Teknor) hose promoted as high visibility hose); T0301 at 328 (yellow and black "Commercial" hose promoted as high visibility hose); T0301 at 345 (same as hose in 2003 catalog); T0504; T0505 (Goodyear MaxLite High Visibility Rubber); Eric Williams Dep. at 88:10-20, 89:22-90:2, 90:22-91:4, 92:17-23 (describing the importance of the color of Swan Products, LLC's ("Swan") Goodyear MaxLite High Visibility Rubber hose as "safety on the job site. Also help to prevent the hose from being run over"); 94:1-6, 100:5-8, 100:16-101:4, 101:12-17, and 103:22-104:6 (discussing Swan's and others' high visibility hoses); Rauch Dep. at 58:11-62:21; 62:23-63:24.

The record establishes that high visibility yellow, green and yellow-green colors are commonly used in connection with other products to enhance visibility and safety. *See, e.g.*, W034 at 24, 25, 68, 69; T0715 (school signs); T0717 (traffic signs); T0719 (flagger's vests); T0720 (high visibility clothing); T0721. Several United States Patents describe the color "chartreuse" as being a high visibility color that enhances visibility

of an object. *See, e.g.*, T0004 (patent directed to a coating composition for game balls to enhance the visibility of the finished balls) at 3 (Col. 1, ll. 26-32: noting that fluorescent colored softballs are more visible in daylight conditions, and "fluorescent colored softballs afford extended visibility during night play as they can be readily seen under field lights and against the evening's black sky"), at 6 (Col. 6, ll. 19-22: noting that the colorants suitable for use in the involved invention comprised daylight fluorescent pigments, of which a "chartreuse" pigment, Radiant P7-CH0620, provided the desired level of fluorescence in the finished, coated softball product); T0010 (patent directed to an illumination apparatus for edge lit display signs, such as edge-lit emergency exit signs) at 24 (Col. 15, ll. 17-25: describing an embodiment of the invention, where the indicia – the wording of sign, e.g., EXIT – comprises a fluorescent pigment material, and a preferred class of fluorescent materials are fluorescent pigments, including "commonly used in so-called 'day glow' fluorescent plastics to make objects more visible under normal lighting conditions"; Col. 15, ll. 35-37: noting that these pigments "are sold in a variety of fluorescent colors, such as chartreuse [and] green."); T0012 (patent directed to a portable collapsible safety barrier) at 15 ("It is preferable, for visibility to manufacture the barrier in a highly visible color and material such as chartreuse, day glow or hunter orange, reflective beads or glow-in-the-dark (phosphorescent, chemi-luminescent or the like) materials."); T0013 (patent directed to a cover for hand guns and rifles) at 11 (Col. 6, ll. 27-29: "Alternately, safety coloring can be used, such as neon or blaze orange, yellow or chartreuse for high visibility."), at 12 (Col. 7, ll. 9-15: noting that "[t]he inventive cover can be made in a variety of colors . . .and can be selected from . . . safety colors including blaze orange, chartreuse or neon yellow."), at 16 (Claim 7: "A universal scope and action cover . . . wherein . . . said safety color is selected from neon orange, yellow and chartreuse."); T0020 (patent directed to a deer crossing warning zone applied to roadway to reduce accidents) at 12 (Col. 7, ll. 42-48: noting that because the

55

upper surface of the roadway is usually of a dark color, the "graphical icon should be of a contrasting color to make it more visible to an approaching motorist. . . . chartreuse [is one of] some colors that appear to be visible to approaching motorist even during periods of low light."); T0021 (patent directed to a fall protection safety harness) at 46 (Col. 15, ll. 22-26: noting that backing and outer cover "may be made of brightly colored fabric, such as a high-visibility, fluorescent chartreuse or safety-orange for increased visibility.").

The record also establishes that the number of high visibility water hose colors that would be marketable and accepted by retailers or consumers is limited. *See* Marchetti Dep. at 117:2-5 ("High visibility could be yellow, it's green, you have other high-visibility colors that wouldn't work in this industry, like a hot pink; that would not sell in this industry."). For example, while orange is a color that is theoretically or conceptually available as a high visibility color, the color is not marketable to retailers because orange is closely associated with Home Depot. Tr. 467:25-468:7; 485:5-8; 485:25-486:14; 765:2-6.

### N.  *Teknor Develops the zero-G and zero-G Pro Hoses*

In 2013 or 2014, Teknor decided to develop a water hose to compete with expandable hoses – such as the "Pocket Hose" – consisting of a non-traditional inner tube with a fabric outer layer or jacket, that had become popular in the consumer market. Tr. 524:11-525:12. Chatell testified that the Pocket Hose was a "game changer" in the garden hose industry. Tr. 782:4-6. Introduced in 2012, the Pocket Hose was marketed nationally through Home Depot and "As Seen On TV" advertising. Tr. 782:4-12. According to Chatell, the Pocket Hose was the "first of its kind for a homeowner in the lawn and garden industry to have something truly lightweight," and consumers "realized they really wanted lightweight hose." Tr. 782:18-23.

Teknor developed and patented a hose comprising an extruded inner tube with an outer fabric jacket comparable to a pocket hose. Tr. 533:5-8; 535:19; 782:23-783:3. Teknor called its product the "zero-G hose" and introduced it in December 2015. Tr. 533:9-18. In June 2016, Weems purchased and tested the zero-G hose and discussed it at several project review meetings. 223:13-224:8; T0198 at 1-4. Weems acknowledges that such competitive analysis of competing hoses is customary and that the zero-G hose was selling well, was comparable in price to Flexzilla water hoses and performed well. Tr. 223:6-12; 224:10-17; 224:22-225:20; T0198 at 1-4.

In 2017, Teknor began to develop a professional version of the zero-G hose, ultimately called the zero-G Pro, for use by contractors and commercial cleaners. Tr. 533:19-534:20; 767:11-21. Blanchette directed his team to explore the use of high visibility colors in connection with Teknor's hoses. Tr. 464:12-17; 535:20-536:2; 767:17-21; T0310 at 1-2. He was primarily interested in the safety benefits of yellow-green colors, such as those used in construction and landscape environments, as well as in the tool and hardware industry in which he had prior experience. Tr. 465:14-18; 465:24-466:3; 467:3-14; 468:8-11; 505:15-507:4; 536:3-12; 556:2-16; Marchetti Dep. at 96:1-14; W156.

To make the fabric outer jacket of its zero-G hoses, Teknor outsourced materials from a third-party yarn manufacturer and was therefore limited by the color choices available from that manufacturer. Tr. 468:8-16; 483:18-21; 537:12-538:3; 767:3-20; T0465. Teknor decided on a neon green colored yarn (neon green-1 G2) for zero-G Pro, due to both its lower cost and its high-visibility color. *Id.* The color compared closely to a fluorescent version of Pantone 802C. Tr. 594:12-595:2.

Teknor introduced the zero-G Pro hose in January 2019. Tr. 538:4-7. Teknor has promoted that hose as being designed for contractors or professionals and as having a high visibility color as a safety feature and benefit:




The zero-G® PRO hose is 55% lighter in weight compared to commercial vinyl hoses. The hose is so compact it will fit in a 5-gallon bucket which can be transported in the back of a work truck or compartment. The 3/4 inch diameter allows for high water flow and the neon green color provides high-visibility for job site safety.

Tr. 533:19-534:4; W170 at 3; T0267; T0291; T0292; T0297; T0304 at 1-2.

## O.  Teknor Develops the NexFlex Hose

Beginning in 2016 and continuing into 2017, Teknor worked on developing a hose in a more conventional, extruded form, that would have lightweight and flexibility properties similar to the zero-G hose.  Tr. 526:23-25; 529:1-4; 570:10-17; 577:6-10; 768:19-769:4; Marchetti Dep. at 25:12-19.  Teknor named this project "alternative material hose" because it determined that the only way to achieve its goals was by developing new materials that made hoses lighter and more flexible.  Tr. 526:5-527:7. Teknor tasked Tim Chapman (Chapman), then a technical manager at Teknor's manufacturing and research facility, and his group to develop a hose that was lighter weight and more flexible than the conventional PVC hoses Teknor had developed to that point.  Tr. 831:10-835:8; 843:24-844:2.  The alternative material hose project resulted in Teknor's introduction of its NexFlex hose, followed by the Hydroflex hose and, later, the Synergy hose.  Tr. 528:7-13; 570:5-9; 847:19-21; 888:3-14.

During this process, Teknor compared and tested the performance of a variety of competitor hoses – including, among others, Flexzilla, Green Frog, Stanley Fat Max, Gilmour, Swan and Teknor's own Neverkink.  Tr. 463:11-19; 468:19-469:2; 500:1-5; 502:19-25; 527:12-25; 577:24-25; 853:13-854:14.  The testing included performance tests such as burst, flexibility, abrasion, adhesion, type of reinforcement and core

58

hardness. Tr. 503:9-16; 757:18-23; 838:9-20; 853:13-854:14; 889:7-18; W172; W174. Other than testing for UV resistance (or color fastness), Teknor's comparison testing did not involve color. Tr. 757:24-758:5; 888:15-889:6; 889:19-22; W172; W174.

With regard to color fastness, Teknor sought to determine if the hoses maintained their color after being exposed to sunlight. Because of the Flexzilla hose's use of fluorescents, Teknor decided to perform a color fastness test "to see what the effects on the sun have on the Flexzilla hose." W198. At this time, Teknor was investigating color choices for the alternative material hose but had not defined a color. Tr. 886:24-887:11. In addition, at one point during the alternative material hose project Blanchette asked Chapman to explore what he could do to obtain a hose surface having a softer feel that he had experienced with other products in the market. Tr. 511:21-512:20. On May 7, 2017, Chapman contacted Paul Kroushl (Kroushl), a Teknor vinyl chemist, to determine whether he could modify a previous formulation (Core No. 1120048011) to make a "grittier or more textured" or more "matte" surface. Tr. 842:9-844:12; 875:8-876:4; W171 at 8-9; W192 at 2. Chapman stated that Williams would be bringing Kroushl two samples to examine – a "lime green" sample "labeled 'Flexzilla'" and an "orange [sample] labeled 'Teknor'" – and to use the Flexzilla hose as a point of reference for something that was more textured. Tr. 844:13-845:5; W171 at 9. Teknor ultimately did not go down the path of having a textured exterior surface, as it found that such a surface compromised the hose's ability to resist abrasion and made the hose more prone to mold development. Tr. 512:19-513:4.

In May 2017, Michael Melo, a product manager for Teknor's Consumer Products division, instructed Emily Williams to research color options for bright, high visibility colors. Tr. 570:22-25; 770:2-7; Williams Dep. at 26:7-11, 51:24-52:9. Williams reviewed various sports and outdoor recreation websites to ascertain what

59

colors might be on trend and created a PowerPoint of high visibility-colored products that grabbed her attention. Tr. 771:22-772:13; Williams Dep. at 26:15-27:27:3; T0324. Williams then reviewed color swatches to see if she could find similar colors that Teknor had used. Tr. 82:23-483:5; 593:3-13; 770:5-8; Williams Dep. at 102:15-21, 103:3-10; W171 at 11.

Williams ultimately presented five color swatches to the Consumer Products division team. Tr. 483:6-12; 529:5-15; 570:22-25; 770-7-9; 770:20-771:1; 771:9-17; 806:14-24; Williams Dep. at 104:11-21; T0323. The team reviewed the color swatches and selected a yellow color that compared closely to Pantone 388C. Tr. 593:3-594:11; 770-7-9; 790:7-12; 808:21-10; W171 at 21, 29-31. Teknor introduced its NexFlex hose in January 2019. Tr. 520:2-4. Teknor promoted the fact that NexFlex's color provides a high visibility function. T0304.

**P. Weems Attempts to Prevent Teknor from Selling Yellow-Green Water Hoses**

By July 2018, NexFlex had been shown to some of Teknor's customers. Tr. 542:7-13. A Weems sales representative saw a prototype of a NexFlex hose in the planogram room at Meijer, a retailer in Michigan, and alerted J.D. Erner, a Weems salesperson. Tr. 44:20-45:6; 88:9-89:1; T0180. On July 25, 2018, Laurenzo sent a letter on behalf of Weems to Jonathan Fain, Teknor's CEO, stating that Weems had learned that Teknor "may have plans to introduce a new chartreuse or similarly colored water hose into the market." W011 at 1. The letter advised Teknor of Weems' ownership of the '921 Registration and requested confirmation that Teknor would not "introduce a chartreuse or similarly colored water hose into the market." W011 at 1; Tr. 88:1-6. The letter stated that failure to confirm "in a satisfactory manner will be viewed by our client as willful infringement of its trademark." W011 at 1. It also warned that Weems was "prepared to enforce their rights through any and all available legal remedies." *Id*.

60

Fain provided the letter to Teknor's Consumer Products Division management team to review and address. Tr. 457:13-17; 540:22-541:1; 579:9-14; Fain Dep. at 35:15-18, 36:1-4. Members of the team – Blanchette, Chatell, Marchetti and Melo – investigated the letter's claims. Tr. 541:11-18; 547:4-19; 560:21-561:2; 579:21-580:2; 582:2-19; 583:6-7; 585:11-15; 587:4-588:7; 588:19-606:7; 606:22-610:7; 611:15-615:1; Marchetti Dep. at 112:12-113:4, 113:9-114:6, 121:8-123:19; W171 at 35-42. The team concluded that "chartreuse," a term they considered to be indefinite and vague, meant Pantone 389C based on the packaging and advertising for Weems' Flexzilla water hose. Tr. 541:2-542:6; 599:9-18; Marchetti Dep. at 122:2-8, 146:17-20; W171 at 40; T0044; T0055.

In an attempt to resolve Weems' concern, Blanchette decided to move away from the yellow Pantone 388C color and directed his team to find a different color for its NexFlex hose, using Pantone 389C as a reference for Weems' asserted chartreuse color. Tr. 542:14-22; 790:17-22. Ultimately, Teknor selected a light-green color corresponding to Pantone 375C, similar to colors Teknor had previously used with its other hose offerings. Tr. 543:9-18; 790:23-24. Teknor advised Weems of this decision in an email message to Laurenzo dated August 8, 2018. W012. Teknor noted that Pantone 375C was at least 20% more green and 20% less yellow compared to Pantone 389C. Tr. 543:24-544:18; W012.

Laurenzo replied on behalf of Weems on September 6, 2018, stating that Teknor's proposed change was unacceptable. W013. Laurenzo asserted that Weems' mark covered the color "chartreuse," not a specific Pantone, and stated that the Pantone color to which Flexzilla most closely compared was Pantone 374C, not Pantone 389C. *Id*. Laurenzo further asserted that Pantone 375C is either chartreuse or confusingly similar to chartreuse. *Id*. He also alleged that the colors used by Teknor on its zero-G Pro and Smart Flo water hoses were confusingly similar to Flexzilla's color. *Id*.

61

Teknor decided to change its color again in an effort to avoid further conflict with Weems. Tr. 546:7-19; 563:4-8; 565:8-12. Based on Laurenzo's claim that Flexzilla compared closely to Pantone 374C, Teknor selected a yellow color that was similar to colors that Teknor had used before on water hoses and compared closely to Pantone 387C. Tr. 547:20-548:17; 564:20-565:4; 791:3-8. Teknor advised Weems of this change in a letter dated September 18, 2018. W014. Teknor contrasted Weems' claim of Pantone 374C with the colors of Teknor's zero-G Pro hose (equivalent to a neon version of Pantone 802C) and Smart Flo hose (Pantone 387C), noting that they were 35.53 Delta E and 14.72 Delta E from Pantone 374C, respectively. *Id*. at 2.

Teknor also challenged Weems' claim of distinctiveness, asserting that the use of green and yellow green colors was widespread and that Teknor had been using such colors for decades. *Id*. Teknor noted that a cursory search revealed that at least three other bright yellow-green colored water hoses were available for sale at Home Depot and provided links and photos concerning those hoses. *Id*. at 2-3. Despite raising these concerns, Teknor stated that because of Weems' position that its color mark corresponded to Pantone 374C, it would be proceeding with Pantone 387C for NexFlex and Smart Flo and a fluorescent version of Neon Pantone 802C for zero-G Pro. W014 at 3; 548:7-17.

On October 19, 2018, Laurenzo responded on Weems' behalf by claiming that Teknor's hoses remained "confusingly similar" to Flexzilla. W015 at 1. Laurenzo diminished the Pantone system, stating that it was neither an industry nor objective standard. *Id*. Laurenzo also stated that the use of Delta E is not well-correlated to perceived color differences. *Id*. Laurenzo backtracked from Weems' earlier use of the Pantone system to describe its color mark and provided a new definition of "chartreuse." *Id*. at 1-2. Specifically, Laurenzo indicated that Weems defined "chartreuse" in terms of CIELAB's three color parameters: hue angle, lightness and chroma, and stated that hue is the most important variable. *Id*. Laurenzo defined

Weems' claimed range for "chartreuse" as being "a hue angle of between 100-130, lightness greater or equal to 70, and chroma greater than or equal to 30." *Id*. at 2.

Laurenzo asserted that Teknor's proposed colors were "quite close" to Weems' new definition of chartreuse and created a likelihood of confusion. *Id*. Laurenzo provided yet another color range definition, stating that colors having a hue angle of 145 and greater, or 90 or less, would not be considered infringing regardless of their lightness and chroma values. *Id*. Thus, Weems reserved hue angles greater than 90 and less than 145 for itself. Laurenzo stated, alternatively, that colors having all three CIELAB values outside of the parameters defined by Weems as its color mark "may be acceptable upon confirmation." *Id*.

In an attempt to understand Weems' claimed CIELAB ranges, Blanchette contacted his counterpart at Teknor Color Company, a wholly owned subsidiary of Teknor, who then directed him to John J. Wood III, a color technology manager at Teknor Color Company. Tr. 550:15-21; 791:23-792:7; 951:17-952:19; 968:3-5; 973:22-24. Wood determined that because color is principally visual in nature, he needed to convert the CIELAB coordinate range referenced in Laurenzo's October 19, 2018, letter into a physical, visual model. Tr. 952:19-25. Wood then prepared a two-dimensional, demonstrative view of the visual spectrum, with Pantone color swatches inside and outside of Weems' CIELAB definition of its color mark, to visually demonstrate its reach. Tr. 792:8-21; 953:1-956:25; T0712. Wood drew a dot where the color of Teknor's zero-G Pro would fall in his demonstrative, which was outside of Weems' CIELAB definition of its color mark. Tr. 974:16-18.

Based on Wood's input, Teknor was concerned that Weems' claimed range was overly broad, effectively precluding Teknor from using any high visibility yellow-green color. Tr. 550:22-551:3; 792:22-793:5. On November 8, 2018, Teknor responded to the October 19, 2018, letter, explaining why it believed that confusion as to the source of Teknor's zero-G Pro, Smart Flo and NexFlex hoses was unlikely to occur. W016 at

1; Tr. 551:4-19. Teknor raised other issues as well, including the issue of the functionality of Weems' claimed chartreuse color. W016 at 2-6. Teknor stated:

> chartreuse . . . provides a great utilitarian advantage, namely [it] provides high visibility and it is easily seen in the environment in which water hoses are typically utilized, for example in a yard or on a driveway. Greater visibility aids in safer use of a watering hose, which typically is extended across the ground during use. Bright colored hoses, such as chartreuse, are easier to see under generally all lighting conditions and especially in grass and landscaping.

*Id*. at 5-6.

On December 17, 2018, the parties' attorneys spoke by telephone, discussing the possibility of Teknor providing samples of its hoses for Weems' evaluation. W017 at 1. On January 2, 2019, Teknor provided Weems with a photograph of a comparison of the NexFlex and Flexzilla hoses and requested a substantive response to its November 8, 2018 letter. W017 at 1-2; Tr. 552:6-553:15. Weems did not respond. Tr. 553:19-22. Nonetheless, on January 17, 2019, Teknor provided Weems with a sample of a NexFlex hose that was already in production and being shipped to customers. W018; Tr. 554:1-7. Teknor also renewed its request for a response to the issues raised in its November 8, 2018, correspondence. W018; Tr. 554:14-19. Again, Weems did not respond. Tr. 554:14-555:7. Nor did Weems provide Teknor with any information as to any testing performed on the NexFlex sample. *Id*. Teknor moved forward with its promotion and sale of zero-G Pro and NexFlex products in January 2019. Tr. 520:2-4; 538:4-7; 577:6-12; Fain Dep. at 97:8-20.

In 2020, Chatell contacted Wood again to seek a better understanding of what Weems' claimed range from 2018 meant visually. Tr. 793:11-794:15; 958:2-6; 959:8-11. Wood created several three-dimensional demonstratives to visually depict the scope of Weems' claimed CIELAB range. Tr. 959:12-966:14. He estimated that the number of Pantone shades in Weems' claimed, 2018 range would be "hundreds." Tr. 966:15-18. Wood testified that – based on an estimate that there are approximately 2 million

64

different colors that humans can perceive and Weems' assertions that its range covered roughly 4 percent of those colors – Weems' claimed trademark protected range theoretically represented 80,000 different colors. Tr. 962:9-963:1.

When he reviewed Wood's demonstrative models, Chatell believed that not only had other manufacturers previously used colors covered by Weems' claimed range, but that Teknor itself had used such colors in connection with, at least, its Medium Duty 8336 and Healthy Habitat hoses. Tr. 794:16-21. In early 2021, at Wood's recommendation, Chatell contacted Munsell Pantone, the company behind the Pantone system, and asked it to provide a report based upon the CIELAB coordinates that Weems claimed in its October 19, 2018, letter. Tr. 793:15-22; 794:22-795:8; 966:19-967:4. Munsell Pantone reported that Weems' claimed definition of its chartreuse color mark (without regard to Weems' broader, "likelihood of confusion" buffer), comprised 177 different Pantone colors. Tr. 795:9-23; T0191.

In 2022, Chatell requested another report from Munsell Pantone based on the new range defined by the CIELAB criteria on which Flexon had settled its lawsuit with Weems – a range that varied only slightly from the range that Weems asserts as its "trademark protected range" in this case. T0690; W175; Tr. 796:14-797:10. This report differed in that it did not provide discrete Pantones, but rather identified the colors included in a range defined by a Delta E difference of 9.5 from CIELAB coordinates L* (lightness) 83, C*ab (chroma) 77, and hab (hue angle) 113. Given the number of colors that would fall within this range, Munsell Pantone provided a list of colors encompassed by the range, each separated by a "1 Delta." Tr. 797:11-24; 798:21-799:5. The report revealed that Weems' claimed range embraced at least 966 separate colors. Tr. 795:25-796:6; W175.

**Q.** **Recognition of Flexzilla's "Chartreuse" Color as a Trademark**

    **1.** **Consumer Evidence**

Weems presented no direct or indirect evidence that consumers recognize Flexzilla's color, or the color "chartreuse," as a trademark for water hoses or as a source identifier for Weems. Tr. 177:22-178:1. Nor did Weems produce evidence suggesting that its sales of Flexzilla water hoses are driven, to any extent, by its color. Weems did offer evidence of its sales of its Flexzilla air and water hoses by year. Tr. 61:20-62:15; W007. However, the exhibit on which Weems relies to demonstrate its sales (W007) disagrees with what Weems had previously disclosed to Teknor in discovery in this case (T0687). Tr. 153:6-11; W007; T0687. Mark Weems could not explain the discrepancies. Tr. 153:6-11. In addition, Exhibit W007 shows that Weems had no sales of its water hoses in 2009, despite stating at trial (and representing to the USPTO) that it first sold Flexzilla water hoses in May 2009. *Compare* W007 with Tr. 40:20-21, 41:25-42:2 and T0035 at 4, 10-11, 13, 22, 26, 72. Even if the sales figures shown in Exhibit W007 are accurate, they reflect that Weems' sales of the Flexzilla hose have increased over time but nonetheless represent a small (less than five percent) share of the total market for water hoses. W007; W032 at 17; Tr. 685:6-8; 685:21-24; 801:8-21.[6]

    **2.** **Flexzilla-Related Advertising Expenses**

Weems did not present direct evidence as to how much of its advertising, or advertising expenses, specifically related to its chartreuse color mark, nor could it point to any. Tr. 149:10-150:2. Instead, Weems simply estimated how much it has spent on such advertising by taking the proportion of all Flexzilla product sales – including

---

[6] While Mark Weems testified that Flexzilla has been the "number 1 best seller in garden" on Amazon.com, Tr. 61:13-18, 62:21-63:13, online sales of garden hoses represents only 2 to 2.5 percent of the total market for garden hoses. Tr. 685:25-686:9.

Flexzilla air hoses and air hose accessories – relative to all of Weems sales and then applying this ratio to Weems' total advertising expenses. Tr. 150:14-151:15. Even if this approach provided a reasonable estimate of Weems' total Flexzilla-related advertising expenses, it does not permit a finding as to the amount of advertising, if any, that specifically related to the chartreuse color of Flexzilla water hoses. Moreover, Weems did not demonstrate that there is a one-to-one correlation between the amount of its sales and the amount of advertising. The sales of Flexzilla products depended on a number of factors apart from advertising, such as its sales team's efforts and its success in securing shelf space with large retailers and distributors like Home Depot. Tr. 151:16-152:11.

Finally, as with the total sales numbers addressed above, the marketing expenses set forth in Weems' Exhibit W007 differ from those that Weems previously disclosed during discovery in this case. *Compare* W007 and T0687. In addition, the expenses shown in W007 go beyond direct advertising expenses and include items such as the salaries of Weems' marketing department and the food, travel and lodging expenses of Weems' employees. Tr. 156:19-157:1. In short, Weems did not provide reliable evidence permitting a finding as to any expenses it incurred for the specific purpose of advertising and promoting the chartreuse color of Flexzilla water hoses.

### 3. *Form and Manner of Flexzilla-Related Advertising*

Mark Weems testified that Weems advertised the color of its Flexzilla hoses so the color "could become a source identifier" by referring not only to the brand but also the color in its advertising, thus creating a connection between the brand and the color. Tr. 45:22-25; 54:12-25. However, the manner in which Weems has promoted its chartreuse color has not educated customers that the color chartreuse is a source identifier for its Flexzilla garden and water hoses. Weems' advertising of Flexzilla water hose products always includes the words and marks Weems, Legacy and

67

Flexzilla. Tr. 159:4-15. Weems presented no advertising that related solely to the color chartreuse for any Weems product. Tr. 159:22-24.

Weems' early advertising did not mention Flexzilla's color as a source identifier or trademark. *See, e.g.,* W019, W022, W023, W024, W025. Mark Weems acknowledged that this advertising did not mention or call out the color of the Flexzilla product itself. Tr. 46:10-47:6; 47:17-18; 48:19-23; 50:1-11; 51:12-18; 109:19-25. However, in 2009 he represented to the USPTO that Weems did, in fact, promote the color as a trademark, spending more than $76,000 in doing so. Tr. 110:22-111:5; W209 at 25; T0034 at 11. Actually, as discussed above, (1) the marketing Weems conducted through June 2009 did not call out Flexzilla's color in any way and (2) Weems has used a wide variety of words and phrases to describe that color (*e.g.*, yellow, hi vis safety green, chartreuse Pantone 389C and chartreuse. *See* Section III(B), *supra*.

### R.    *The Appearance of the Products in the Marketplace*

When compared side-by-side, without packaging, the colors of the hoses at issue are not identical. Weems' Flexzilla hose is chartreuse. T0060; T0061. Teknor's NexFlex hose is closer to yellow. T0266; T0289; T0290; 548:9-17; 608:22-609:3. Teknor's zero-G Pro hose is neon green. T0291; T0292. Wood, who has over 43 years' experience in color theory, color quality control and color matching, testified that one does not need a Ph.D. in color science to determine the difference in colors of the three hoses. Tr. 980:5-8. I agree.

The trade dress utilized for each hose when displayed for sale to consumers further differentiates the hoses. Each party's product packaging prominently displays its own name, trademarks, logo, and tagline unique to that party's hose product. For Weems, that includes such words and phrases as "Legacy," "Flexzilla," "SwivelGrip," and "If it's not ZillaGreen, it's not Flexzilla." Tr. 159:2-21; W035 at 48-51, 58;

68

W038; T0045; T0060; T0063.  For Teknor, that includes such words and phrases as "Teknor Apex," "NexFlex®," "zero-G® Pro," Tru-Flex"®, "The future of advance hose design®," and a "TA" inside a red diamond.  Tr. 539:20-540:3; 768:5-13; 772:24-773:7; T0032.  In addition, the packaging for Teknor's zero-G Pro is distinctly different from Flexzilla's packaging, comprising a unique, oblong, product design.  Tr. 538:15-539:15; T0297.

As for the actual hoses, the outer body of Weems' Flexzilla hose has the words "Flexzilla" and "Legacy" displayed repeatedly along the length of the entire hose.  Tr. 181:4-13; 787:25-788:3.  Similarly, the outer body of Teknor's hoses display "TEKNOR APEX," for NexFlex and "ZERO-G®" for zero-G® Pro.  Tr. 768:14-18.  In addition, the NexFlex hose has a clear window that runs along the length of the entire hose.  Tr. 529:21-530:5-7; 772:14-17; T0290.

Like Weems' Flexzilla hoses, Teknor's hoses are always marketed and displayed with the product's name, trademarks and packaging on Teknor's website and social media advertising.  Tr. 768:5-13; 772:24-773:7; T0266-T0267; T0304.  The parties' hoses are marketed in similar retail outlets (home centers, farm and ranch stores, hardware stores and on e-commerce websites).  Flexzilla water hoses are sold at retailers such as Walmart, Tractor Supply and Menards, hardware stores such as Ace Hardware, farm stores, and through various e-commerce sites such as Amazon, Lowes, Home Depot, and Murdoch's.  Tr. 102:20-103:9;105:10-11; 197:3-7; 198:4-5; 198:20-199:7; Fain Dep at 13:17-20).  Similarly, Teknor's water hoses have been distributed through large home centers such as Home Depot and Lowe's, rural retailers, such as Tractor Supply, hardware distributors such as Ace Hardware and True Value, other retailers such as Walmart and through e-commerce sites, such as Amazon.  Tr. 518:4-519:8.

Consumers are often confronted with both parties' hoses displayed in close proximity to one other in the above-described retail outlets.  Tr. 785:19-786:6; *see also*

519:17-520:1. Chatell testified that she has been to at least one hundred different retail establishments that sell garden hoses over the past five years and the parties' hoses are often positioned next to each other or in the same aisle. Tr. 785:19-786:6; *see also* Tr. 519:17-520:1. Chatell testified that she conducted "store shops" at retail stores in the Cedar Rapids area prior to trial in August 2023, during which she observed the parties' hoses sold at the same retailers. Tr. 779:20-780:19; 788:7-9). In several stores, Teknor's zero-G Pro and NexFlex hoses were being sold next to or near Weems' Flexzilla water hoses. Tr. 780:15-19; *see also* Tr. 196:22-198:3.

On e-commerce websites, sellers label the parties' products by identifying the product's brand, name and trademarks, product description and pricing and including photographs of the item in the retailer's electronic display of the hose. Tr. 787:13-24; T0622 at 2; T0623 at 2; T0624 at 2-7; see also T0627 at 2-3; T0628 at 2-7; T0630 at 2-3; T0631 at 2-3; T0633 at 2-3; T0634 at 2-3; T0636 at 2; T0637 at 2-3; T0640 at 2; T0641 at 2; T0643 at 2-3; T0644 at 2-3; T0646 at 2; T0647 at 2-3. On many retailer websites, the Flexzilla, zero-G Pro and NexFlex hoses are shown near each other on the same webpage. Tr. 198:8-199:7; 518:16-24; 787:20-788:12; 787:13-788:18; T0621 at 4; T0635 at 6; T0639 at 5; T0642 at 2-3.

### S. *The Role of Color in Consumers' Purchasing Decisions*

Color does not play a significant role in a consumer's selection of a particular water hose. Based on her experience in the garden hose industry, and information Teknor obtained from its consumer research studies, Chatell testified that durability, kink resistance, light weight and flexibility are the important features that consumers desire in a garden hose while color ranks low on the list of factors that drive purchasing decisions. Tr. 762:4-13; 803:20-804:2. In general, consumers do not shop for a particular color of water hose unless they have a functional reason for desiring a specific color. Tr. 804:3-5.

Brad Farnsworth, who has over 45 years of experience in performing market research in the home improvement and lawn and garden industry, testified that color is an insignificant factor for consumers when purchasing water hoses.  Tr. 905:12-15; 931:16-24.  That testimony was supported by market studies on water hoses performed by The Farnsworth Group in 2005, 2011, 2013, and 2015.  T0369; T0370; T0372; T0373; T0374.  Farnsworth surveyed consumers on what attributes or features of water hoses thew viewed as important in making purchasing decisions.  Tr. 911:9-914:8; T0369 at 22-28; 918:3-919:24; T0370 at 16-23. These studies showed that water hose consumers are largely focused on performance features of garden hoses, such as durability, quality, fittings and non-kinking, and view color as immaterial.  Tr. 911:9-914:8; T0369 at 22-28; 918:3-919:24; T0370 at 16-23.  Color consistently ranked extremely low in importance.  Tr. 912:17-23; 914:2-8; T0369 at 25; 918:11-919:24; T0370 at 19-20.

### T.     *The Lack of Actual Confusion*

There is no evidence of any actual confusion as to the source or association of Teknor's NexFlex and zero-G Pro hoses.  Neither party is aware of any such instances since these products were introduced in January 2019.  Tr. 164:10-166:13; 555:16-556:1; 788:19-789:13.  Weems has not lost any sales as a result of the sale of Teknor's accused products.  Tr. 164:2-5; 200:6-17.  Nor has Weems suffered any lost profits or damage to its reputation.  Tr. 164:6-9; 200:4-5.  Weems has not identified any irreparable harm resulting from the sale of Teknor's NexFlex and zero-G Pro hoses. Tr. 199:21-200:3.

## U.    Expert Opinions And Testimony

### 1.    The Scope of Weems' Color Mark

#### a.    Roy Berns (Weems)

Roy Berns has B.S. and M.S. degrees in textiles and a Ph.D. in chemistry.  Tr. 244:1–21; W086 at 1.  He holds the title of Professor Emeritus at the Rochester Institute of Technology and previously held the titles of Professor, from 1987 to 2020, and Director of the Munsell Color Science Laboratory, from 1987 to 1996 and again from 2008 to 2013.  W086 at 2.  Based on the evidence Weems presented concerning his credentials and experience, I find that Berns is qualified to render opinions in the field of color science.

As set forth in detail above, Weems initially described the scope of its color mark in terms of the Pantone system.  *See, e.g.,* Sections III(B), (C), (I), *supra*.  In 2010, the '628 Supplemental Registration defined Weems' color mark as "highlighter yellow pantone 389C."  W209 at 2.  In a 2013 letter to Valley Industries Corp., Weems identified Pantones that would "undoubtedly" cause a likelihood of confusion, including Pantones 3935C, 3955C, 3945C, 3965C, 393C, 394C, 395C, 396C, 397C, 386C, 387C, 388C, 389C, 390C, 379C, 380C, 381C and 382C.  T0228.  As late as 2018, Weems told Teknor that its registered mark was closer to Pantone 374C.  W013 at 1.

In October 2018, after several communications in which Teknor agreed to change the color of its NexFlex hose to accommodate Weems' concern, Weems advanced a new definition of "chartreuse" developed by Berns in terms of three color parameters:  hue angle, lightness and chroma.  W015 at 2.  Weems defined a range for each of these parameters: a hue angle of between 100-130, lightness greater or equal to 70, and chroma greater than or equal to 30.  *Id*.; Tr. 1526:14-20, 1527:3-6.  At trial, Berns characterized this range as an "approximation" used before he switched to using the Delta E analysis that formed the basis of his trial testimony.  Tr. 1527:17-1528:16.

In settling Weems' case against Flexon, Berns created yet another definition for the chartreuse based on a tolerance (color difference) from a reference standard defining a "Prohibited Range" of a CIELAB Delta E value equal to or less than 9.5 when measured from CIELAB coordinates L*(lightness) 83, C*ab (chroma) 77 and hab (hue angle) 113. W054 at 2. In addition to the Prohibited Range, Weems compiled an illustrative list of 35 Pantones comprising the Prohibited Range, noting that it was understood that the Prohibited Range was controlling. *Id.* at Ex. B; Tr. 1528:20-23. An analysis by Munsell Pantone of this new Flexon range showed that at least 966 colors (not Pantone designations), separated by a Delta E of 1, fell within this range. W175; 797:23-798:6.

At trial, Berns testified that as part of his work for Weems, he came up with a Trademark Protected Range for "chartreuse" based on color memory. Tr. 299:20-300:10; W103. He measured the color attributes of the drawing submitted to the Trademark Office for the '921 Registration, finding CIELAB criteria for that drawing of L*(lightness) 90.0, C*ab (chroma) 98.2, and hab (hue angle) 110.8. Tr. 265:25-266:4. He also undertook an analysis of "chartreuse," referring to a number of different sources for defining that color, averaging the numbers and assigning them a CIELAB value. Tr. 312:1-9. He defined chartreuse, as used in Weems' color mark registrations, as having a range of hue angles (hab) from 97.9 through 131.3, with a midpoint of 111.3. Tr. 274:21-276:24; 281:9-12; 296:23-297:9. Berns also generated reference hose colorimetric data for Weems' air and water hoses, reporting CIELAB criteria of (1) L* 83, C*ab 75.2, hab 113.3 and (2) L* 84.3, C*ab 77.5 and hab 110.3, respectively, under a D65 (daylight) illuminant. W103; Tr. 299:21-24; 300:6-13.

In attempting to determine a Trademark Protected Range for Weems' chartreuse mark, Berns analyzed human color memory studies, calculating four different color differences ("Delta E" or $\Delta E00$) to measure differences between the reference color viewed by the subject and what the subject remembered the color to be, and averaged

them to arrive at 9 Delta E as the color difference (tolerance). Tr. 299:20-300:5; 323:21-24. Berns then applied that 9 Delta E tolerance to the above-referenced colorimetric data for the air hose to come up with his Trademark Protected Range. Tr. 280:12-281:1; 283:12-14; 285:25-286:2; 299:20-300:5; 323:21-24; W103 (Table 6). Berns did not use the CIELAB criteria determined for the actual trademark drawing to determine his Trademark Protected Range. *Id*. He testified that the Trademark Protected Range is based on his definition of chartreuse, not the drawing, and represents the scope of the trademark. Tr. 325:23-326:7. When Berns analyzed the NexFlex and zero-G Pro hoses to determine whether the colors of those hoses were within the Trademark Protected Range he created (9 $\triangle$E00 or less based on the reference air hose), he found NexFlex to be 7 Delta E and zero-G Pro to be 7.3 Delta E from the Weems air hose. W0110.

Berns testified that he is familiar with the term "just noticeable difference," which means the Delta E (difference) that human beings are able to see between one shade of color and another under specific illumination and viewing conditions. Tr. 316:1-10. He utilizes a just noticeable difference of 0.5 Delta E and testified that within this range – the space of which is shaped like a football – there would be an "infinite" number of colors whose CIELAB numbers would result in a 0.5 Delta E difference. Tr. 316:11-22. Berns justified his use of a large Delta E difference to define his Trademark Protected Range on the premise that human color memory is poor. Tr. 323:21-24. The predicate of his theory is that "someone imagines a hose in their mind" and goes out to find it and the assumption is that the person is starting with a Weems hose. Tr. 325:1-12.

Berns admitted that he has no evidence that any consumers associate Weems with chartreuse, or that consumers go out to buy a Weems chartreuse-colored garden hose. Tr. 325:17-22. While he concluded that the colors of the accused Teknor hoses are confusingly similar, he denied evaluating infringement, stating that his analysis was

74

with respect to color, not infringement. Tr. 322:8-24, 323:10-20. Berns stated that his intent was only to consider color and whether colors were perceptually visually confusing based on memory. Tr. 322:5-7.

Berns acknowledged that the market presents consumers with many different color choices and agreed that when consumers see two products side-by-side they may not be perceptually confused as to the colors. Tr. 326:13-22; 327:2-6. When presented with physical samples of the Flexzilla (T0060), NexFlex (T0289), and zero-G Pro (T0291) hoses, Berns testified that it was not his opinion that a consumer who encounters those three hoses cannot tell any difference in color. Tr. 328:4-7. He then clarified this statement by stating that the three hoses would be within a range considered chartreuse, based on his analysis, but "not what we see here." Tr. 328: 8-12. While finding that Teknor's accused hoses are perceptually visually confusing, Berns admitted that he was aware of no evidence of actual confusion between Weems' Flexzilla hose and the Teknor NexFlex and zero-G Pro hoses. Tr. 330:12-21.

### b.  Renzo Shamey (Teknor)

Renzo Shamey's degrees include a Ph.D. in color chemistry. Tr. 1394:19-1395:8. He is on the faculty at North Carolina State University in the College of Textiles, where he taught in the polymer and color chemistry department and in the textile engineering, chemistry and science departments. Tr. 1388:11-25. He currently holds the Ciba distinguished professorship chair at NC State and is also the director of the color science and imaging labs. Tr. 1388:11-1389:11. Based on the evidence Teknor presented concerning his credentials and experience, I find that Shamey is qualified to render opinions in the field of color science.

Shamey was asked to review the Berns report and provide an opinion about its content and conclusions. He was not asked to check the accuracy of Berns' calculations; nor was he questioned about the validity of the science employed by Berns

or to conduct measurements of any hoses. Tr. 1395:4-16. Shamey is familiar with the concepts of CIELAB, LCH, RGB, as used in this case, and agrees with Berns that humans have poor color memory. Tr. 1396:9-21. Shamey stated that he understands the term "perceptually confusing" but testified that it is not a term generally used for color matching. He understands the term to mean that people can confuse two colors when they remember them. Tr. 1396:22-1397:5. Shamey testified that in his field, reliance on human memory to compare a color against a standard would not be a routine or standard process and would most likely not have any success. Tr. 1397:6-18.

Shamey testified that the color chartreuse could be a range but stated that providing a large hue range for any color term "opens the door" for inclusion of other color terms in that range. Tr. 1429:8-15; 1430:24-1431:1. He reviewed the hue range Berns specified for chartreuse (97.1 to 131.3) and characterized it as a very large range, covering about 9.3% of the entire hue circle. Tr. 1397:19-1398:14. Shamey testified that Berns' range encompasses other hue color terms, including inch worm, lawn green, lime, spring bud, pear and android green. Tr. 1399:11-1400:14. He presented a three-dimensional plot of Berns' color range titled "Demonstration Depicting Color Range in Three Dimensions," an ellipsoid shaped color space using 9 Delta E and 7 Delta E, with the center of the plot being the specifications for the air hose (D65) used by Berns. According to Shamey, his plot demonstrates that the colorimetric data for the color terms in his updated tables would fall within Berns' range. Tr. 1400:20-1402:8; 1403:14-24.

In addressing Berns' 4% gamut calculation, Shamey noted that human beings can see millions of colors and that 4% of a million is a big number. Tr. 1404:24 – 1405:19. To further illustrate his opinion that Berns' range includes a variety of different colors, Shamey presented a poster titled "Berns' Trademark Range," which showed easily-obtainable color samples that fall within the Berns' range. Tr. 1406:1-

15. The center point of this plot was a physical cutting of the air hose Berns used as a reference standard. Tr. 1406:16-23. Samples for the poster were obtained from Archroma, a Swiss company that produces chemicals for the textile, paper and packaging industries and maintains a color atlas of available samples with colorimetric values that can be compared to Berns' range. Tr. 1407:5-21. While Shamey included 18 color samples, he testified that based on what was available in the color atlas, at least 100 samples within the range could have been placed. Tr. 1407:22-1408:1.

Shamey presented another demonstrative exhibit entitled "Dr. Shamey Differentiation Demonstration" to reflect an analysis in which he used values reported by Berns and compared the values generated by Berns for Weems' trademark drawing against the specifications for the air and water hose under three different illuminations. Tr. 1411:10–1415:11. Shamey found that most of the values fell outside Dr. Berns' range. *Id.*

Berns was recalled as a witness to rebut Shamey's testimony. To the extent any disagreements between the experts are relevant to the analysis, they will be addressed later in this order.

### 2. *Functionality*

#### a. *Steven Bleicher (Teknor)*

Bleicher holds both a bachelor's and master's degree in fine arts and has held various positions in the fields of art and color theory, ultimately becoming the chair of the art department at Coastal Carolina University. Tr. 1171:5-1183:22. Based on the evidence Teknor presented concerning his credentials and experience, I find that Bleicher is qualified to render opinions in the fields of color theory and color psychology, including how people perceive colors. He opined that the color chartreuse yields a utilitarian/functional advantage to water hoses in making them more visible. Tr. 1185:11-14 ("chartreuse makes the garden hoses . . . easier to see. They're more

77

visible and, therefore, are easier to use"). He further testified that chartreuse (or yellow-green) is one of the best design colors for visibility and that it has a longstanding use in making objects more visible. Tr. 1184:3-9, 1185:15-20, 1192:13-16. Bleicher testified that colors of longer wavelengths, such as yellow-green, are easier for humans to see, especially in low light. Tr. 1185:21-1186:8.

### b. Roy Berns (Weems)

Berns testified that one of his assigned tasks was to define methods for characterizing color conspicuity and to determine whether colors exist other than those within Weems' chartreuse trademark-protected limits with the same or higher conspicuity. Tr. 256:11-15). The purpose of this work was to counter Bleicher's opinion that Weems' chartreuse mark is functional.

Berns analyzed colors using both gray and green backgrounds and found that there were many colors that were more conspicuous against these backgrounds than the Flexzilla hose color. He concluded that there were many color choices if the goal was to have something conspicuous to green grass and that Flexzilla, zero-G Pro and NexFlex would be on the low end of those choices, as they would not have maximum conspicuity to green grass. Tr. 293:23-294:4, 294:14-295:7. Berns concluded that there are many hoses with greater visibility or greater clarity than Weems' chartreuse. Tr. 306:20-21.

Berns was critical of Bleicher's statements that colors of longer wavelengths are easier for humans to see, especially in low light, while colors of shorter wavelength can barely be seen in low light. Tr. 1485:25-1486:5; 1487:21-25. Berns asserted that Bleicher was "confused" about the electromagnetic spectrum and misused it to represent color as a single wavelength. Tr. 1486:21-1487:6. Berns described Bleicher as a "layperson" who has "no understanding of color physics." Tr. 1486:7; 1487:18-

19. Berns stated that Bleicher's use of "visibility" was that of a lay person and was not based on a scientific analysis or any measurement. Tr. 1486:8-19.

Berns was particularly critical of Bleicher's opinion that yellow-green is one of the most visible colors, stating that green, not yellow-green, is more visible on the wavelength visibility curve. Tr. 1485:3-1486:5. However, Bleicher testified that wavelength is not the only consideration in determining whether a color was more visible, as hue and illumination are also factors. Tr. 1214:6-25, 1215: 15-19. Regardless, Berns did not identify where yellow-green, or "Weems' chartreuse," falls on the wavelength visibility curve, despite acknowledging that Weems equated "chartreuse" as a "hi-vis" green color and despite identifying the most visible color as "green" at 555 nm. Tr. 1485:11-16; 1530:7-21; 1531:11-1532:19; 1533:9-24. Berns acknowledged as one moves right from 555 nm (green), the color becomes "yellowish" Tr. 1531:11-15. He conceded that he could testify about where yellow-green was on the curve, but he did not do so because it was not relevant. Tr. 1533:19-24.

Berns did not render an opinion as to whether Weems' fluorescent Flexzilla hose is a high visibility color. Tr. 1532:20-25. However, he acknowledged that yellow-green is a high visibility color. Tr. 1533:3-8. He agreed with Bleicher that the FEMA Emergency Vehicle Visibility and Conspicuity Study (FEMA Study), T0724, is a study on which he would "absolutely" rely. Tr. 1493:2-4. The FEMA study found that "Fluorescent colors (especially fluorescent yellow-green and orange) offer higher visibility during daylight hours," T0724 at 8, a finding Berns accepted. Tr. 1492:8-10.

### 3. Likelihood of Confusion

#### a. Isabella Cunningham (Weems)

Weems offered consumer survey evidence through Isabella Cunningham, a Professor at the University of Texas. Tr. 335:20-336:12. Based on the evidence

Weems presented concerning her credentials and experience, I find that she is qualified to render opinions regarding consumer surveys and the likelihood of confusion.

Cunningham designed two surveys to assess the likelihood of confusion between Weems' color mark and the color of Teknor's NexFlex and zero-G Pro hoses. Tr. 345:19-346:4. She used a two-room "modified" Squirt design for the surveys, in which online survey respondents were shown a stimulus representing the Weems' color mark as applied to the Flexzilla hose in room 1 and, in room 2, either a stimulus for the trade dress of the accused Teknor product or a control product. Tr. 403:2-4; 364:1-16; 365:10-13. Cunningham chose a Squirt design, in part, because she was aware of no evidence that Weems' asserted color mark had top of mind awareness or was commercially strong. Tr. 405:1-406:13.

The purpose of Cunningham's first survey was to understand whether consumers were likely to be confused as to source or affiliation between the Weems' color trade dress and the trade dress of the Teknor NexFlex hose. To create images of the hoses for use as stimuli, Cunningham asked Weems' counsel to provide real photos of the Weems and Teknor hoses coiled in the same fashion and to take away some of the visible indicia on the Flexzilla hose. Tr. 401:5-17, 21-23: 401:24-402:2; 420:6-421:10. The hose images were created by Berns, who testified that he "created hoses that exactly matched the color of the various hoses as would be displayed on a typical monitor." Tr. 310:5-17.

After Cunningham received the hose images, she hired a graphic arts student to alter the images further. Tr. 421:19-422:2; 422:9-13. She asked the student to photoshop the images to remove various indicia or identifiers of source. (421:23-422:2). The image of Weems' Flexzilla hose was altered to remove both the stylized Flexzilla mark and the Legacy logo or mark printed every several inches along the length of the hose. Tr. 423:4-424:19; 413:23-414:1; W128 at 19; T0045. This altered

image of the Flexzilla hose was shown to the respondents without any packaging material. Tr. 424:20-24.

Cunningham also had the student photoshop an image of the Teknor NexFlex hose provided by Weems' counsel. Tr. 425:20-426:10. As noted above, the NexFlex hose includes a clear window along the length of the hose. The student altered the image of the NexFlex hose to remove the clear stripe. Tr. 426:24-427:3. The clear stripe is shown on the hose itself and its packaging or "disc" (along with the NexFlex mark). Tr. 411:6-17; T0298. As with the Flexzilla hose, Cunningham used the altered image of the NexFlex hose without any packaging. W128 at 21.

Cunningham referred to various authorities on trademark surveys in her work on this case. Tr. 415:12-20. One source she considered "reliable" and "very authoritative" is entitled Trademark and Deceptive Advertising Surveys by Diamond and Swann. Tr. 415:21-416:23. The authors describe the importance of selecting test stimuli that are consistent with real-word marketplace conditions under which consumers are likely to encounter the relevant marks:

> The need to adhere to the real-world marketplace is as critical to the selection and presentation of stimuli as it is the selection of an appropriate survey format.

> \* \* \*

> While the survey setting is necessarily artificial, the survey expert must make every reasonable effort to duplicate the marketplace conditions under which consumers are likely to encounter the marks at issue. At a minimum, this requires the survey expert to find out how the allegedly infringing product is typically encountered in the marketplace.

Tr. 417:10-13; 417:22-418:4. Cunningham agreed with these statements regarding the selection of proper stimuli for a likelihood of confusion survey. Tr. 417:10-418:7. However, she conceded that the way consumers view products in stores (under

marketplace conditions) is different than how she presented the products with altered images in her consumer survey. Tr. 427:13-428:18.

In addition, when presented with an image of the NexFlex hose as shown to respondents in her survey and the actual NexFlex hose, Cunningham recognized that the colors were at least "slightly different." Tr. 429:10-16. She agreed that if the colors shown to respondents in the survey were different from the colors of the actual hoses, that would be a fundamental flaw in her survey. Tr. 430:8-16.

Some of the respondents in Cunningham's survey were shown a control image rather than an image of the NexFlex hose. Cunningham considers the selection of the correct control to be "very important" and agreed that a control should be as close to an infringing design as possible without itself being infringing. Tr. 440:18-24; 441:8-11. However, she chose as her control an image of a black hose, which she described as a hose with "an absence of color." Tr. 441:12-16. She did not ask Weems or its counsel for a hose having a color just outside what Weems would consider to be infringing. Tr. 441:17-442:3. She confirmed that had she selected a different control – not one with "an absence of color" – she would not know how that would have affected the results of her survey. Tr. 442:16-21.

Of respondents who were shown the altered images used as stimuli for the Flexzilla and NexFlex hoses, 72.4% answered "yes" to the questions regarding the same source or affiliation. For the respondents who were shown the altered image of the Flexzilla hose and the black hose used as a control, 44.4% answered "yes" to the same source or affiliation questions, resulting in a "net confusion" rate of 28% according to Cunningham's survey design and methodology. Tr. 373:5-374:12.

Cunningham followed the same survey design and methodology in her survey concerning the Teknor zero-G Pro hose. She used the same altered image of the Flexzilla hose as her stimulus in room 1. For the stimulus of the Teknor zero-G Pro hose, Cunningham again had the graphic arts student photoshop the Berns images that

were supplied by Weems' counsel.  Tr. 430:23-431:8; W129 at 8.  Thus, the zero-G mark on the grip or sleeve of the hose was removed.  Tr. 432:8-11; T0091.  The image of zero-G Pro used as a stimulus in the survey did not show the product in its packaging.  Tr. 433:12-13.  For a control, Cunningham used the same image of a black hose.

Of the respondents who were shown the altered images used as stimuli for the Flexzilla and zero-G Pro hoses, 67.7% answered "yes" to the questions regarding same source or affiliation.  The respondents shown the altered image of the Flexzilla hose and the black hose used as a control, 24.5% answered "yes" to the same source or affiliation questions, resulting in a "net confusion" of 43.2%.  Tr. 378:10-379:13.

Cunningham sought to deflect criticism of her survey in characterizing the stimuli she selected as "post-sales stimuli."  However, various source-identifying indicia was removed from the Flexzilla, NexFlex and zero-G Pro hoses in the altered images Cunningham showed to respondents, despite the fact that those same source-identifying indicia would have been present on the hoses regardless of whether observed in a post-sale or point-of-sale situation.  Additionally, the format of each survey made it appear that Cunningham was presenting a point-of-sale context.  For example, before the respondents were shown the test stimuli, they were shown the following photo of hoses for sale – in their packaging – on the shelves of a retail store:



Tr. 434:20-435:4; W128 at 17. Cunningham acknowledged that the photo "had every indicia of being a retail store," "shows marketplace conditions at a brick-and-mortar store," and "[d]oesn't show any conditions where a consumer would encounter the product in [a] post-sale confusion world." Tr. 435:5-17.

Moreover, Cunningham's surveys included the following statement before the stimuli were displayed: "On the next screen you're going to see a picture of some products as they are typically displayed in stores selling lawn and gardening products." Tr. 435:18-436:5; W128 at 16. However, the respondents were instead shown the stimuli with altered images of the Flexzilla, NexFlex and zero-G Pro hoses, without packaging. Tr. 436:15-19. The respondents were also told how to view the images they were about to be shown: "Please look carefully at this garden/water hose as if you were shopping for such a product." Tr. 437:10-438:9; 439:4-9. None of this is consistent with Cunningham's testimony that she was testing for post-sale confusion, rather than point-of-sale confusion. Moreover, Cunningham acknowledged that she is

84

aware of no evidence that consumers purchase garden hoses based on what they may see outside of the marketplace – she simply adopted this position as a hypothesis. Tr. 1453:21-1454:6.

While I have found that Cunningham is qualified to present expert testimony concerning consumer confusion, I conclude that her survey results and conclusions in this case are entitled to virtually no weight. The use of altered images of the Flexzilla and NexFlex hoses with identifying indicia removed, the failure to present respondents with images of products as consumers would encounter them in the marketplace, the differences in the colors of the test stimulus for the NexFlex hose and the actual product, and the use of a control that bore no resemblance to the alleged infringing design, all render Cunningham's survey virtually useless.

### b.    Thomas Maronick (Teknor)

Thomas Maronick, a retired professor of marketing from Towson University, serves as a consultant with regard to marketing practices and trademarks. Tr. 1242:4-13. Based on the evidence Teknor presented concerning his credentials and experience, I find that he is qualified to render opinions regarding consumer surveys and the likelihood of confusion.

Teknor retained Maronick to (a) identify what factors are important to consumers when purchasing a garden hose and (b) conduct a likelihood of confusion survey between the Flexzilla garden hose and the NexFlex and zero-G Pro garden hoses. Tr. 1249:24-1250:5. To address these issues, Maronick designed an online survey. Tr. 1252:2-12. Qualified respondents were selected using a funneling process of questions to find respondents in the target market who buy or would consider buying garden hoses. Tr. 1252:13-20; T0707 at 2-4. The screening questions to find qualified respondents were essentially the same questions Cunningham used in her surveys. Tr. 1256:14-18.

85

Qualified respondents were randomly assigned to two groups. One was for the factors study. Tr. 1258:17-1259:11. Maronick selected the 13 factors for his study based upon research by The Farnsworth Group. Tr. 1259:9-19. He found The Farnsworth Group to be a "very credible source" for factors important to the consumer's decision to purchase a garden hose in view of the many studies the company had done with lawn and garden products, including branding studies. Tr. 1259:20-1260:8. The respondents in the factors study were asked to rank the factors from least important to most important to the decision to buy a garden hose. Tr. 1260:9-15. The higher the average score for a factor, the more important it is in terms of the consumer's decision of whether to purchase a garden hose. Tr. 1261:20-1262:4. The most important factor from the consumers' perspective is product quality and the next is durability. Tr. 1262:5-7. Color ranked last. Tr. 1262:7-11. Based on these results, Maronick concluded that "color was the least important, virtually nonimportant as a factor in consumers' decision to buy [a] garden hose." Tr. 1251:20-24.

Maronick also designed and conducted a likelihood of confusion survey. The qualified respondents who were not assigned to the factors study participated in this survey. Tr. 1259:4-8. Maronick used a Squirt two-room survey format in which respondents were shown a stimulus in room 1 and were asked to view it as if they were shopping for a garden hose (*i.e.*, a point-of-sale instruction). Tr. 1263:18-25. The stimulus shown in room 1 was an image of the Flexzilla hose, in its retail packaging, with the statement that "[b]elow is the image of a garden hose as you might [see at] a Lowes, Home Depot, or your local garden store." Tr. 1323:22-1324:2; T0704 at 6, 7. Maronick testified that he selected that image for room 1 because "[o]ne of the purposes of the Squirt survey is to replicate the experience that a consumer would have in the marketplace." Tr. 1324:3-7. In other words, he was attempting to measure point-of-sale confusion. Tr. 1324:10-15.

86

After the respondents were shown the image in room 1, they were shown an array of products in room 2. Tr. 1324:16-20. The six products in the array were shown in three different orders to avoid the "order effect." Tr. 1323:22-1324:2; T0704 at 6, 7. Maronick testified that showing an array of products in room 2 is the generally-accepted approach for a Squirt survey to minimize the so-called "demand effect." Tr. 1267:17-20. He explained that the demand effect can bias a survey by suggesting to respondents that there is at least some sort of relationship between the different items. Tr. 1267:17-1268:11. This effect is maximized when there is only one choice in room 2, as in Cunningham's survey. Tr. 1268:1-3.

The two accused products (the NexFlex and zero-G Pro hoses) were included in the array in room 2. The other four hoses, in addition to being part of the array to minimize the demand effect, also served as the control condition. Tr. 1325:14-24. Maronick explained that the use of the control condition helps filter out the noise or guessing by respondents. Tr. 1325:25-1326:7. He selected the four control hoses at issue (the Flexon, Flexogen, Hydroflex and Green and Grow hoses) because they are all in the same category as the accused products. Tr. 1326:17-21. He "chose one that was an anchor on the yellow side, one of very yellow color, and the others are very green colors, so the yellow and green serve as anchors to this color issue." Tr. 1326:17-24.

Weems and Cunningham raised the issue of whether the very yellow and green hoses Maronick used as controls in the array were so close to Weems' asserted color mark as to be infringing. However, Cunningham admitted that she did not know whether those were infringing. Tr. 1455:1-5. She did agree that a control should be as close to an infringing design as possible without itself being infringing. Tr. 441:8-11. Weems offered no evidence, through its color science expert or otherwise, that the yellow and green controls used by Maronick infringed Weems' asserted mark.

While reviewing the array of products in room 2, the respondents were asked to "CHECK ALL THAT APPLY" to the following question: "Which of the products, if any, come from the same maker or company or an affiliated marker or company as the first product you reviewed?" Tr. 1327:6-13; T0704 at 8. In answering that question, 28.9% of the respondents selected the NexFlex and 13.8% selected the zero-G Pro hose. Tr. 1328:18-1329:9-12. The average response for the four control hoses was 20.3%. Tr. 1329:17-24. Subtracting out the noise from the controls resulted in a net confusion of 8.6% for the NexFlex product and negative 6.5% for the zero-G Pro product. Tr. 1330:1-6; 1330:18-1331:4. These results fall far below what is regarded as sufficient to have any probative value to establish a likelihood of confusion. Tr. 1330:11-17; 1331:5-14; 375:15-19.

After the respondents were asked the same maker/affiliated maker question, they were asked, "Why do you say that?" Tr. 1331:15-19; T0704 at 8. Maronick explained that the standard approach is to ask this open-ended question in order to look "for some sort of an indication of what is the driver of their attitudes or opinion." Tr. 1331:20-23. Maronick reviewed the verbatim responses and put them in certain "buckets or categories." Tr. 1332:12-23; T0709. For those respondents who found a relationship between Flexzilla and NexFlex, only 6.7% did so on the basis of color. *Id*. For those respondents who found a relationship between Flexzilla and zero-G Pro, only 3.3% did so on the basis of color. *Id*. Based on this data, Maronick concluded that the low percentages of net confusion were not driven by the color of the hoses. Tr. 1333:12-19. When asked to explain his reaction to this data in view of the factors survey and the importance of color in consumers' decisions to purchase a garden hose, Maronick stated:

> They're very – first of all, they're very consistent. In both cases it was very low percentage was the color the driver. In the Farnsworth, the factors, it was the least important factor in a consumer's decision. And these numbers [in Table 5] are very consistent with that. So both sides of

my survey lead to the same conclusion, namely, number one, there's a very low likelihood of confusion, and to the extent that it exists, although it's way below the 15-20 percent standard, to the extent it exists, it is not being driven by the color of the products.

Tr. 1334:4-15.

I find Maronick's likelihood of confusion survey to be far more reliable, and much more reflective of real-world marketplace conditions, than Cunningham's deeply-flawed and artificial approach. Based on Maronick's reasonably-accurate effort to duplicate how the accused products are typically encountered by consumers, and his selection of proper controls and an array of products in room 2 of the standard Squirt survey, I find that his conclusions are entitled to substantial weight.

## IV.   *ANALYSIS*

Weems asserts claims for trademark infringement under both the Lanham Act, 15 U.S.C. § 1114(1)(a), and Iowa common law. Similarly, Weems asserts claims for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and Iowa common law. *See* Doc. 21. These claims, though distinct causes of action, are essentially identical in this case. *See Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 483 (8th Cir. 1967); *Com. Sav. Bank v. Hawkeye Fed. Sav. Bank*, 592 N.W.2d 321, 327 (Iowa 1999). All four claims are based on the same substantive allegations and require Weems to prove that (1) Weems owns a valid, protectable trademark in its claimed color, "chartreuse," and (2) the colors used by Teknor on its zero-G Pro and NexFlex water hoses create a "likelihood of confusion" regarding their source. I addressed this overlap as follows in a prior ruling in this case:

> The main difference between these claims lies in what is required to establish the first overarching element – that a mark is entitled to legal protection. Section 1114 protects only registered trademarks. If a plaintiff has a registered trademark, there is a rebuttable presumption that it is valid and protectable. 15 U.S.C. §§ 1057(b), 1115(a); *Sturgis*

89

*Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 323 (8th Cir. 2018).

For trademark infringement claims under § 1125, the plaintiff must show that its mark is protectable at common law. Generally, courts look to the principles "qualifying a mark for registration under § 2 of the Lanham Act . . . in determining whether an unregistered mark is entitled to protection under [§ 1125]." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citations omitted). This requires showing, at a minimum, that a mark is (1) non-functional and (2) distinctive. *Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1004–07 (8th Cir. 2005); *First Bank*, 84 F.3d at 1044.

A general unfair competition claim under § 1125, or under Iowa law, also protects registered and common law trademarks against infringement. However, unfair competition offers broader protections because it may protect marks that cannot be registered, or recognized at common law, as trademarks. *See Metric & Multistandard Components Corp. v. Metric's, Inc.*, 635 F.2d 710, 714 (8th Cir. 1980); *Motor Accessories Mfg. Co. v. Marshalltown Motor Material Mfg. Co.*, 149 N.W. 184, 186 (1914). It also prohibits a broader range of unfair practices. *See Dastar*, 539 U.S. at 28–29; *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 858 (1982); *see also Iowa Health System v. Trinity Health Corp.*, 177 F. Supp. 2d 897, 929 (N.D. Iowa 2001) (noting that "[t]he 'doctrine of unfair competition' under Iowa law is at least as broad" as unfair competition under the Lanham Act). A plaintiff need only show that its mark (1) is non-functional and (2) is inherently distinctive or, in the case of a mark that is descriptive or cannot be protected as a trademark, has acquired secondary meaning. *See Metric*, 635 F.2d at 714; *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1217 (8th Cir. 1976); *Marshalltown Motor*, 149 N.W. at 186–87.

An unfair competition claim under Iowa law is different from the other three claims in one additional way, as in some circumstances a plaintiff must show wrongful intent. *See Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220, 231 (Iowa 1977); *Iowa Auto Mkt. v. Auto Mkt. & Exch.*, 197 N.W. 321, 323 (1924).

*Weems Indus., Inc. v. Teknor Apex Co.*, 540 F. Supp. 3d 839, 848 n.5 (N.D. Iowa 2021). Weems acknowledges that its claims should be analyzed together.[7] *See* Doc. 266 at 26, 60-64.

## A.      *Does Weems Own a Valid, Protectable Trademark in Chartreuse?*

Although registered trademarks and common law (unregistered) trademarks may appear to be two distinct and separate categories, that is not the case. *See Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1115 (Fed. Cir. 2018). Trademarks are not created by federal law or the act of registration, but by simply using a source-distinguishing mark in commerce. *See Matal v. Tam*, 137 S. Ct. 1744, 1751–53 (2017). Registering a mark "confers important legal rights and benefits on" the one who registers it, but it is possible only when a valid and protectable common law trademark already exists. *Matal*, 137 S. Ct. at 1752–53; *see also Converse*, 909 F.3d at 1115–16 ("[T]he Lanham Act does not create trademarks. While it may create some new substantive rights in trademarks, unless the trademarks pre-exist there is nothing to be registered." (quoting *In re Deister Concentrator Co.*, 289 F.2d 496, 501 (CCPA 1961))). Thus, one of the benefits of registration on the principal register is a rebuttable presumption that the trademark is valid (and thus is presumed to be used in commerce, non-functional and distinctive).[8] 15 U.S.C. §§

---

[7] The amended complaint also includes, as Count V, a claim for unjust enrichment. Doc. 21 at 13-14. In its post-trial briefing, Weems confirmed that its unjust enrichment theory is not a separate cause of action, but instead an equitable basis for obtaining the disgorgement of Teknor's profits from the infringement of Weems' color mark. Doc. 266 at 64. As with its substantive claims, then, Weems' unjust enrichment theory requires a showing that Teknor's accused products infringed Weems' valid and protectable mark.

[8] While the existence of a registration, and the evidence of validity it provides, are most evidently relevant to cases involving claims based on registered trademarks, nothing in the Lanham Act prohibits a registration from being submitted as prima facie evidence of validity in any case brought under its provisions. *See* 15 U.S.C. § 1115(a) ("Any registration . . . owned

1057(b), 1115(a); *see also SoClean, Inc. v. Sunset Healthcare Solutions, Inc.*, 554 F. Supp. 3d 284, 294 (D. Mass. 2021). As the Eighth Circuit Court of Appeals has explained:

> In a trademark suit, whether a mark is registered is important because it determines which party bears the burden of persuasion. If the mark is not registered, the mark user bears the burden of showing that the mark is protected by the Lanham Act. *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010); *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008) ("To prevail on their trademark infringement claim, the plaintiffs … must establish ownership in a legally [protectable] mark, and … they must show infringement by demonstrating a likelihood of confusion."). But if a mark is listed on the PTO's Principal Register, the party challenging the mark's validity bears the burden of showing the mark is not protected by the Lanham Act. *Lovely Skin, [Inc. v. Ishtar Skin Care Prods., LLC,]* 745 F.3d [877,] 883 [(8th Cir. 2014)].

*ZW USA, Inc. v. PWD Systems, LLC*, 889 F.3d 441, 449 (8th Cir. 2018) (footnote omitted).

Because Weems' color mark (the '921 Registration) is listed on the Principal Register, Teknor bears the burden of proving that the mark is not valid and protectable. In attempting to meet that burden, Teknor focuses its arguments on the issues of functionality and distinctiveness. I will address each concept separately.

---

by a party to *an action* shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark." (emphasis added)); *see also Aromatique*, 28 F.3d at 869 (finding that owner of registered trademarks, who brought claims under both §§ 1114 and 1125, was "entitled to the presumption that the marks are valid").

## 1. Functionality

### a. Overview

Functionality is not determined solely by asking whether a mark serves some functional purpose apart from identifying the source of a good or service. *Frosty Treats*, 426 F.3d at 1006–07. Rather, "a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article[,] . . . if it affects the cost or quality of the article" or if it is "necessary to afford a competitor the means to compete effectively." *Id.* at 1007 (citations omitted). This requirement prevents trademark law from being used to undermine patent law by heading off attempts to monopolize useful product features under the guise of protecting a trademark. *Id.*

In *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159 (1995), a case involving "a special shade of green-gold color" for laundry press pads, the Supreme Court held that a product's color, alone, may receive trademark protection. *Id.* at 161, 163. In addressing the issue of whether the concept of functionality might impact the validity of a color trademark, the Court explained:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§ 154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

> * * *

> Although sometimes color plays an important role (unrelated to source identification) in making a product more desirable, sometimes it does not.

93

And, this latter fact—the fact that sometimes color is not essential to a product's use or purpose and does not affect cost or quality—indicates that the doctrine of "functionality" does not create an absolute bar to the use of color alone as a mark.

*Id*. at 164-65 (citations omitted).  The Court summarized its analysis by stating:

It would seem, then, that color alone, at least sometimes, can meet the basic legal requirements for use as a trademark.  It can act as a symbol that distinguishes a firm's goods and identifies their source, ***without serving any other significant function***.

*Id*. at 166 (emphasis added).

The Court returned to the concept of functionality in rejecting an argument that color trademarks should not be permitted due to the limited number of colors:

The functionality doctrine, as we have said, forbids the use of a product's feature as a trademark where doing so will put a competitor at a significant disadvantage because the feature is "essential to the use or purpose of the article" or "affects [its] cost or quality." *Inwood Laboratories, Inc.*, 456 U.S., at 850, n.10, 102 S. Ct., at 2186, n.10. The functionality doctrine thus protects competitors against a disadvantage (unrelated to recognition or reputation) that trademark protection might otherwise impose, namely, their inability reasonably to replicate important non-reputation-related product features.  For example, this Court has written that competitors might be free to copy the color of a medical pill where that color serves to identify the kind of medication (*e.g.*, a type of blood medicine) in addition to its source.

\* \* \*

The upshot is that, where a color serves a significant nontrademark function—whether to distinguish a heart pill from a digestive medicine or to satisfy the "noble instinct for giving the right touch of beauty to common and necessary things," G. Chesterton, Simplicity and Tolstoy 61 (1912)—courts will examine whether its use as a mark would permit one competitor (or a group) to interfere with legitimate (nontrademark-related) competition through actual or potential exclusive use of an important product ingredient.

94

*Id*. at 169-70 (citations omitted).

The Supreme Court again analyzed functionality in *TrafFix Devices v. Mktg. Displays*, 532 U.S. 23 (2001), a case involving claimed trade dress protection for a dual-spring design to keep outdoor signs upright in high wind conditions. *Id*. at 25. After its utility patents expired, the plaintiff claimed trade dress protection in an attempt to limit copying by competitors. *Id*. at 26. The district court entered summary judgment against the plaintiff due to both lack of secondary meaning and functionality but the Sixth Circuit reversed. *Id*. at 26-28 (citing *TrafFix Devices v. Mktg. Displays*, 971 F. Supp. 262 (E.D. Mich. 1997), *reversed in part*, 200 F.3d 929 (6th Cir. 1999)). Addressing functionality, the Sixth Circuit found that the ability of competitors to conceive of alternative designs that would provide similar utilitarian value is a relevant consideration. 200 F.3d at 940. The court stated that "[e]xclusive use of a feature must 'put competitors at a significant non-reputation-related disadvantage' before trade dress protection is denied on functionality grounds." *Id*.

The Supreme Court reversed, finding that the court of appeals erred in its analysis of the functionality issue. The Court explained the concept of functionality as follows:

> [W]e have observed that a functional feature is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." 514 U.S., at 165, 115 S. Ct. 1300. The Court of Appeals in the instant case seemed to interpret this language to mean that a necessary test for functionality is "whether the particular product configuration is a competitive necessity." 200 F.3d, at 940. *See also Vornado*, 58 F.3d, at 1507 ("Functionality, by contrast, has been defined both by our circuit, and more recently by the Supreme Court, in terms of competitive need"). This was incorrect as a comprehensive definition. As explained in *Qualitex*, *supra*, and *Inwood*, *supra*,[9] a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device. The *Qualitex* decision did not

---

[9] *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982).

purport to displace this traditional rule. Instead, it quoted the rule as *Inwood* had set it forth. It is proper to inquire into a "significant non-reputation-related disadvantage" in cases of esthetic functionality, the question involved in *Qualitex*. Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature. In *Qualitex*, by contrast, esthetic functionality was the central question, there having been no indication that the green-gold color of the laundry press pad had any bearing on the use or purpose of the product or its cost or quality.

*Id*. at 32-33. The Court thus rejected the Sixth Circuit's consideration of available alternative designs. 532 U.S. at 32-34. The Court held that if a feature is functional, then trademark or trade dress protection is unavailable, regardless of whether alternative designs are available:

There is no need, furthermore, to engage, as did the Court of Appeals, in speculation about other design possibilities, such as using three or four springs which might serve the same purpose. 200 F.3d, at 940. Here, the functionality of the spring design means that competitors need not explore whether other spring juxtapositions might be used.

*Id*. at 33-34.

### b. *Functionality and Color*

Like any other design feature, a product's color is not subject to trademark protection if it is "essential to the use or purpose of the article" or "affects [its] cost or quality." *See, e.g., ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1288 (Fed. Cir. 2010) ("Color may not be granted trademark protection if the color performs a utilitarian function in connection with the goods it identifies"); *Baughman Tile Co., Inc. v. Plastic Tubing, Inc.*, 211 F. Supp. 2d 720, 723 (E.D.N.C. 2002) (if "a color has an effect beyond identifying the source or reputation of the product and provides some additional utility to the product or increases its efficacy it would appear to qualify as functional."). It follows that if increased visibility is a

96

useful trait with regard to a product, then a color that enhances the product's visibility provides a utilitarian function that goes beyond merely designating the product's source. *See, e.g.*, *ERBE*, 629 F.3d at 1289 (plaintiff failed to prove that the color blue did not make the probe more visible against human tissue when seen through an endoscopic camera); *Poly-America, L.P. v. Stego Indus., LLC*, 482 F. App'x 958, 969 (5th Cir. 2012) (yellow is functional for vapor barrier used in building foundations, because, inter alia, its high visibility aids users in finding and patching holes in the barrier); *Baughman Tile Co.*, 211 F. Supp. 2d at 724 (yellow tubing functional because that color was generally more visible and reflected more light than other colors, ensuring the tubing retained its shape in hot conditions); *Cedar Valley Exteriors, Inc. v. Prof'l Exteriors, Inc.*, 119 U.S.P.Q.2d 1445, 1450-51 (D. Minn. 2016) (because of its high visibility, orange is functional in certain construction situations); *Poly-America, L.P. v. Stego Indus., LLC*, No. 3:08-CV-2224-G, 2011 WL 3206687, at *9-10 (N.D. Tex. July 27, 2011), *aff'd*, 482 F. App'x 958 (5th Cir. 2012); *Sportvision, Inc. v. Sportsmedia Tech. Corp.*, No. C04-03115 JW, 2005 WL 1869350, at *6-7 (yellow is functional because it affects the quality of the virtual first-down indicator by contrasting best with the green playing field).

### c.   *Functionality and Advertising*

"If a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality." Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 7:74 (5th ed.) (citing *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 205 U.S.P.Q. 1009, 1979 WL 25106 (D.N.H. 1979), *aff'd*, 626 F.2d 193 (1st Cir. 1980) (weighing advertising pointing out the utilitarian advantages of stove design features in favor of functionality in affirming district court's finding of functionality)); *see also Schutte Bagclosures Inc. v. Kwik Lok Corporation*, 193 F. Supp. 3d 245, 272 (S.D.N.Y. 2016), *aff'd*, 699 Fed. Appx. 93 (2d Cir. 2017)

(weighing Plaintiff's advertising of its product design as functionally superior in favor of functionality and ultimately finding that the product design of the bag closure was functional); *American Greetings Corp. v. Dan-Dee Imports, Inc.,* 807 F.2d 1136 (3d Cir. 1986) ("tummy graphics" on teddy bears that conveyed the emotional or personality message of each bear were functional. "If the marketer of a product advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of its functionality."); *Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.,* 647 F.3d 723, 729 (7th Cir. 2011) (advertising that links the product design registered as a trademark to various utilitarian benefits is evidence of functionality, rejecting argument that the advertising was "mere puffery" and affirming summary judgment as to functionality); *ASICS Corp. v. Target Corp.,* 282 F. Supp. 2d 1020 (D. Minn. 2003), *reconsideration denied*, 2003 WL 22005602 (D. Minn. 2003) (advertising touted the functional advantages of the structure of a sports shoe; request for a preliminary injunction denied); *Universal Frozen Foods, Co. v. Lamb-Weston, Inc.,* 697 F. Supp. 389 (D. Or. 1987) (efficiencies of the spiral shape of French fried potatoes were touted by plaintiff in advertising; shape held functional); *Epic Metals Corp. v. Souliere,* 99 F.3d 1034 (11th Cir. 1996) (evidence of plaintiff extolling the functional advantages of an industrial design helps prove functionality); *Mine Safety Appliances Co. v. Electric Storage Battery Co.,* 405 F.2d 901 (1969) (ribs on hard hat promoted in advertising as functionally advantageous and trademark registration ultimately refused); *New England Butt Co. v. International Trade Com'n,* 756 F.2d 874 (1985) (court relied in part on advertising that promoted the utilitarian advantages of a machine; overall shape of the machine was held functional); *In re Bose Corp.,* 772 F.2d 866 (Fed. Cir. 1985) (applicant's promotional materials lauded the pentagonal shape of a loudspeaker as a functional part of the sound system; held functional); *In re Bio-Medicus Inc.,* 31 U.S.P.Q.2d 1254, 1993 WL 723404 (Trademark Trial & App. Bd. 1993) (applicant's promotional materials touted utilitarian advantages of conical

98

shape of medical blood pump; held functional); *In re American National Can Co.,* 41 U.S.P.Q.2d 1841, 1997 WL 109226 (Trademark Trial & App. Bd. 1997) (weighing applicant's advertising of its fluted can structure as "providing a stronger sidewall-20% greater crush resistance than an equivalent, nonfluted can" in favor of functionality and ultimately finding structure functional); *In Re Caterpillar Inc.,* 43 U.S.P.Q.2d 1335, 1997 WL 424965 (Trademark Trial & App. Bd. 1997) (tractor sprocket design held functional in part because "applicant's own promotional materials tout the utilitarian advantages of its elevated sprocket," the Board rejecting applicant's argument that the advertising claims were mere "puffery" and "self-serving"); *In re Gibson Guitar Corp.,* 61 U.S.P.Q.2d 1948, 2001 WL 1631369 (Trademark Trial & App. Bd. 2001), *publication ordered*, 2002 WL 243563 (Trademark Trial & App. Bd. 2002) (applicant's advertising promoted the shape of a guitar as producing better music; held functional)).

To weigh in favor of a finding of functionality, "the advertising must tout the utilitarian advantages of the feature claimed as trade dress, not some other aspect of the product." Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 7:74 (5th ed.) (citing *In re Browning,* 217 U.S.P.Q. 933 (T.T.A.B. 1982) (advertising touting the sighting advantages of a shotgun did not prove functionality since that advertising did not relate to that part of the design sought for registration)).

### d.     *Factors for Analyzing Functionality*

Decisions from other circuits provide guidance for analyzing functionality and the question of whether a feature is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood*, 456 U.S. at 850, n.10. Of relevance to this case, these tests for analyzing functionality weigh advertising the utilitarian advantages of a particular feature in favor of a finding of functionality. For example, the Federal Circuit "applie[s] the '*Morton–Norwich* factors': (1) the existence of a utility patent disclosing the utilitarian advantages of the design; **(2) advertising**

99

materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs;[10] and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product." *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 (Fed. Cir. 2002) (citing *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1340–41 (CCPA 1982) (emphasis added)). The *Morton-Norwich* factors have been applied by the Fourth and Sixth Circuits. *See, e.g., CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 660 (4th Cir. 2020) ("Under the second *Morton-Norwich* factor—advertising focusing on the utilitarian advantages of a product's design—Plaintiff's marketing materials tout its feeders' '[c]hick-friendly 14-spoke grill design [that] lets birds exit pans easily.'"); *Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 685-86 (6th Cir. 2006) (listing examples of Fuji's advertising materials which touted the functionality of its design).

The Ninth Circuit applied slightly different functionality factors in *Disc Golf Ass'n v. Champions Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998), which also weigh advertising in favor of a finding of functionality: "[t]o determine whether a product feature is functional, this circuit typically considers four factors: **(1) whether advertising touts the utilitarian advantages of the design;** (2) whether the particular design results from a comparatively simple or inexpensive method of manufacture; (3) whether the design yields a utilitarian advantage; and (4) whether alternative designs

---

[10] The Supreme Court's decision in *TrafFix* has not changed the analysis of this factor: "Nothing in *TrafFix* suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court's observations in *TrafFix* as rendering the availability of alternative designs irrelevant. Rather, we conclude that the Court merely noted that **once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available.** But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place." *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002) (emphasis added).

are available."[11] *Talking Rain Beverage Co. Inc. v. S. Beach Beverage Co.,* 349 F.3d 601 (9th Cir. 2003) (citing *Disc Golf Ass'n,* 158 F.3d at 1006 (emphasis added)). These "*Disc Golf* factors" establish that even implying functionality in advertising weighs in favor of a finding of functionality. In finding that Disc Golf Association (DGA) advertising weighed in favor of functionality, the court reasoned:

> Like Patent '189, DGA's advertising never mentions the term "parabolic." However, the functional value of the parabolic design is implicit in the advertising. *See In re Witco Corp.,* 14 U.S.P.Q.2d 1557, 1560, 1989 WL 274427 (TTAB 1990) (holding that the advantages of a specific design feature need not be touted explicitly, but may be implied from the advertisement as a whole). For example, in one of its advertisements DGA asserts:
>
> > The challenge was to design a device as reliable as the "cup" in "ball golf" that could catch a disc in its natural flight path and still be vandal resistant. After 56 models and numerous meetings with L.A. County, it was decided that the present design met all criteria…. The question, "DID YOU SEE THAT SHOT?" is no longer asked, the disc in the basket is irrefutable evidence of the completion of each hole. The Disc Pole Hole® is now the standard of Disc Golf™ Courses all over the country and is protected by U.S. Patent No. 4039189.
>
> Accompanying that statement is a picture of a flying disc hitting the parabolic chain and falling into the basket. The inference of functionality is inescapable: The parabolic chain configuration is designed to "catch" the flying disc and to identify affirmatively whether a "hole" is completed.

*Disc Golf Ass'n,* 158 F.3d at 1010.

---

[11] *See* note 10, *supra*.

### e.    Applying the Functionality Factors in the Eighth Circuit

Both the *Morton-Norwich* factors and the *Disc Golf* factors provide a useful framework for analyzing a particular product feature's functionality, particularly with regard to advertising.  However, the Eighth Circuit Court of Appeals has not formally adopted either approach.  Other courts in this circuit have analyzed only the relevant functionality factors when determining functionality rather than mechanistically analyzing each factor.  *See ASICS Corp. v. Target Corp.,* 282 F. Supp. 2d 1020, 1025-1031 (D. Minn. 2003) (analyzing only the factors about which the parties argued: the existence of utility patents and advertising that touted the utilitarian advantages of the feature at issue); *see also* § 36:1. TMEP § 1202.02(a)(v) (2024 rev.) (collecting cases for the proposition that "[i]t is not necessary to consider all the *Morton-Norwich* factors in every case.").

The District of Minnesota's opinion in *ASICS* provides persuasive guidance, particularly with how to weigh advertising touting a product's functionality.  In that case, the plaintiff obtained a registered trademark in 1972 for the Stripe Design it used on many of its shoes.  *ASICS,* 282 F. Supp. 2d at 1024.  In 2003, Target began selling shoes with a similar striped design.  *Id.* at 1025.  ASICS filed suit and sought a preliminary injunction, alleging that Target had infringed its Stripe Design trademark. *Id.* at 1024.

In denying the motion for preliminary injunction, the court pointed to the existence of utility patents and two pieces of marketing in which ASICS extolled the utilitarian function of the Stripe Design.  *Id.* at 1029-30.  The marketing stated that the Stripe Design provided additional support, prevented stretching and protected the Achilles tendon area.  *Id.* at 1030.  ASICS countered that even if the Stripe Design was functional when it first developed the shoes 40 years prior, advancements in shoe materials had obviated its functionality.  *Id.*  The court rejected ASICS' contention that the feature it once touted as functional later became non-functional.  *Id.*  The court

102

noted that the standards cited by the Trademark Board in decisions advancing that position had been invalidated by the Supreme Court and pointed out that another case ASICS relied on did not include the presence of marketing touting the functionality of the feature. *Id.* The court concluded:

> The evidence before the Court strongly suggests that a jury would consider the Stripe Design to be functional. While no doubt "stripes, waves, and swooshes" are common in the industry, the evidence indicates that ASICS has used the functionality of its logo to distinguish itself from its competition. Its advertising, in particular, suggests that while other logos are mere decoration, ASICS' Stripe Design actually *does something*. Although it is true that "ASICS exclusive use of its Stripe Design mark for over 35 years has not stopped competitors from effectively competing" (*id.* at 8), the threshold question before the Court is whether the Stripe Design "is essential to the use or purpose of the article or if it *affects the cost or quality*" of shoes, *Inwood,* 456 U.S. at 850, n. 10, 102 S.Ct. 2182 (emphasis added). Because ASICS' own utility patents and marketing provide strong and convincing evidence that the Stripe Design affects the quality of shoes and is not "a mere arbitrary embellishment … primarily adopted for purposes of identification and individuality," *Aromatique,* 28 F.3d at 873, and because this evidence has not been effectively rebutted, "there is no need to proceed further to consider if there is a competitive necessity for this feature." *TrafFix,* 532 U.S. at 33, 121 S.Ct. 1255.
>
> Accordingly, the Court concludes, for the purposes of this Motion, that a jury would find that the Stripe Design is functional. ASICS therefore cannot demonstrate a likelihood of success on the merits, and the Court need not reach the question of whether ASICS has proven Target's shoes create a likelihood of confusion.

*Id.* at 1030-31.

While *ASICS* involved a different procedural posture than the present case, I agree with the court's approach of analyzing only the relevant *Disc Golf* and *Morton-Norwich* factors while keeping the ultimate inquiry as whether the particular feature "is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood,* 456 U.S. at 850, n.10.

103

### f. Discussion

After considering the relevant functionality factors, the overwhelming weight of the evidence demonstrates that the chartreuse color of the Flexzilla hose is functional and, therefore, not eligible for trademark protection. I will discuss these relevant functionality factors in turn, while ultimately analyzing whether the chartreuse color mark "is essential to the use or purpose of" Weems' water hoses "or if it affects the cost or quality" of Weems' water hoses. *Inwood*, 456 U.S. at 850, n.10.

### i. Weems' Advertising of the "Hi-Vis" Color

The first relevant factor is Weems' extensive promotional campaign concerning the safety benefits of its "Hi-Vis" color, as described in Section III(D), *supra*. When the marketer of a product advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of its functionality. *See* Sections IV(A)(1)(c)-(d), *supra*. Beginning in 2009, Weems undertook aggressive efforts to tout the safety benefits of the "Hi-Vis" color with regard to both its air hoses and water hoses. As noted above, for example, in September 2009, Weems directed its sales representatives and marketing agencies to have retailers indicate Flexzilla's color as "Hi-Vis Safety Green," stating that it was "[e]xtremely important." W009; T0116; T0117; T0195 at 1-2; Tr. 57:9-58:5. In September 2009, Matthew Weems emphasized that the "Flexzilla Hi Vis safety green feature" should be accentuated on the packaging for Flexzilla air and water hoses. Tr. 1047:24-1051:19; T0118, T0119; T0141. On October 7, 2009, Matthew Weems presented "Marketing Bulletin No. 82" to Weems' sales, marketing and customer service departments. Tr. 711:21-712:18; 1034:20-1035:17; 1039:10-1040:4; T0122-T0129; T0131-0133; T0135. Matthew Weems stated that the Bulletin discussed Flexzilla's color, its "safety feature[]" and how the color "improves safety by increasing visual awareness thus increasing safety." Tr. 160:17-162:6; 210:19-24; 1034:18-1036:5; T0133.

104

Weems suddenly put the brakes on these marketing efforts in 2010, commencing the high-priority "scrubbing" process described in Section III(F), *supra*. Weems' change of direction was not prompted by a realization that the Hi-Vis color of its Flexzilla air and water hoses was not, in fact, a functional safety feature. In other words, there is no evidence that Weems received new information demonstrating that its safety-related advertising was false or misleading. Instead, Weems learned that promoting Flexzilla's color as a safety feature was contrary to its efforts to obtain trademark protection for that color. From January 26, 2010, to January 29, 2010, Matthew Weems, Mark Weems, and Laurenzo communicated with each other to address, among other things, Weems' "secondary registration," "color mark case studies," and the use of the term "ZillaGreen." T0714 at 10, 12-13. On February 2, 2010, in an abrupt about-face, Matthew Weems ordered Otte to remove "all references" to "Hi-Vis Safety green" and "[i]n its place [Weems] will refer to 'If it's not ZillaGreen™ it not Flexzilla®['.]" W010; Tr. 162:7-15; 713:7-12; 1063:18-24.

The scrubbing of any mention of the high visibility of Flexzilla's color was a high priority for Weems. Tr. 720:18-721:5; T0158 at 1, 6. Matthew Weems admitted that "Weems thought it was so critical it went through a process of scrubbing anything about the hi-vis safety feature from all Flexzilla marketing materials" and "sanitizing all hi-vis references was a priority." Tr. 1064:24-1067:15; 1068:3-7; 1080:3-15; T0154; T0158 at 1, 6; T0733. When Weems discovered continuing references to "Hi-Vis safety green" in 2011, Matthew Weems wrote:

> US trademark attorney will take away our secondary registration on Zillagreen™ if our competition sends them one of our labels stating safety green. Filing to attain a trade mark on color is like a hail mary pass, they are almost never successful. The fact that we have one and then to loose [sic] it …

T0158 at 1; 722:8-723:9; 1087:9-14; 1088:10-1089:9; 1089:4-13.

Weems' effort to "scrub" and "sanitize" all visibility-related references in its advertising and marketing materials extended to the point of concealing those materials from the USPTO. As discussed above, on June 15, 2009, squarely in the middle of Weems' efforts to promote the safety and visibility benefits of Flexzilla's color, the Examining Attorney issued an Office Action refusing registration of the color mark for Weems' air hoses. W209 at 12. The Office Action including a request that Weems provide various documents and information, including:

(1) An explanation as to whether the identified color(s) serve(s) any purpose as used on the goods; [and] . . .

(3) Any available advertising, promotional or explanatory literature concerning the goods, particularly any material that relates specifically to the applied-for color mark;

W209 at 12. The Examining Attorney pointed out "that a color that is functional for specific goods is not registerable." W209 at 13. The Examining Attorney further stated: "A color is functional if it yields a utilitarian or functional advantage, *e.g.*, yellow or orange for safety signs make the signs more visible." *Id.*

On December 15, 2009, Weems filed a response to the June 15, 2009, Office Action. W209 at 16-17. The response included a declaration of Mark Weems and examples of advertising for Weems' chartreuse hoses. T0714 at 14; W209 at 16, 24-27. While the Examining Attorney specifically requested "advertising, promotional or explanatory literature . . . that relates specifically to the applied-for color mark," the prosecution history contains no evidence that any such materials were ever provided to the USPTO. Even though Weems' then-current advertising promoted the "safety feature" of Flexzilla as having a high visibility color that makes the hose more visible – none of these materials were submitted in response to the Examining Attorney's request. Tr. 211:10-14; W209 at 24-50. Instead, Weems submitted examples of three third-party catalogs from 2008 – when Flexzilla product specifications identified the

106

color as Pantone 381C and before Flexzilla's color change from yellow to yellow-green – that merely referred to the color of Flexzilla air hoses as "yellow" and not as a trademark. Tr. 214:9-215:18; W209 at 30-47. Weems also submitted a printout of a computer screen display of a webpage from Weems' website displaying a mere list of Flexzilla "yellow air hoses." W209 at 48-50.

In responding to the Examining Attorney's request for information as to whether the applied-for color served any purpose, Weems failed to disclose that Weems selected Flexzilla's color to be highly-visible and help avoid accidents due to tripping, and that Weems had been aggressively promoting this utilitarian advantage as a safety feature. Instead, Weems stated:

> . . . [Weems] notes that the color 'chartreuse (pantone 389C)' is a bright or intense yellow-green. As a result, the color has the potential to be more visible than some other colors. However, any visibility attribute is purely incidental to the true purpose of the mark, namely to identify the source of Applicant's air hoses, which is certainly attained by the attention grabbing nature of the color.

W209 at 20. In short, Weems knew the color of its Flexzilla hoses was a functional safety feature and proudly touted that fact until it decided to prioritize its efforts to obtain trademark protection for that color. It then attempted to "sanitize" its advertising and marketing materials and withheld them from the USPTO in order to achieve registration of its color mark. This advertising and subsequent conduct weighs strongly in favor of a finding that the chartreuse color mark affects the quality of the water hoses, and is thus functional. *Inwood,* 456 U.S. at 850, n.10.

### ii.     *Whether the Mark Yields a Utilitarian Advantage*

Additional evidence, apart from Weems' advertising and its conduct surrounding this advertising, also supports a finding that Weems' color mark is functional, as this evidence shows that the chartreuse color mark yields a utilitarian advantage. Teknor's

107

color theory expert, Steven Bleicher, testified that the color chartreuse yields a utilitarian/functional advantage to water hoses in making them more visible. Tr. 1185:11-14 ("chartreuse makes the garden hoses . . . easier to see. They're more visible and, therefore, are easier to use"). He further testified that chartreuse (or yellow-green) is one of the best design colors for visibility and that it has a longstanding use in making objects more visible. Tr. 1184:3-9, 1185:15-20, 1192:13-16. Bleicher testified that colors of longer wavelengths, such as yellow-green, are easier for humans to see, especially in low light. Tr. 1185:21-1186:8.

While Weems' color expert, Berns, disputed Bleicher's opinions concerning the visibility of longer-wavelength colors in low light, and was generally dismissive of Bleicher's expertise, he acknowledged that yellow-green is a high visibility color. Tr. 1533:3-8. He further agreed with Bleicher that the FEMA Emergency Vehicle Visibility and Conspicuity Study (FEMA Study), T0724, is a study on which he would "absolutely" rely. Tr. 1493:2-4. That study found that "Fluorescent colors (especially fluorescent yellow-green and orange) offer higher visibility during daylight hours," T0724 at 8, a finding Berns accepted. Tr. 1492:8-10. Similarly, Teknor presented evidence of United States utility patents that describe the utilitarian advantages of the color "chartreuse" as a color that enhances visibility of an object. *See* T0003; T0004; T0005; T0008; T0010; T0012; T0013; T0020; T0030; T0031. Weems did not present any evidence to contest or rebut the claims set forth in these patents. These utility patents, in combination with the color experts' testimony, place Weems' use of the color chartreuse firmly in line with cases in which colors were found to be functional due to their high-visibility. *See* Section IV(A)(1)(b), *supra*.

Weems does, however, argue that the functionality analysis is different when applied to its Flexzilla water hoses, as opposed to its air hoses. Weems suggests that "higher visibility is not an essential use or purpose of a water hose" and "there is little evidence that any end consumer ever purchased a Flexzilla water hose with high

108

visibility in mind." Doc. 266 at 22. I disagree, for two reasons. First, when Weems decided to promote the safety benefits of its chartreuse color in 2009, it did not distinguish between its air hoses and water hoses. The advertising and marketing materials discussed in Section III(D), *supra*, touted the safety benefits of the "Hi-Vis Safety Green" color with regard to both water and air hoses. Weems' current argument that Flexzilla's chartreuse color has no functional benefit with regard to water hoses is in stark contrast to Weems' own statements and representations. These statements and representations make Weems' comparison of water hoses to the lacquered red coloring on the bottom of six-inch high heels particularly inapposite. Doc. 272 at 18 (discussing Registration No. 2,390,667). One can easily imagine situations in which a water hose must be stretched out across a busy environment, meaning that a low-visibility hose risks tripping and accidents. In contrast to a pair of shoes, which can easily be moved out of the way, a water hose could be cumbersome to move out of highly trafficked areas. This is not a mere hypothetical. Throughout 2009, Weems used this exact logic to market its Flexzilla hose as being "a hi vis color making it easy to see at the job site. Making it a safe hose." T0194 at 1. This utilitarian advantage, touted by Weems until doing so became disadvantageous to the trademark registration process, weighs strongly in favor of a finding of functionality.

Second, as summarized in Sections III(G), (L), *supra*, the process through which Weems obtained its color mark for water hoses (the '921 Registration) was deeply intertwined with its prior registration of its color mark for air hoses (the '169 Registration). In March 2010, after its (incomplete) response to the June 15, 2009, Office Action, Weems' color mark for air hoses was registered on the Supplemental Register as the '628 Supplemental Registration. W209 at 168-173, 178; Tr. 149:6-9. In 2015, when Weems applied to register that mark on the Principal Register, it identified the '628 Supplemental Registration as a prior registration of the same mark. T0034 at 3, 5. Once again, there is no evidence that Weems disclosed information to

109

the USPTO relating to its 2009 advertising materials, which had promoted Flexzilla's color as a safety feature. T0034 at 9-35. In October 2015, the USPTO granted Weems' application, which became the '169 Registration and was registered on the Principal Register on October 6, 2015. T0034 at 1, 37-42.

In 2016, when Weems applied to register chartreuse as a color mark with regard to its water hoses, it cited the '169 Registration and relied on its use of chartreuse and claimed acquired distinctiveness, asserting that it had made "substantially exclusive and continuous use" of the color mark "for at least the five years immediately before" the date of the application. T0035 at 4. In response to an Office Action, Weems certified that the color of the mark was the same color it had been using since 2007 in connection with air hoses. T0035 at 26, 74. Again, Weems failed to provide the USPTO with any of Weems' safety-related advertising from 2009. T0035 at 21-75. Thus, Weems did not provide examples of the advertising in which it promoted the functionality of the color of Flexzilla's water hoses as a high visibility color that made the hose more visible and prevented tripping accidents. T0035 at 28-70.

In short, Weems obtained its color mark for water hoses (the '921 Registration) by bootstrapping that application to the previously-registered color mark for air hoses (the '169 Registration). There is no evidence that Weems, at any point during these various proceedings, suggested to the USPTO that the analysis of the color's functionality differed as between air hoses and water hoses. Instead, having first persuaded the USPTO to register its chartreuse color mark for air hoses, Weems relied on that registration, and its use of that color with regard to both air hoses and water hoses, to obtain the '921 Registration. Weems' current argument that the functionality analysis is different when applied to water hoses is neither persuasive nor consistent with its past actions.

In sum, the evidence presented at trial points to the chartreuse color mark yielding a utilitarian advantage. Weems' counterarguments regarding the air hose

110

registration process fail to cut against this evidence. This factor weighs in favor of functionality.

### iii. Whether Alternate Designs Are Available

Weems did present some evidence that there are other high-visibility colors available for Teknor to use in its hoses. Tr. 293:9-295:18; 306:20-21; 465:22-23; 466:10-11. However, as noted above (*see* Note 10, *supra*), the Supreme Court has deemphasized the consideration of the availability of alternate designs when a feature is functional based on other considerations. *TrafFix,* 532 U.S. 23 at 33-34. As such, while this factor weighs slightly against a finding of functionality, this is not enough to outweigh the other factors which strongly weigh in favor of functionality.

### g. Summary - Functionality

Because the chartreuse color mark is registered on the Principal Register, Weems is entitled to a rebuttable presumption that the mark is non-functional and otherwise valid. 15 U.S.C. §§ 1057(b), 1115(a). Based on the evidence before me, however, I find that this presumption has been firmly rebutted. Weems' own marketing materials, in addition to other evidence of the chartreuse color mark's utilitarian function, show that the chartreuse color mark clearly affects the utility and quality of Weems' water hoses. *Inwood,* 456 U.S. at 850, n.10. While "color alone, at least sometimes, can meet the basic legal requirements for use as a trademark," it cannot do so if it serves "any other significant function." *Qualitex*, 514 U.S. at 166. As Weems itself previously proclaimed, the color of its water hoses serves the "significant function" of making those hoses more visible, thus improving safety. This "significant function" is further supported by the testimony of both parties' color experts. Because Teknor has shown that the color protected by the '921 Registration is functional,

111

Weems' mark is invalid and all of Weems' claims against Teknor fail.  Nonetheless, I will proceed to address the issue of distinctiveness.

### 2. Distinctiveness

#### a. Overview

A trademark may be distinctive in one of two ways – inherent distinctiveness or acquired distinctiveness.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).  Color marks are never inherently distinctive.  *Id.* at 211-12 (citing *Qualitex*, 514 U.S. at 162-63).  Thus, such marks are entitled to protection only upon a showing of acquired distinctiveness.  *Id.* at 212.

"[A] mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"  *Id.* at 211 (quoting *Inwood Laboratories, Inc.*, 456 U.S. at 851, n.11).  "A mark has secondary meaning when 'by long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others.'"  *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 323 (8th Cir. 2018) (quoting *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994)).  "If the mark's 'primary significance' for consumers is not its identification of its source, it does not have secondary meaning and is thus not protected."  *Id.* (citing *Wal-Mart Stores*, 529 U.S. at 211).

"Secondary meaning is a fact-intensive inquiry."  *Nat'l Presto Indus., Inc. v. U.S. Merch. Fin. Grp., Inc.*, ___ F.4th ___, 2024 WL 4746280, at *7 (8th Cir. Nov. 12, 2024).  It may be established by either direct or circumstantial evidence, but "direct evidence such as consumer testimony or surveys are most probative of secondary meaning."  *Frosty Treats*, 426 F.3d at 1005 (citing *Heartland Bank v. Heartland Home*

*Fin., Inc.*, 335 F.3d 810, 818–19 (8th Cir. 2003) (Smith, J., concurring)). In the absence of direct evidence, "[c]ircumstantial evidence such as the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying could also establish secondary meaning." *Id*. at 1005-06 (citing *Heartland Bank*, 335 F.3d at 819-20 (Smith, J., concurring).

Here, Weems provided no direct evidence – such as consumer testimony or consumer surveys – to show that its chartreuse color mark "has become so associated in the public mind" with regard to water hoses that "the mark serves to identify the source of the goods and to distinguish them from those of others." *Sturgis Motorcycle Rally*, 908 F.3d at 323. Given that direct evidence is "most probative of secondary meaning," *Frosty Treats*, 426 F.3d at 1005, Weems' failure to produce such evidence is curious, at best. Regardless, as discussed further below, the circumstantial evidence in the record falls far short of demonstrating that the color of Weems' Flexzilla hoses has acquired secondary meaning such that consumers associate that color with Weems, as opposed to other manufacturers of water hoses.

### b. *Weems' Circumstantial Evidence*
#### i. *Exclusivity, length and manner of use*

The exclusivity, length and manner of use of the chartreuse mark do not weigh in Weems' favor. As noted above, Weems claims that it has continuously and exclusively used the color chartreuse on its Flexzilla air hoses since November 2006, and on Flexzilla water hoses since 2009. Long, continuous use does not, by itself, establish that a mark has acquired secondary meaning. *See, e.g., In re Andes Candies Inc.*, 478 F.2d 1264, 1267 (C.C.P.A. 1973) ("Because of long use, large sales and advertising, it may be assumed that some persons might recognize a mark as designating origin, but that alone is not enough."); *In re Gibson Guitar Corp.*, 61

113

USPQ2d 1948, 1952 (TTAB 2001) (66 years of use insufficient to show acquired distinctiveness of guitar trade dress; while "guitar collectors and aficionados" may recognize the trade dress as identifying the guitar's source, "the determination of acquired distinctiveness must be made on the basis of casual guitar purchasers as well."). Moreover, Weems' claim of continuous use is dubious in light of the numerous changes Weems has made to Flexzilla's precise color over time. *See* Sections III(B), (I), *supra*. To summarize, the color changed from a "yellow color" to a "predominantly green" color – going from "highlighter yellow" to Pantone 381C to Pantone 389C to Pantone 374C to any color that may be found within the protected range defined by Berns. The fact that Weems made multiple changes to the color of its Flexzilla hoses makes it more difficult to find that consumers associate a particular color of water hose with Weems.

As for exclusivity, Teknor has shown that yellow, green and yellow-green colored water hoses were widely marketed by Teknor and other manufacturers before Flexzilla was introduced and continue to be widely marketed today. *See* Section III(M), *supra* ("Teknor has made this showing to an extreme degree."). Among other things, Teknor produced evidence of more than 50 examples of such water hoses that have been, and are, widely available in retail outlets across the country, including at least 20 hoses having colors that Weems has defined to be chartreuse. *See* Doc. 271 at 77-81, ¶¶ 225-27 (citing exhibits and displaying photographs). The availability of so many models of water hoses that are similar in color to the Flexzilla hose makes it far less likely that consumers viewing a hose body with a particular shade of chartreuse would associate the hose with Weems. This factor weighs against a finding of acquired distinctiveness.

### ii.     The amount and manner of advertising

Weems relies on its advertising efforts and expenditures to argue that its color mark has acquired secondary meaning.  However, I have found Weems' evidence to be weak.  *See* Section III(Q)(2) ("Weems did not provide reliable evidence permitting a finding as to any expenses it incurred for the specific purpose of advertising and promoting the chartreuse color of Flexzilla water hoses."); Section III(Q)(3) ("Weems presented no advertising that related solely to the color chartreuse for any Weems product.").   Even if Weems' estimate of its relevant advertising expenditures is reliable, Weems did not present evidence to place those expenditures in context.  Is the amount Weems has spent to promote the chartreuse color of its water hoses substantially higher or lower than the comparable expenditures of its competitors?  Weems failure to provide evidence on this point makes it difficult to evaluate the significance of its advertising efforts.  *See, e.g., BigStar Entertainment, Inc., v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 202-03 (S.D.N.Y 2000) (explaining the plaintiff's failure to provide comparative data contrasting its advertising expenditures to those of its competitors).

Moreover, Weems offered no evidence of advertising in which it sought to focus consumers' attention on the color chartreuse, as opposed to its other marks (such as the words "Legacy" and "Flexzilla"), as a source identifier for Weems' water hoses.  As the Eighth Circuit has explained, advertisements "cannot establish secondary meaning" if "they do not separate the claimed dress of the products from the other marks that serve to identify the products as those of [the seller]."  *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 871 (8th Cir. 1994); *see also Forney Indus. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1254 (10th Cir. 2016) ("[S]econdary meaning cannot usually be proven by advertising that merely pictures the claimed trade dress and does nothing to emphasize it or call attention to it.") (citations omitted).  Weems' failure to show that it made focused efforts to promote chartreuse as a source indicator is especially

115

problematic because, as the Supreme Court has noted, consumers are more predisposed to view word marks and packaging, as opposed to a product's color or design, as source indicators. *Wal-Mart*, 529 U.S. at 213.

Weems has also failed to show that the manner of its advertising supports a finding of secondary meaning. While relying on its own estimates as to the overall amount it has spent for the purpose of advertising the chartreuse color of Flexzilla water hoses, Weems provided no specific information concerning the number of consumer-directed advertisements it has placed or how many potential customers have been exposed to that advertising. Moreover, Weems' "look for" slogan ("If it's not ZillaGreen it's not Flexzilla") does not identify Weems as the source of the product and does not explain that "ZillaGreen" is Weems' word for its chartreuse color mark.

As the Eighth Circuit has explained:

> Although it is true that advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the effect of such advertising that is important, not its extent. . . . To be effective in this respect, the advertising must cause the public to equate the mark with the source of the product.

*Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985) (citation omitted); *see also Nat'l Presto Indus.*, ___ F.4th at ___, 2024 WL 4746280, at *7 (advertising did not establish a finding of secondary meaning when it "promoted the product's functions and appearance, not its source."); *Frosty Treats*, 426 F.3d at 1006 (the relevant question is whether the plaintiff advertised or published its mark "to an extent that would be effective in having the public recognize it and equate it with a single source"). The evidence falls far short of demonstrating that Weems' advertising and marketing efforts have been "effective in having the public recognize" the chartreuse color of its water hose and equate that color with a single source. This factor weighs against a finding of acquired distinctiveness.

116

### iii. *The amount of sales, number of customers and Weems' established place in the market*

As with the evidence of its advertising expenditures, Weems' evidence of the sales of its Flexzilla water hose is flawed.  *See* Section III(Q)(1), *supra*.  Regardless of precise numbers, those sales have increased over time.  However, the Flexzilla water hose continues to represent only a relatively-small share (five percent or less) of the overall market for water hoses.  W007; W032 at 17; Tr. 685:6-8; 685:21-24; 801:8-21.

Even crediting Weems for its increase in market share, it has failed to show that this increase is attributable to its chartreuse color mark, rather than other factors.  *See, e.g., Aromatique*, 28 F.3d at 873 ("sales figures alone are inadequate to establish a connection between a product and its source").  In *Aromatique*, the Eighth Circuit acknowledged the commercial success of the plaintiff's products while noting as follows: "But such evidence may not provide the basis for an inference of secondary meaning because something other than the secondary meaning of the trade dress may have been responsible for the success of the product."[12]  *Id*.  Here, Weems has promoted various unique, functional features of the Flexzilla water hose, including its kink resistance, light weight and flexibility.  *See, e.g.,* T0049, T0053, T0062.  The evidence does not support a finding that Weems' increased sales over time have resulted from consumers' awareness of its color mark, as opposed to other beneficial features of its water hose.  This factor weighs against a finding of acquired distinctiveness.

---

[12] The court also noted that commercial success is "not among the types of evidence described by the PTO as useful in establishing secondary meaning."  *Id*. (citing TMEP § 1212.02(a) (1986 rev.).  The same is true today.  *See* TMEP § 1212.06 (2024 rev.).

#### iv.     The existence of intentional copying

Weems presented no evidence that Teknor or others have intentionally copied its chartreuse color with the intent to confuse consumers and pass off their water hose products as Flexzilla water hoses.  Teknor presented unrefuted evidence concerning the steps and discussions that led to its color choices for the zero-G and NexFlex hoses.  *See* Sections III(N), (O), *supra*.  The evidence also demonstrates Teknor's willingness to alter the colors of its hoses in response to Weems' concerns and claims of infringement.  *See* Section III(P), *supra*.  This factor weighs against a finding of acquired distinctiveness.

#### v.     Other evidence

Weems produced evidence of favorable online reviews concerning its Flexzilla water hose.  Tr. 1017:17-1026:6; W046-W051.  Like other forms of advertising, marketing and promotion, such evidence is relevant to the secondary meaning analysis only to the extent that it causes the public to equate Weems' chartreuse color mark with the source of the product.  *Co-Rect*, 780 F.2d at 1332 (8th Cir. 1985).  None of the exhibits promote the color of Flexzilla as a source identifier.  *See* W046-W051.  One does not mention Flexzilla's color at all.  W051.  In any event, Weems presented no evidence as to the extent to which the online reviews have been viewed, or as to the extent (if any) they have caused the public to perceive Flexzilla's chartreuse color as a source indicator.  Weems' online-review evidence does not support a finding of acquired distinctiveness.

#### c.     Summary - Distinctiveness

As with the issue of functionality, Weems is entitled to a rebuttable presumption that its chartreuse color mark is distinctive and otherwise valid.  15 U.S.C. §§ 1057(b), 1115(a).  Because color marks are never inherently distinctive, *Wal-Mart Stores*, 529

118

U.S. at 211-12, Weems' mark is entitled to protection only if it has acquired distinctiveness. *Id*. at 212. Weems presented no direct evidence of acquired distinctiveness and the circumstantial evidence in the record fails to demonstrate that Flexzilla's color has acquired secondary meaning such that consumers associate that color with Weems. Teknor has met its burden of rebutting the presumption of validity by showing that the color protected by the '921 Registration is not distinctive.

### 3.    Conclusion

As noted above, each of Weems' claims against Teknor requires a showing that Weems owns a valid, protectable trademark in its claimed color, chartreuse. Because the claimed mark is functional and lacks distinctiveness, Weems does not own a valid, protectable mark. As such, Weems is not entitled to any form of its relief and all of its claims against Teknor must be dismissed.[13] The only remaining issue involves Teknor's request for cancellation of the '921 Registration.

### B.    Should the '921 Registration be Canceled?

As noted above, Teknor's counterclaims include requests for cancellation of the '921 Registration on various grounds, including that it fails to function as a source indicator (Count III), is functional (Count IV) and lacks secondary meaning (Count VII). *See* Doc. 39. Section 37 of the Lanham Act provides as follows:

> In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in

---

[13] Even if Weems could show that it owns a valid, protectable trademark in the color chartreuse, it would also have to show that the colors used by Teknor on its zero-G Pro and NexFlex water hoses create a likelihood of confusion regarding their source. While it is unnecessary to address this element in detail, based on my detailed findings concerning the parties' respective consumer confusion surveys (*see* Section III(U)(3), *supra*), I find that Weems failed to come close to demonstrating a likelihood of confusion.

part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119. Because there are no property rights in invalid marks, a mark that is "neither registrable nor protectable" should be canceled pursuant to Section 37. *See Aromatique*, 28 F.3d at 875 ("Because the marks are not distinctive and are functional, Aromatique may not exclude others from using those marks.").

A party seeking cancellation "must prove two elements: (1) that it has standing; and (2) that there are valid grounds for canceling the registration." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000). Standing "requires only that the party seeking cancellation believe that it is likely to be damaged by the registration." *Id*. A party sued for trademark infringement "has the requisite injury to confer standing." *Aerogroup Intern., Inc. v. Marlboro Footworks, Ltd.*, 977 F. Supp. 264, 267 (S.D.N.Y. 1997); *see also WM Intern., Inc. v. Golden Lyon Invest. Co.*, 2020 WL 6826485, at *2 (C.D. Cal. Nov. 5, 2020) (noting that "numerous courts have concluded that being sued for trademark infringement is sufficient injury to confer standing to seek cancellation of a mark.") (citing cases). Teknor has standing to request cancellation of the '921 Registration.

Teknor has also met its burden of showing that there are valid grounds as to why the '921 Registration should be canceled. When "the mark at issue has been registered for less than five years when challenged, the 'valid grounds for discontinuing registration' include any reason for which 'the registration should have been barred in the first instance.'" *Royal Palm Props., LLC v. Pink Palm Props., LLC,* 950 F.3d 776, 782 (11th Cir. 2020) (quoting *Coach House Rest., Inc. v. Coach and Six Rests., Inc.,* 934 F.2d 1551, 1557 (11th Cir. 1991)). The '921 Registration was issued on September 26, 2017. T0035. Teknor challenged the '921 Registration on June 1,

120

2021, and is within the five-year limit discussed above. Doc. 39 at 70-75. Teknor's request to cancel the '921 Registration may thus be granted if there was "any reason for which 'the registration should have been barred in the first instance.'" *Royal Palm Props.,* 950 F.3d at 782.

Either a finding that the chartreuse color mark was functional or that the chartreuse color mark lacked distinctiveness would have been valid grounds for the USPTO to deny the '921 Registration. W209 at 12-13 (Examining Attorney denying Weems' initial attempt at registering the chartreuse color mark because it lacked distinctiveness and further explaining that a finding of functionality would require a denial of the registration); 15 U.S.C. §§ 1052(e)(5), (f); *Milwaukee Elec. Tool Corp. v. Freud Am., Inc.,* 2019 TTAB LEXIS 384, *64-75 (citing lack of distinctiveness as one basis for canceling registration of color red trademark); *Poly-America, L.P. v. API Indus.,* 2020 TTAB LEXIS 67, *33-33 (finding that the color orange used in drawstring trash-bags was functional and thus canceling the registration of the color orange trademark); *Aromatique,* 28 F.3d at 875 (canceling a trademark registration pursuant to 15 U.S.C. § 1119 due to its functionality and lack of distinctiveness). I have found that the chartreuse color mark is both functional and lacks distinctiveness. *See* Section IV(A), *supra*. As such, registration of that mark should have been denied in the first place. Because Teknor initiated its cancellation request within five years of the trademark's registration, its request to cancel the '921 Registration will be **granted.**

## V. CONCLUSION

For the reasons set forth herein:

1. All claims asserted in the amended complaint (Doc. 21) filed by plaintiff Weems Industries, Inc., are hereby **dismissed with prejudice**.

2. Pursuant to Counts III, IV and VII of the counterclaim (Doc. 39) filed by defendant Teknor Apex Company, Registration No. 5,293,921 on the Principal

121

Register of the United States Patent and Trademark Office is hereby **canceled**. All other counts of the counterclaim (Doc. 39) are hereby **dismissed with prejudice**.

3.       Pursuant to 15 U.S.C. § 1119, the Clerk of Court shall certify this order to the Director of the United States Patent and Trademark Office.

4.       All motions for judgment as a matter of law asserted on the record during trial, along with the motion (Doc. 236) for judgment on partial findings, are **denied**.

5.       Judgment **shall enter** in favor of defendant Teknor Apex Company and the Clerk of Court shall **close this case**.

     **IT IS SO ORDERED** this 20th day of November, 2024.

_____
Leonard T. Strand
United States District Judge